William Ellis,

vs.

Detective Jeffrey Yasenchack, et al.,

In the United States District Court
For the Northern District of Ohio
Eastern Division
Case No. 1:22-cv-00815

**Jeffrey Yasenchack**
Friday, July 14, 2023

Reporter Denise Cardona





Court Reporting & Videotaping
www.tacklacourtreporting.com
216-241-3918  fax: 216-241-3935

1020 Ohio Savings Plaza
1801 East 9th Street
Cleveland, OH 44114

www.table8litigationsolutions.com

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE NORTHERN DISTRICT OF OHIO

 3                       EASTERN DIVISION

 4

 5   WILLIAM ELLIS,              )

 6                               )

 7            Plaintiff,         )

 8                               )    JUDGE SOLOMON OLIVER, JR.

 9     -vs-                      )    CASE NO. 1:22-CV-00815

10                               )

11   DET. JEFFREY YASENCHACK,    )

12   Et al.,                     )

13                               )

14            Defendants.        )

15                               )

16                  -   -   -   -

17      Deposition of JEFFREY YASENCHACK, taken as if upon

18   examination before Denise Cardona, a Notary Public

19   within and for the State of Ohio, at the offices of

20   Friedman, Gilbert, & Gerhardstein located at 50 Public

21   Square, Suite 1900, Cleveland, Ohio, at 10:00 a.m., on

22   Friday, July 14, 2023, pursuant to notice and/or

23   stipulations of counsel.

24                  -   -   -   -

25
```

```
 1   APPEARANCES:

 2              On behalf of the Plaintiff

 3   JOSEPH F. SCOTT, ESQ.

 4   Scott & Winters

 5   Terminal Tower

 6   50 Public Square, Suite 1900

 7   Cleveland, Ohio 44113

 8   216-650-3318

 9   Jscott@ohiowagelawyers.com

10              On behalf of the Defendants:

11   JR RUSSELL, ESQ.

12   CARLI R. YOUNG, ESQ.

13   City of Cleveland

14   Department of Law

15   9601 Lakeside Avenue, Room 106

16   Cleveland, Ohio 44114

17   216-644-276712

18   Jrussell2@clevelandohio.gov

19   Cyoung2@clevelandohio.gov

20

21                    - - -

22

23

24

25
```

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

```
 1                         INDEX

 2                          - - -

 3   EXAMINATION OF JEFFREY YASENCHACK:          PAGE/LINE

 4   BY MR. SCOTT:                               4/6

 5

 6                     EXHIBIT INDEX

 7                          - - -

 8   PLAINTIFF'S EXHIBIT   PAGE/LINE    DESCRIPTION

 9   1                     7/13    Affidavit for search

10                                  warrant

11   2                     12/16   Case information

12   3                     29/4    Duty Report

13   4                     43/2    Departmental Information

14   5                     62/13   Duty Report

15   6                     62/19   Duty Report

16   7                     66/12   Journal Entry and Opinion

17

18                          - - -

19

20

21

22

23

24

25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2                          -  -  -

 3          Jeffrey Yasenchack, of lawful age, being first

 4    duly sworn, testified upon his oath as follows:

 5                EXAMINATION OF JEFFREY YASENCHACK

 6    BY MR. SCOTT:

 7       Q.  Please let the record reflect that we are here

 8    today for the deposition of Jeffrey Yasenchack, being

 9    taken in the matter of William Ellis, versus Detective

10    Yasenchack, et al.  This case pending in the United

11    States District Court, For the Northern District of

12    Ohio, before the Honorable Judge Solomon Oliver, Jr.

13          Mr. Yasenchack, my name is Joseph Scott.  And

14    we've asked you to come here today to ask you a number

15    of questions relative to the complaint that has been

16    filed and the allegations asserted in that complaint.

17          You understand that, correct?

18       A.  I do.

19       Q.  Have you ever had your deposition taken in a

20    civil matter before?

21       A.  I think I had one years ago on an accident.

22       Q.  Okay.

23       A.  A traffic accident.

24       Q.  Let me just say a couple of things.  And I

25    appreciate that some of the questions today may test
```

1  your memory a little bit, and if you don't recall,

2  that's certainly appropriate, just tell me you don't

3  recall and we'll move on.

4        I'm going to be asking you questions, of course.

5  And if there's anything that I ask that isn't clear to

6  you, please tell me and I'll try to rephrase my

7  question.  Otherwise, I'm going to assume that you are

8  going to answer my questions to the best of your

9  ability; is that fair?

10  A.  Yes.

11  Q.  Okay.  If at any time you want to stop, take a

12  break, I appreciate it's a little stuffy in here, just

13  tell me and we will take a break.  I only ask that you

14  answer whatever question is pending before we break; is

15  that okay?

16  A.  Yes.

17  Q.  Would you please state your full name for the

18  record.

19  A.  Jeffrey Yasenchack.

20  Q.  And my understanding is you are now retired from

21  the City of Cleveland Police Department; is that

22  correct?

23  A.  I am.

24  Q.  And are you currently employed or just enjoying

25  retirement?

1    A.  Enjoying retirement.

2    **Q.  Very good.  Fair enough.**

3        **And when you retired Friday the City of**

4    **Cleveland, your last duty assignment would have been as**

5    **Detective; is that correct?**

6    A.  Correct.

7    **Q.  With what unit?**

8    A.  The Fifth District Vice Unit.

9    **Q.  How long had you been in the Fifth District Vice**

10   **Unit?**

11   A.  Probably close to seven or eight years.

12   **Q.  Okay.  All right.  Were you eligible for the drop**

13   **program --**

14   A.  Yes.

15   **Q.  -- when you retired?**

16       **You just elected not to participate in that?**

17   A.  Correct.

18   **Q.  Okay.  All right.  We're obviously here to talk**

19   **about the investigation, subsequent criminal cases**

20   **involving William Ellis.  And you were at least one of**

21   **the detectives involved in at least two investigations**

22   **of Mr. Ellis; is that fair?**

23   A.  Yes.

24   **Q.  The first investigation would have been on or**

25   **about March 4th of 2019; is that correct?**

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1   A.  Correct.

2   Q.  And that arose out of a traffic stop that you

3   initiated on Mr. Ellis, while driving his vehicle?

4   A.  Correct.

5   Q.  Okay.  And the second investigation would have

6   been related to a search warrant affidavit that was

7   executed on or about May 14, 2020; does that sound about

8   right?

9   A.  Sounds about right.

10   Q.  Okay.  Let's just get to that.  I'm going to mark

11   this.

12                  -  -  -  -

13          (Thereupon, Plaintiff's Exhibit 1 was marked

14           for purposes of identification.)

15                  -  -  -  -

16   Q.  Mr. Yasenchack, I'm going to hand you what we're

17   going to mark, for the purposes of this deposition, as

18   Plaintiff's Exhibit 1.

19          And if you could please take a few minutes and

20   look that over.  We'll be going through this off and on

21   today.

22          Okay?  And first of all, what I've handed you,

23   marked as Plaintiff's Exhibit 1, do you recognize that

24   as a copy of an affidavit for a search warrant that you

25   executed on or about May 14th of 2020?

1     A.  Yes.

2     **Q.  Okay.  And prior to executing this search**

3 **warrant, am I correct that you had been involved in an**

4 **earlier investigation and subsequent criminal**

5 **prosecution of Mr. Ellis in the Cuyahoga County Court of**

6 **Common Pleas; is that correct?**

7     A.  Yes.

8     **Q.  Okay.  And that was, again, the 2019 case that**

9 **followed the traffic stop that you initiated on March**

10 **4th of 2019; is that correct?**

11     A.  Yes.

12     **Q.  Okay.  And am I correct that the 2019 case**

13 **involved an suppression hearing concerning evidence that**

14 **was collected during the March 4, 2019 traffic stop?**

15             MR. RUSSELL:  Objection.

16             Go ahead.

17     **Q.  Do you recall that?**

18     A.  Yeah.  That case ended up being -- having a

19 suppression hearing.

20     **Q.  Okay.  And did you testify at the expression**

21 **hearing?**

22     A.  I did.

23     **Q.  Okay.  You would agree with me that the Court**

24 **ultimately suppressed all of the evidence that was**

25 **collected on March 4, 2019, correct?**

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1   A.  Yes.

2   Q.  And part of the basis for the Court's suppression

3   was the Court's conclusion following the hearing that

4   you were not credible?

5           MR. RUSSELL:  Objection.

6           Go ahead.

7   Q.  Is that your recollection?

8   A.  Yes.

9   Q.  Okay.  Now how would that typically work?  How

10  would you typically work with the prosecutor's office

11  when there was a criminal case pending, where you were

12  one of the detectives involved?  Would you meet with

13  them regularly?  How did that work, in general?

14  A.  Yeah.  We would -- you would meet with the

15  prosecutor.

16  Q.  Okay.

17  A.  Just go over.

18  Q.  Were those -- I guess I'm just trying to figure

19  out how that worked.

20      You know, was it formal?  Would they reach out to

21  you and schedule a meeting?  Or would you just simply

22  drop into their offices?  How did that work?

23  A.  You know, sometimes they sent out a subpoena to

24  meet at their office to discuss the case.  Or sometimes

25  they would just call you up to request you to come.

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    Q.  All right.  And did you have a fairly close

2    working relationship with the folks in the prosecutor's

3    office?

4    A.  Yeah.  Some of the prosecutors, yes.

5    Q.  What about the prosecutors that were involved in

6    the 2019 criminal prosecution to Mr. Ellis, were those

7    folks that you had worked with before?

8    A.  A prosecutor I worked with a couple of times.

9    Q.  Are these people that you would recognize and see

10   them if you saw them out and about?

11   A.  Yes.

12   Q.  Okay.  And do you recall, as regards to 2019

13   criminal case, how you came to first contact the

14   prosecutor's office with the initial case information?

15   A.  You mean, like, got the case started?

16   Q.  Correct.

17   A.  Like, how we initiated the case?

18   Q.  Yes, sir.

19   A.  We fill out a, like, a case packet.  And it just

20   goes eventually to the prosecutor's office.

21   Q.  Okay.  Just through some inner office mail?  You

22   don't take it over, it gets dropped off?

23   A.  Yes.

24   Q.  Okay.  And then after they review it, do they --

25   would they have reached out to you to follow up on the

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    information in the initial case packet?

2        A.  From that point, it would be scheduled for a

3    Grand Jury.

4        Q.  Okay.  So you would be notified that there would

5    be a Grand Jury proceeding involving your investigation?

6        A.  Yes.

7        Q.  Okay.  And do you recall if you testified before

8    the Grand Jury in the state court proceeding?

9        A.  I'm pretty sure.  You know, sometimes other

10   detectives will fill in if you're absent that day.

11           But, you know, I don't remember testifying in the

12   Grand Jury for this.  But it just could be just, like,

13   don't recall.

14       Q.  And that's fair.  I appreciate that.

15           So after the case gets going, at some point were

16   you notified by the prosecutor's office that there's

17   going to be a hearing on the defense's motion to

18   suppress the evidence?

19       A.  Yes.

20       Q.  And would there have been some sort of prep

21   session between you and the prosecutors to prepare for

22   that suppression hearing?

23       A.  Yes.

24       Q.  Do you recall any of that?

25       A.  I do.

Deposition of Jeffrey Yasenchack          William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

```
 1        Q.  All right.  And was that something where somebody
 2   would have called you from the prosecutor's office or
 3   sent you an e-mail or something, requesting that you
 4   come in for the session?
 5        A.  Like I said earlier, they may have sent me a
 6   subpoena or called us directly.
 7        Q.  Okay.  You're not sure which way it occurred?
 8        A.  No.
 9        Q.  Okay.  But you do recall there was some sort of
10   meeting?
11        A.  Yes.
12        Q.  And then you, of course, attend the suppression
13   hearing itself?
14        A.  I did.
15                      -   -   -   -
16              (Thereupon, Plaintiff's Exhibit 2 was marked
17              for purposes of identification.)
18                      -   -   -   -
19        Q.  Mr. Yasenchack, handing you what's been marked as
20   Plaintiff's Exhibit 2, I will represent to you is a copy
21   of the docket from the state court proceeding,
22   captioned, State of Ohio, versus William Ellis.  This is
23   the 2019 case.
24        I believe I'm correct that the suppression
25   hearing was held some time in 2019.
```

Deposition of Jeffrey Yasenchack                              William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

```
 1            Do you recall that?
 2      A.   I don't recall that date but it does show it as
 3  August 23rd, I think.
 4      Q.   Okay.  And do you recall in that case that the
 5  state court judge ultimately determined that the
 6  evidence that had been collected from Mr. Ellis during
 7  the March 4, 2019 stop should be suppressed?
 8      A.   Do I remember that or?
 9      Q.   Do you recall that?
10      A.   Yeah.  That was the ultimate decision.
11      Q.   And was that around September of 2019?
12      A.   That, I don't know.
13      Q.   I'm sorry, August 23, 2019?
14      A.   That's when it was sent, the suppression.
15      Q.   Well, am I correct that if you turn to the third
16  page of Plaintiff's Exhibit 2, by the 8/23/19 docket
17  entry, the Court indicated, "Defendant's Motion to
18  Suppress, filed on 5/16/2019 is granted."
19            Do you see that?
20      A.   Yep.
21      Q.   I guess what I'm -- what I'd ask you is, were you
22  notified by the prosecutor's office around that time
23  that that had been the Court's ruling, was to suppress
24  that evidence?
25      A.   No.
```

Deposition of Jeffrey Yasenchack                          William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    Q.  All right.  Do you recall being informed at any

2    time that the State Court ruling was to suppress that

3    evidence?

4    A.  I don't remember any notification.

5    Q.  Okay.  Well would the prosecutor's office

6    typically keep you apprised of developments of criminal

7    cases where you were one of the detectives involved?

8    A.  Sometimes.

9    Q.  Okay.  Did you come to learn at any time that the

10   prosecutor's office was trying to appeal that decision?

11   A.  Yes.

12   Q.  When did you become aware of that?

13   A.  I don't know what date.

14   Q.  Okay.  Would it have been in 2019 some time, to

15   the best of your recollection?

16   A.  No.

17   Q.  No it would not have been or --

18   A.  It would not have been in 2019.

19   Q.  It would have been in 2020 some time?

20   A.  I don't remember the date that --

21   Q.  Okay.

22   A.  -- I eventually learned, but...

23   Q.  Let me ask you this:  Would you have had a system

24   of some sort, for your own benefit, of keeping track of

25   active criminal prosecutions where you may have been a

Deposition of Jeffrey Yasenchack          William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    witness?

2    A.  Just the county website.

3    Q.  Okay.  So let me understand what you mean by

4    that.  Would you go to the county court docket from time

5    to time and check on criminal prosecutions that you knew

6    you were involved in?

7    A.  Yes.

8    Q.  And what sort of system or practice did you have

9    in place for monitoring those cases?

10   A.  You know, if I remembered that a case was coming

11   up and I needed to see that the date as to a sentencing

12   or motion to suppress, I would check it.

13   Q.  Let me ask you this:  How many cases, active

14   criminal prosecutions, would you typically be involved

15   in at any given time?

16   A.  Numerous.

17   Q.  Okay.

18   A.  We were constantly getting complaints.

19   Q.  Okay.

20   A.  We have cases that are going through the court

21   system and then cases that we're actively investigating

22   before arrest.

23   Q.  Do you think at any give time during your time,

24   and let's talk about this time, around 2019, that you

25   would have had more than a dozen criminal prosecutions

Deposition of Jeffrey Yasenchack                William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    going on at a given time?

2        A.  Yes.

3        Q.  So would those have all been in state court?

4        A.  Yeah.  Only a handful of cases during this time

5    period would -- were prosecuted through the federal

6    system.

7        Q.  Okay.  And let me ask you this:  Other than

8    Cuyahoga County and the Federal District For the

9    Northern District of Ohio, do you recall ever being

10   involved in any criminal prosecutions outside those two

11   venues, like, for instance, Summit County, Lake County,

12   Lorain County?

13       A.  I think we assisted Lake County Narcotics on a

14   case.

15       Q.  Okay.

16       A.  Or a few cases, yeah.

17       Q.  In that situation, you might have been part of a

18   multiple jurisdictional task force or something involved

19   in the criminal prosecution?

20       A.  No.  I don't think we were involved in the task

21   force.  We were just -- since our district borders, you

22   know, Euclid and then Lake County, we would help Lake

23   County Narcotics during some of their investigations.

24       Q.  Okay.  To the best of your recollection, in those

25   cases where you may have assisted Lake County or some

1  other jurisdiction, would you have been considered a

2  lead detective on that case?

3      A.  No.

4      Q.  Okay.  And in those situations where you may have

5  assisted another jurisdiction, such as Lake County,

6  would you have been the officer to have brought the case

7  to the local prosecutor?

8      A.  No.

9      Q.  You believe it was then some time in 2020 when

10  you learned that the Court had ordered suppression of

11  the evidence seized from Mr. Ellis during the

12  March 4, 2019 traffic stop?

13      A.  The question is when I learned that the evidence

14  was suppressed?

15      Q.  Yes, sir.

16      A.  I don't remember a date on that.

17      Q.  Okay.  Do you remember how you came to learn

18  that?

19      A.  I don't remember if it was the prosecutor that

20  called, or I looked on the website, but -- I don't

21  remember.

22      Q.  Okay.  All right.  So it could have been either

23  one of those things, you could have been informed

24  directly by the prosecutor's office, or you may have

25  seen it in the course of going through active case

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

```
 1   dockets that you may have been involved with; is that
 2   fair?
 3       A.  Yes.
 4       Q.  Okay.  And did you come to learn that the State
 5   was actually going to move to dismiss the charges
 6   against Mr. Ellis in the State Court proceeding?
 7       A.  When did I learn, or whether --
 8       Q.  Did you come to learn that?
 9       A.  Probably just from seeing it on the website.
10       Q.  Okay.  All right.  So you'll see on Plaintiff's
11   Exhibit 2, there's an entry on the docket for
12   May 14, 2020, concerning the State's Motion to Dismiss
13   the indictment as being granted.
14           Do you see that?
15       A.  Yes.
16       Q.  And the State had, in fact, filed a motion to
17   dismiss the indictment the day before, on May 13, 2020?
18       A.  Yeah.  That's what it says right there.
19       Q.  And you don't recall whether or not you saw
20   either one of those entries or exactly when you saw
21   either one of those entries; is that fair?
22       A.  That's fair.
23       Q.  Okay.  And you are not sure how you came to be
24   informed about either one of those actions by the
25   prosecutor's office or the Court?
```

Deposition of Jeffrey Yasenchack                          William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1        A.  Correct.

2        Q.  Okay.  Now if we could go back to the Plaintiff's

3   **Exhibit 1**, which is the Search Warrant Affidavit.

4             Am I correct, sir, that you began preparing this

5   on a date earlier than May 14, 2020?

6        A.  Did I actually start writing this?

7        Q.  Yes, sir.

8        A.  Before May, no.

9        Q.  Before May 14th?

10       A.  No.

11       Q.  Okay.  Do you recall presenting a draft of this

12  Search Warrant Affidavit to one of the city prosecutors

13  prior to May 14th of 2020?

14       A.  Going back one question, I did draft this before

15  May 14th.

16       Q.  Okay.  Do you recall when?

17       A.  No.  But shortly before that date.

18       Q.  Could it have been a couple days before?

19       A.  Yeah.  I don't know.  I don't remember.

20       Q.  Do you recall having one of the city prosecutors

21  review the Search Warrant Affidavit prior to

22  May 14, 2020?

23       A.  Yes.

24       Q.  Was that Gina Villa[spelling]?

25       A.  I don't remember who.

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1      Q.   Okay.   Now this Search Warrant Affidavit,

2  Plaintiff's Exhibit 1, am I correct, is the product of a

3  subsequent investigation that you conducted relative to

4  Mr. Ellis?

5          And by subsequent, I mean subsequent to the

6  March 4, 2019 traffic stop; is that fair?

7      A.   Yes.

8      Q.   Okay.   And do you recall how you were assigned to

9  perform that particular investigation that was used to

10  support this search warrant?

11     A.   Whether I was assigned to it or -- what do you

12  mean by that?

13     Q.   Let me ask it this way:   How did you become

14  tasked or responsible for a particular criminal

15  investigation?

16     A.   There's quite a few avenues as to how we generate

17  cases.

18     Q.   Okay.

19     A.   And this case, I had received information about

20  someone selling drugs on that street.

21     Q.   Well, yeah.   Let's explore that a little bit and

22  go through this.

23          The first contact you had with Mr. Ellis, back in

24  March of 2019, was a result of a traffic stop, correct?

25     A.   Yes.

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    Q.  And were you, as you recall, were you just

2    patrolling the area where that traffic stop occurred or

3    were you conducting an investigation into potential

4    criminal activity?

5    A.  I believe that there was complaints about drug

6    activity in the East 200 area, up near the highway.

7    Q.  Okay.  And, again, was that complaint brought to

8    you directly or did somebody inform you within the

9    department that "we have this complaint and need you to

10   go and investigate"?

11   A.  I don't remember how I got that complaint.  You

12   know, it could have been someone calling the office,

13   someone calling the Commander's office.  Could have been

14   someone coming to the lobby and giving information.

15   There's quite a few ways that we receive complaints.

16   Q.  Okay.  And I guess I'm just trying to understand

17   that a little bit.  If somebody would call in or walk

18   into the Fifth District and complain about criminal

19   activity in a particular area, and then would you be the

20   one that takes the complaint or would somebody else take

21   it and apprise you of it?  How does that work?

22   A.  Probably one of the lobby office workers take

23   that information and then convey it to the Vice Unit.

24   Q.  Is that put on a form of some kind?

25   A.  Normally, it's just sheet of paper that that

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    person writes on.

2        Q.  Is it maintained in a file somewhere?

3        A.  No.

4        Q.  Or once it's handed off to you, nobody keeps it?

5        A.  Yeah.

6        Q.  Okay.  And is it just based upon the availability

7    of detectives who picks up on that complaint and goes

8    out to investigate?

9        A.  Yes.

10       Q.  So it's not necessarily a lieutenant or a

11   supervising officer that is saying, "I want you to go

12   out and perform this investigation"; is that fair?

13       A.  Yes.

14       Q.  Okay.  So that's one of the ways.

15           And then with regards to the investigation that

16   was conducted relative to the May 14, 2020 search

17   warrant, you indicated that you had received some

18   information; is that right?

19       A.  I did.

20       Q.  Do you remember how you received that

21   information?

22       A.  I made a traffic stop.  And I received some

23   information from the person I conducted the traffic stop

24   on.

25       Q.  Okay.  And do you recall when that was?

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    A.  Just in April of 2020.

2    **Q.  Okay.  And do you recall who was involved in the**

3    **traffic stop?**

4    A.  I do.

5    **Q.  Who was that?**

6    A.  Victor Payne.

7    **Q.  Victor Payne?**

8    A.  P-A-Y-N-E.

9    **Q.  Okay.  Did Mr. Payne receive some sort of traffic**

10   **citation?**

11   A.  No.

12   **Q.  Do you remember anything about the stop?**

13   A.  I do.

14   **Q.  What do you recall?**

15   A.  I conducted a traffic stop when he was driving a

16   motorcycle.

17   **Q.  Okay.**

18   A.  He pulled into a driveway off of 127th.

19   **Q.  Okay.**

20   A.  I mentioned the possibility of, if he gave me

21   information about the neighborhood, he wouldn't get a

22   traffic violation, a traffic ticket.

23   **Q.  Okay.  So you told him, "In exchange for**

24   **information about the neighborhood, I won't write you a**

25   **ticket," something like that?**

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

 1    A.  Something like that.

 2    Q.  Okay.  And he gave you information?

 3    A.  He did.

 4    Q.  And what information do you recall him giving

 5 you?

 6    A.  He pointed out -- discretely signaled the street,

 7 a house across the street that he noticed a large volume

 8 of white, Caucasian people were going to, staying a

 9 short period of time and leaving.

10    Q.  And would it be fair to say that the house that

11 he pointed out was ultimately determined to be the

12 residence of William Ellis?

13    A.  Yes.

14    Q.  Okay.  And was there any sort of report that was

15 made that went along with this traffic stop?

16    A.  No.

17    Q.  Okay.  It's my understanding that you were

18 wearing a wearable body camera system.

19    A.  I was.

20    Q.  Okay.  And that the camera captured the first

21 part of the conversation; is that correct?

22    A.  Correct.

23    Q.  But did not capture the part of the conversation

24 regarding Mr. Payne identifying Mr. Ellis's residence as

25 a location where there was a lot of folks coming and

1   going; is that fair?

2      A.   That is correct.

3      Q.   Okay.   Was that intentionally not captured?

4      A.   Yes.

5      Q.   So you would have turned the camera off?

6      A.   I did.

7      Q.   Okay.   Now this interaction with Mr. Payne

8   occurred in mid April of 2020; is that fair?

9      A.   Yes.

10      Q.   Okay.   And the activity that the investigation,

11   if you will, that forms the basis for the Plaintiff's

12   Exhibit 1, the Search Warrant Affidavit doesn't occur

13   until on or about May 11th of 2020, correct?

14      A.   Can you just say that question again?

15      Q.   Yeah.   The investigation that you subsequently

16   conducted that formed the basis for your Search Warrant

17   Affidavit, that investigation activity does not take

18   place until approximately May 11th of 2020; is that

19   correct?

20            MR. RUSSELL:   Objection.

21      Q.   If you recall.

22      A.   So you.

23         Re -- I don't understand the question.

24      Q.   I'm just trying to ask you, you know, there was a

25   time period between this traffic stop involving

1    Mr. Payne and when you had went back out to investigate

2    Mr. Ellis's residence on 127th Street, right?

3        A.  The -- this investigation started when I got the

4    information from Mr. Payne.

5        Q.  Oh, okay.  All right.  What do you recall doing

6    after you got the information from Mr. Payne?

7        A.  I think I drove by the house a few times, trying

8    to get license plate numbers.

9        Q.  Okay.  And do you recall when you did that?

10       A.  No.

11       Q.  Would there be some record of when you did that?

12       A.  No.

13       Q.  Okay.  And do you recall if you were successful

14   in capturing any license plate numbers when you drove

15   past his house?

16       A.  I don't remember.

17       Q.  Okay.  Do you recall if you gathered any other

18   significant information when you drove by Mr. Ellis's

19   house on those occasions?

20       A.  You know, had I got any worthwhile information, I

21   would have included that in the affidavit.

22       Q.  Okay.  All right.  Well, let's move on to that.

23   That helps.

24           Again, we've established that Plaintiff's Exhibit

25   1 is the Search Warrant Affidavit that you signed on or

1    about May 14, 2020, correct?

2        A.   Correct.

3        Q.   And you prepared this in anticipation of meeting

4    with one of the Cuyahoga County Common Pleas judges to

5    obtain a search warrant for Mr. Ellis's home, correct?

6        A.   Once I drafted this, I took it to a county judge,

7    yes.

8        Q.   Okay.  And that was the purpose for drafting the

9    search warrant, right -- or affidavit, was to ultimately

10   ask for a search warrant, correct?

11       A.   Yes.

12       Q.   And in preparing this, you would have detailed

13   the entirety of the investigation up to that point in

14   time, correct?

15       A.   I would have put pertinent information in the

16   affidavit.

17       Q.   Okay.  And any material information, any

18   important information that your investigation had

19   gathered would have gone into this Search Warrant

20   Affidavit, correct?

21       A.   Information that I thought -- well, that proved

22   valuable, I would include in the affidavit.

23       Q.   Okay.  Because you understood -- look, when you

24   wrote this affidavit, you had been on the force for,

25   what, 22 years?

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1     A.   I would have to calculate that out.

2     Q.   But you'd been on the force for quite a few

3  years, right?

4     A.   Yes.

5     Q.   And you'd been a detective for a number of years,

6  correct?

7     A.   Yes.

8     Q.   And this wasn't the first time that you prepared

9  a Search Warrant Affidavit?

10    A.   No.

11    Q.   Okay.  And you understood that whatever judicial

12  officer was reviewing this information would be relying

13  upon this to determine whether or not there was probable

14  cause to issue a search warrant, correct?

15    A.   Correct.

16    Q.   All right.  So you would want to put in there

17  anything that you thought might be of a value in helping

18  the court officer to determine whether or not probable

19  cause existed, right?

20    A.   Yes.

21    Q.   Okay.  Now ultimately met with Cuyahoga County

22  Common Pleas Judge Brian McCormick, right?

23    A.   Yes.

24    Q.   And you met with him on May 14th of 2020?

25    A.   Correct.

```
 1      Q.  You recall that?

 2      A.  No.  I don't recall.

 3                  -  -  -  -

 4              (Thereupon, Plaintiff's Exhibit 3 was marked

 5              for purposes of identification.)

 6                  -  -  -  -

 7      A.  That's the date he signed it.

 8      Q.  Mr. Yasenchack, handing you what's marked as

 9  Plaintiff's Exhibit 3 is Duty Report, dated 5/14/2020.

10      And the first line at 0900 hours, JC -- which I

11  assume stands for Justice Center?

12      A.  Yes.

13      Q.  -- Case Investigation SW signed by -- is that

14  search warrant?

15      A.  Correct.

16      Q.  -- signed by Judge McCormick, right?

17      A.  Correct.

18      Q.  And does that refresh your recollection that you,

19  in fact, met with Judge McCormick on May 14, 2020, to

20  get that search warrant signed?

21      A.  Yes.

22      Q.  Okay.  And that's also the same day that the

23  Cuyahoga County Court of Common Pleas dismissed the

24  criminal charges against Mr. Ellis, relative to the 2019

25  case, correct?
```

Deposition of Jeffrey Yasenchack                                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    A.  I was unaware of that at that time.

2    Q.  Okay.  So that's just coincidental, as far as you

3    know, that those two things happened on the same day?

4    A.  I had no knowledge of the suppression decision

5    had occurred at this time, on that date.

6    Q.  Okay.  How often would you check the criminal

7    dockets for the cases you were involved in while those

8    cases were pending?

9    A.  I -- it varied.

10   Q.  You don't recall checking the criminal docket in

11   2019 case of Mr. Ellis at any time between August 2019

12   and May of 2020?

13   A.  No.

14   Q.  Kind of a long period of time for a criminal

15   case, isn't it?

16   A.  From what date?

17   Q.  August 23rd of 2019 until May 14th of 2020?

18   A.  So the question is, had I checked the county site

19   in between that time.

20   Q.  Concerning that specific case, yes, sir.

21   A.  I probably checked.  But not before I had this

22   search warrant issued.

23   Q.  Well, let me understand that.  You are saying

24   that you probably checked during that nine-month period?

25   A.  On this date, when I had this signed, the last

1    knowledge I had was that the State was appealing.

2        Q.  Okay.  Let me understand that.  When you had this

3    search warrant signed on May 14th of 2020, you were

4    aware that the State was appealing an order of the

5    Common Pleas Court concerning the suppression of

6    evidence?

7        A.  Correct.

8        Q.  So you would have been aware, one, that the

9    evidence had, in fact, been suppressed by the State

10   Court judge, correct?

11       A.  Yes.

12       Q.  And two, that the prosecutor's office had

13   attempted to take a appeal of that issue to the 8th

14   District Court of Appeals; is that fair?

15       A.  I knew that the event was suppressed and the

16   State was planning to appeal.

17       Q.  Okay.  And well, in fact, had you come to learn

18   now that the State did not file a timely appeal of the

19   suppression ruling?

20       A.  I know that.

21       Q.  In fact, they only had seven days from the date

22   of the ruling to appeal to the 8th District Court of

23   Appeals.

24           Do you understand that?

25       A.  That's probably why we are here today.

1       Q.  Okay.  And the 8th District Court of Appeals

2   dismissed the appeal for lack of jurisdiction, on or

3   about April 20th of 2020; did you learn that?

4       A.  That was due to the prosecutor not getting it in,

5   in time.

6       Q.  Yes.  I agree.

7       A.  I'm aware of that now.

8       Q.  But you don't believe you were aware of that on

9   May 14, 2020?

10      A.  I know I wasn't.

11          MR. RUSSELL:  Objection.

12      Q.  All right.  Did anybody else, other than

13  yourself, participate in the meeting with Judge

14  McCormick on May 14, 2020?

15      A.  No.

16      Q.  Was that typical that you would go meet with the

17  judge by yourself?

18      A.  Yes.

19      Q.  And meet in his chambers?

20      A.  Yes.

21      Q.  And did you provide the judge with any other

22  information, other than what was contained in the Search

23  Warrant Affidavit?

24      A.  Normally, I would just provide him with the

25  affidavit.

1    Q.  Okay.  So had you sought search warrants

2    previously from Judge McCormick?

3    A.  You know what?  I'm not sure.

4    Q.  Okay.  All right.  That's fair.

5        I guess what I'm trying to find out is, is there

6    sort of a routine practice of how this operated with the

7    Common Pleas judges?  Would you kind of go in and say,

8    "Judge, we're here for a warrant.  And here's my

9    affidavit."

10       Or did they kind of know why you were there?

11   A.  Yeah.  You would advise the bailiff as to the

12   reason why you were there.

13   Q.  Okay?

14   A.  And they would accommodate you to see the judge.

15   Q.  Okay.

16   A.  But normally, I would go, I think it's to the

17   16th or 17th floor, where Judge Sheehan and Judge

18   Corrigan, that was usually my go-to floor.  They were

19   the most available, usually.

20   Q.  Okay.  All right.  I think Judge Sheehan was the

21   Administrative Judge for a long time.  I don't know if

22   he still is, right?

23   A.  That was just recent, in the last couple of

24   years.

25   Q.  Okay.  All right.  I want to ask you about some

1  specific parts of the Search Warrant Affidavit.

2          So you begin with, on the first page, I believe,

3  toward the bottom of the first page, the last few lines.

4  You write, "Affiant has participated with other members

5  of his unit in an ongoing investigation into the drug

6  trafficking operations described below; Affiant has not

7  always personally observed everything described below,

8  but that he did not personally observe was described to

9  him by other investigating officers who did."

10         Do you see that?

11  A.   Yes.

12  Q.   What other investigating officers did you

13  participate with at this time, May 14, 2020, concerning

14  this investigation?

15  A.   I do not recall if anyone assisted me on doing

16  surveillance or checking the house for plates or

17  anything.

18         I may have asked somebody to, you know, check the

19  house for license plate numbers.  I don't recall.

20  Q.   Okay.  So as you sit here today, you don't recall

21  if there were actually any other law enforcement

22  personnel who participated in this particular

23  investigation, correct?  At least not as of the date of

24  this affidavit?

25  A.   I don't remember if I had people assist me or

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    not.

2       Q.   Okay.   That's fine.   Now on the next page, the

3    location given is 638 East 127 Street in the City of

4    Cleveland, Cuyahoga County, Ohio, correct?

5       A.   Yes.

6       Q.   And I think we established that that was

7    ultimately determined to be the residence of William

8    Ellis, correct?

9       A.   Correct.

10      Q.   If we turn now to the third page of the Search

11   Warrant Affidavit, in the first numbered paragraph,

12   paragraph 1, you state, "Affiant averse that in mid

13   April 2020 he received information from a concerned

14   citizen about a black male residing at 638 East 127th

15   Street selling drugs out of his house."

16          Do you see that?

17      A.   I do.

18      Q.   And I think we've already established that the

19   concerned citizen was, in fact, somebody that you had

20   stopped during a traffic stop, correct?

21      A.   Yes.

22      Q.   Victor Payne.   And you had told Mr. Payne that he

23   would not get a traffic citation if he had told you

24   about criminal activity in the neighborhood; is that

25   fair?

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

```
 1                MR. RUSSELL:  Objection.

 2       A.  I had advised Mr. Payne if he supplied me

 3  information, I wouldn't write him a traffic ticket.

 4       Q.  Well, the information you were looking for was on

 5  possibly criminal activity, correct?

 6       A.  Yes.

 7       Q.  And specifically drug activity, correct?

 8       A.  You know, at first, I think I -- I kind of asked

 9  him if there was anything happening in his neighborhood.

10  And then -- then I asked if there was any drug

11  complaints.

12       Q.  Well, you weren't asking about block parties

13  right?  When you say "I was asking if anything going on

14  in the neighborhood," you meant criminal activity,

15  right?

16       A.  Yes.

17       Q.  Okay.  Now in paragraph 2, you state, "Affiant

18  avers that in early May 2020, a confidential informant

19  provided affiant of a black male know as, quote/unquote,

20  'Lays.'"

21            And give a physical description.

22            Do you see that?

23       A.  I do.

24       Q.  And is there anything that would pin the date

25  down more than May of 2020, early May 2020?
```

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

 1    A.  No.

 2    Q.  Okay.  So you don't know what specific date you

 3  received that information?

 4    A.  Correct.

 5    Q.  Do you know who the confidential informant was?

 6    A.  I do.

 7    Q.  Who was that?

 8    A.  I'm unsure of his first name.  It's either

 9  Nathaniel or Nathan Write.

10    Q.  Nathan Wright, W-R-I-G-H-T?

11    A.  (Indicating.)  W-R-I-G-H-T, Wright.

12    Q.  How did you come to meet with Mr. Wright?

13    A.  I don't recall if it was via text message or

14  phone call.  But I received most of this through text

15  messages with Mr. Wright.

16    Q.  Okay.  And how long had you worked with

17  Mr. Wright?

18    A.  I don't remember how long.

19    Q.  Okay.  If this was received by a text message,

20  would that have been to a city-issued phone that you

21  had?

22    A.  No.

23    Q.  Would it have been to a personal phone?

24    A.  Correct.

25    Q.  What carrier would that have been with?

 1      A.  I do not remember who I had at that time.  I have

 2   changed carriers quite a few times.  I don't remember.

 3      Q.  Okay.  Did you have a city-issued phone?

 4      A.  No.

 5      Q.  Okay.  And do you know what the phone number was?

 6      A.  At that time?

 7      Q.  Yes, sir.

 8      A.  I don't remember if it was my current number.  I

 9   don't remember.

10      Q.  Okay.  So it may or may not have been your

11   current number?

12      A.  Correct.

13           MR. SCOTT:  I don't want to put a phone

14   number on the record.  Maybe just give it to me later.

15           MR. RUSSELL:  Okay.

16      Q.  Did you save this text message?

17      A.  Like, put it in a case file or something?

18      Q.  Yes, sir.

19      A.  No.

20      Q.  Wouldn't that be important information to

21   maintain in a case file?

22      A.  I would have wrote the information that he gave

23   me with me on a note in the file.

24      Q.  So there should be a note in this investigation

25   file with this information, with the text message

Deposition of Jeffrey Yasenchack

William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    information?

2        A.   You know, usually I keep a pad of paper with me

3    while I'm out on the road, making notes.  And I know I

4    would have written it down on a pad of paper.  I don't

5    remember if I actually took that note and put it in the

6    case file.  But I definitely wrote it down on the

7    notepad.

8        Q.   All right.  So the paper may or may not be in the

9    case file?

10       A.   Correct.

11       Q.   Okay.  And how did you know Nathan Wright?

12       A.   I think earlier, I think as a unit, we were

13   hitting hot spots.  And we made a traffic stop on

14   Mr. Wright.  And he was in possession of some narcotics,

15   a small amount.  And I was giving him the opportunity to

16   supply information.

17       Q.   Okay.  So Mr. Wright would have been an

18   individual who was providing information, rather than

19   face criminal charges himself; is that fair?

20       A.   Yes.

21       Q.   And do you recall when you first encountered

22   Mr. Wright?

23       A.   No.

24       Q.   Would it have been shortly before May of 2020?

25       A.   I do not remember.

1    Q.  All right.  And how did Mr. Wright know to reach

2    out to you in May of 2020 with information of Mr. Ellis,

3    if you know?

4    A.  You know, I think I advised him that had he

5    received any information about drug activity that he

6    would -- he should contact me.

7    Q.  Okay.  Well, do you recall if you specifically

8    reached out to him about Mr. Ellis or 628 East 127th

9    Street?

10   A.  I don't know -- I don't remember how, if he

11   contacted me or I contacted him.  But I think he

12   contacted me about the activity.

13   Q.  All right.  Do you know one way or the other, as

14   you sit here today, whether you contacted him first

15   asking if he had any information?

16   A.  I don't remember.

17   Q.  All right.  Is that a possibility, that you

18   contacted him first asking if he had any information?

19   A.  No.  I don't think I would have asked him, "Hey,

20   do you -- were you familiar about this house?"

21       You know.

22   Q.  I guess what I'm trying to say --

23   A.  I don't think I reached out to him.  I wouldn't

24   have done that.  I wouldn't have asked an informant if

25   they were aware of a house that we received a complaint

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

```
 1   on.  I don't see myself doing that.
 2       Q.  Okay.  So you think it was just a coincidence
 3   that he happened to give you this information in May of
 4   2020?
 5       A.  I just know that that's when he contacted me with
 6   that information.
 7       Q.  Okay.  Now in the next paragraph, paragraph 3,
 8   you state, "Affiant arrested Ellis in 2019, having in
 9   his possession heroin, carfentanil, cocaine, and
10   marijuana during a traffic stop.  This case is open and
11   currently in the Court of Appeals."
12           Do you see that?
13       A.  I do.
14       Q.  And we can agree that on May 14th of 2019, the
15   criminal case, 2019 criminal case, was, in fact,
16   dismissed, correct?
17       A.  That's what the docket says.
18       Q.  Okay.  And the appeal had been dismissed in April
19   of 2020, correct?
20       A.  I don't know when that was.  The entry of April
21   22nd?
22       Q.  Yes, sir.
23           Is that correct?
24       A.  Yeah.  That's what the docket shows.
25       Q.  Okay.  And we can agree that your Search Warrant
```

1  Affidavit makes no mention of the fact that -- of the

2  Court's suppression ruling in the 2019 case, correct?

3      A.  No.  But I do mention that it was currently in

4  Appeals Court.

5      Q.  Okay.  And actually, in fact, you know that it

6  was not, correct?

7      A.  Correct.

8              MR. RUSSELL:  Objection.

9      Q.  On this date, May 14th of 2020?

10     A.  I now know that the prosecutor didn't get it in

11  on time.

12     Q.  Okay.  All right.  I want to go down to the next

13  paragraph, please, number 4.

14         "Affiant avers that during the past 72 hours

15  affiant set up surveillance on 638 East 127th Street,

16  parens, the premises, end parentheses, period."

17         Do you see that?

18     A.  I do.

19     Q.  Okay.  And just working backwards from the date

20  of this affidavit, would I be correct that the 72 hour

21  period would have begun on May 11th of 2020?

22     A.  Correct.

23     Q.  So if you are talking about 72 hours between

24  May 11, 2020 and May 14, 2020, correct?

25     A.  Correct.

```
 1                      -  -  -  -

 2                (Thereupon, Plaintiff's Exhibit 4 was marked

 3                for purposes of identification.)

 4                      -  -  -  -

 5     Q.  Mr. Yasenchack, I'm going to hand you what we

 6  marked as Plaintiff's Exhibit 4.

 7          Take a minute to familiarize yourself with that.

 8          Mr. Yasenchack, you had a chance to review 4,

 9  Plaintiff's Exhibit 4?

10     A.  Yes.

11     Q.  And am I correct, sir, this is a Departmental

12  Information Form that you would have completed on or

13  about May 20th of 2020?

14     A.  Yes.

15     Q.  And what was the purpose of this form?  Why did

16  you prepare this?

17     A.  This is just a Form One Report that would have

18  accompanied the packet, the arrest packet, Grand Jury

19  packet.

20     Q.  Okay.  So would you typically complete a Form

21  One, like this, prior to going to the prosecutor's

22  office with a packet for the prosecutor's office to

23  review?

24     A.  Yes.

25     Q.  Okay.  And I take it you would not typically
```

1  complete this type of form earlier in your investigation

2  just to keep the lieutenant or supervising officers

3  apprised of your activities; is that fair?

4       A.  Correct.

5       Q.  Let me ask you this:  Did you have any system for

6  reviewing or keeping supervising officers apprized of

7  investigation activity for all of your activities?

8       A.  Did we have a system?

9       Q.  Yes, sir.

10      A.  No.

11      Q.  So was it just sort of ad hoc that you would go

12  to a supervisor, maybe if you thought there was

13  something of importance that they needed to know, or how

14  would that work?

15      A.  If I knew the information I was gathering was

16  looking to result in an execution of a search warrant, I

17  would give the details to a superior.

18      Q.  Okay.  And would you just go into their office

19  and meet with them, or how would you get that

20  information to the superior?

21      A.  Yeah.  We would just meet at the office.

22      Q.  Okay.  And then, just looking at everything, were

23  there rotating supervisors or did you have multiple

24  supervisors during this period of time?

25      A.  At this time our unit didn't have a direct

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    supervisor, Sergeant Kincaid, I can't remember if he

2    just got another positions or he may have been promoted

3    to lieutenant, and that was the reason why he left.  But

4    there was a time period where we didn't have a direct

5    supervisor.  And Lieutenant Gapente[spelling] and

6    Captain Cane, you know, tried to fill in for him.

7         **Q.   Okay.  And what was, as you understood, what was**

8    **the role of the supervising officer relative to your**

9    **individual case investigations?**

10        A.   What was their responsibilities, as to

11   supervising me?

12        **Q.   Yes, sir.**

13        A.   I think they were just supposed to keep apprise

14   as to the status of our active cases.

15        **Q.   Okay.  Well, were they there to, as you**

16   **understood it, to provide guidance on how to provide the**

17   **investigation?**

18        A.   Provide guidance?  You know, Sergeant Kincaid,

19   after a few years of being our supervisor, he understood

20   how drug investigations occurred.  Because I don't think

21   he did, you know, drug investigations until he, you

22   know, got into the sergeant of the Vice Unit.  So he

23   had, like, a learning period of how the cases were

24   generated and stuff.

25             And so after he learned the process, I would go

```
 1    to him for you know suggestions.  And I definitely kept

 2    him apprised of my cases.

 3        Q.  Okay.  And was that through the course of

 4    informal meetings?  Or did you have a regular scheduled

 5    meeting with him?

 6        A.  Just informal meetings.

 7        Q.  If you catch him in the office?

 8        A.  Yes.

 9        Q.  To your knowledge, does the City of Cleveland

10    Police Department have any policies that require

11    supervising officers to review active ongoing criminal

12    investigations?

13              MR. RUSSELL:  Objection.

14        Q.  To your knowledge?

15        A.  Like, general police orders?  I don't know.

16        Q.  Okay.  That's fair.

17              So as far as you knew, there was nothing that

18    said you had to bring case file investigations to a

19    supervising officer for review?

20              MR. RUSSELL:  Objection.

21              Go ahead.

22        Q.  If you know.

23        A.  I don't know.

24        Q.  Okay.  All right.  Okay.  Looking at Plaintiff's

25    Exhibit 4, the Form One, in the second paragraph, you
```

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    indicate, "On May 11, 2020, I set up surveillance on 638

2    East 127th Street," correct?

3        A.   Correct.

4        Q.   All right.  And let me back up.  That's fine.

5            I haven't seen a duty report for May 11, 2020.

6    Do you know if one would have been completed?

7        A.   I imagine so.

8        Q.   Okay.  Would that detail the time when you set up

9    surveillance and when you stopped the surveillance on

10   that day?

11       A.   I don't think I put, like, exact times.  But it

12   may.  I don't remember.

13       Q.   Okay.  Do you remember how long you conducted

14   surveillance at that location on May 11, 2020?

15       A.   I just remember it wasn't too long.

16       Q.   Okay.  So you think less than an hour, more than

17   an hour?

18       A.   Definitely less than an hour.  I would estimate

19   between 15 minutes and half hour.

20       Q.   Okay.  And would you have been observing the

21   residents from your vehicle or do you recall how you set

22   up surveillance?

23       A.   I was in a vehicle.

24       Q.   Okay.  Parked near or across the street or

25   something like that?

1    A.  I wouldn't have parked across the street.

2    Q.  But where you had view of the house?

3    A.  Yes.

4    Q.  What you described -- first of all, you described

5    seeing a black Ford Explorer, correct?

6    A.  Yeah.  There was one parked in the street.

7    Q.  Okay.  And you ultimately determined that that

8    vehicle was associated with Mr. Ellis; is that right?

9    A.  Yes.  I had earlier -- it had the same place of

10   Henry, yesterday, Henry 8894.

11   Q.  Okay.  And before I forget, did any other law

12   enforcement personnel participate in the investigation

13   of May 11th, other than yourself?

14   A.  I don't know if, you know, I asked somebody to

15   drive by the house or something.  That's a possibility.

16   But I don't remember.

17   Q.  Okay.  So as you sit here today, you don't recall

18   anybody else being involved in the surveillance of this

19   location?

20   A.  I don't remember.

21   Q.  Okay.  All right.  And then after the black Ford

22   Explorer, you next describe a burgundy Dodge Magnum

23   parked on the street?

24   A.  Yes.

25   Q.  And you see two white males exit and enter the

1    accident residence of 638 East 127th Street, right?

2        A.  Correct.

3        Q.  At any time did you have any direct interaction

4    with that vehicle or those two males?

5        A.  No.

6        Q.  So you never stopped them or questioned them or

7    made any sort of search of their vehicle, correct?

8        A.  Correct.

9        Q.  And you didn't gather any evidence directly from

10   them, why they were there or what they were doing?

11       A.  No.

12       Q.  All right.  And why was that?  Did you not -- did

13   you not want to leave your post, where you were, or what

14   was the thought process there?

15       A.  I think I was just waiting to see what the rate

16   of activity was.

17       Q.  Okay.  Now did you record it in any way?  Did you

18   film it?

19       A.  No.

20       Q.  Use your body cam?

21           Did you have the ability to do that?

22       A.  I can't remember if our unit had a camcorder or

23   not.  I'm not sure.

24       Q.  In other investigations, would you have equipment

25   available to you, whereby you could either photograph or

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1   film this type of surveillance, to record the activity?

2       A.   I don't remember if we had a camcorder at that

3   time.  A lot of the times we have to report to our

4   personal phones to photograph.  So I'm not sure if we

5   are -- our unit had a camcorder.

6       Q.   Do you recall in any of your earlier

7   investigations using a camcorder or any type of

8   recording device to record this type of surveillance?

9       A.   There was a couple of cases where I had a

10  camcorder, I think the unit had one, and I used it

11  during a couple of cases.

12      Q.   Okay.  You would agree that that's strong

13  evidence that could potentially be used in court if you

14  are trying to establish that a certain activity occurred

15  during an investigation?

16      A.   Just a video of showing the volume of possibly

17  drug buyers going through and from a house.

18      Q.   That would be one evidentiary value, correct?

19      A.   Seeing the video of people going into a house and

20  leaving may -- may be -- you know, the recovery of the

21  drugs from the occupants, I think that that's strong

22  evidence of...

23      Q.   Well, if you wanted to establish specific people

24  were at that location, that would certainly be, a video

25  or photograph would certainly be strong evidence that

1  they were, in fact, at that location, isn't it?

2      A.   From the distance I was at, a photo wouldn't have

3  been...

4      Q.   Well, how far away do you think you were?

5      A.   I was a good distance.  I'm using high-powered

6  binoculars to see the activity.

7      Q.   Were you a couple of houses down the street or

8  were you on a different block?

9      A.   More than a few houses.

10      Q.   More than a few houses?  So you are observing

11  this from more than a few houses away?

12      A.   Yes.

13      Q.   Okay.  Again, do you have any idea of the total

14  distance you were from this house?

15      A.   No.

16      Q.   You next describe a blue Saturn that parks on the

17  street and a white female exits.

18          Do you see that?

19      A.   I do.

20      Q.   And she ultimately enters the house, correct?

21      A.   She does.

22      Q.   And it looks like at about the same time, a white

23  vehicle pulls up into the driveway; is that right?

24      A.   Yes.

25      Q.   Okay.  So what you describe in paragraph four is

1  the black Ford Explorer that's associated with William

2  Ellis, and a total of three vehicles that come to the

3  house and subsequently leave, correct?

4      A.  Yep.

5      Q.  And there's a total of five individuals

6  associated with those three vehicles, correct?

7      A.  Yep.

8      Q.  You have no interaction with the two white males

9  in the burgundy Dodge Magnum, correct?

10     A.  Correct.

11     Q.  You do stop the white female in the blue Saturn,

12 correct?

13     A.  No.

14     Q.  Oh, you do not?  Do you have any interaction with

15 her?

16     A.  No.

17     Q.  Okay.  And you collect no evidence from her,

18 correct?

19     A.  Correct.

20     Q.  You stop the white vehicle with two individuals,

21 I believe it turns out to be a male and female, correct?

22     A.  Yes.

23     Q.  Okay.  And that's described in Judge Pearson's

24 order.  As Matthew Radovanic and Vanessa Smith; is that

25 right?

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1      A.  Those were the two individuals that I stopped.

2      Q.  Okay.  And you say that those two individuals

3   became confidential informants, right?

4      A.  Yes.

5      Q.  All right.  And were any criminal charges pressed

6   against those two individuals?

7      A.  No.

8      Q.  Did you find evidence of criminal activity that

9   would have supported criminal charges for either of

10  those individuals?

11     A.  Yes.

12     Q.  That would have been drug possession, something

13  like that?

14     A.  Yes.

15     Q.  Okay.  So what you are telling me is that in

16  exchange for not being charged criminally, these

17  individuals agreed to be confidential informants

18  correct?

19     A.  Correct.

20     Q.  And the information that they provided, would

21  they have provided it then on scene when you interacted

22  with them on May 11, 2020?

23     A.  Yeah.  During the stop, I would have collected

24  some information.  I don't remember if they came back to

25  the district and I conducted a more thorough interview

1    with them.  But Matthew eventually came to my office and

2    had more and I received further information from him.

3        Q.  Okay.  So you recall meeting at least with

4    Matthew Radovanic some time after May 11th to gather

5    additional information from him?

6        A.  Some time after the stop.  It might have been

7    about that same day that he came back to the office or,

8    you know, another day.

9        Q.  But Vanessa Smith, you do not recall her coming

10   to the office?

11       A.  I don't remember if she came or not.

12       Q.  Okay.  And would there have been a reason why she

13   would not have come or been required to come?

14       A.  I don't remember.

15       Q.  Okay.  Do you recall anyone else participating in

16   the office interviews of either of those individuals?

17       A.  I don't recall if anybody else was in the office.

18   Chances are there were more people there, but I don't

19   remember.

20       Q.  Okay.  And did they give any sort of recorded or

21   written statement?

22       A.  No.

23       Q.  Is there a reason why it wasn't recorded or in

24   writing?

25       A.  I just probably took notes as to the information

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

```
 1    they supplied.
 2        Q.   Again, would those notes be in the investigative
 3    file?
 4        A.   Possibly.
 5        Q.   Okay.   You wouldn't necessarily always put your
 6    notes in the investigative file?
 7        A.   Sometimes I would.
 8        Q.   Okay.   But I take it that sometimes you would
 9    not?
10        A.   Correct.
11        Q.   Okay.   To your knowledge was there any sort of
12    departmental policy that would have required a statement
13    like this from a confidential informant to be either
14    written or recorded somehow?
15               MR. RUSSELL:   Objection.
16               Go ahead.
17        A.   No.
18        Q.   No, there was not a policy; or no, you were not
19    aware of one?
20        A.   I was not aware of any policy.
21        Q.   Okay.   So I take it, it was not a practice,
22    certainly not a practice of yours, to record statements
23    of confidential informants like this?
24        A.   Correct.
25        Q.   To your knowledge, did any other detectives in
```

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    the Fifth District Detective Bureau record statements

2    from confidential informants?

3            MR. RUSSELL:  Objection.

4        Q.  If you know.

5        A.  In my unit or the Detective Bureau?

6        Q.  In your unit.

7        A.  You stated Detective Bureau.

8        Q.  Am I saying it wrong?

9        A.  I'm in the Vice Unit.

10       Q.  The Vice Unit.

11       A.  No.  I was unaware of anybody else that would

12   record interviews with informants.

13       Q.  Okay.  So you are not aware of any other

14   detectives in the Vice Unit that would record

15   confidential informants' statements?

16       A.  Correct.

17       Q.  And you would agree though that it would be

18   beneficial if those were recorded statements in a

19   subsequent prosecution?

20       A.  They -- a recording of that may have some value.

21   But it also -- there's an also a record there then of

22   that person supplying me information.

23           You know, I do have a duty to help protect

24   informants that give me information.  A lot of

25   informants are worried about their safety when supplying

1  this information.  That they are often worried that that

2  information will come back to the drug dealer and harm

3  may come to them.

4      Q.  Well, certainly in a case like this, I mean, all

5  of these individuals were ultimately identified in court

6  and the court proceedings, right?

7      A.  I know that now.

8      Q.  Okay.  Now I know there was a search warrant was

9  issued, correct?

10     A.  Yep.

11     Q.  And a search of Mr. Ellis's home was conducted,

12  right?

13     A.  Correct.

14     Q.  And you participated in that, together with a

15  number of other law enforcement officers; is that fair?

16     A.  Yes.

17     Q.  To your knowledge, was there -- when you went to

18  get the search warrant from Judge McCormick was there

19  any -- to your knowledge, was there any other law

20  enforcement agency investigating Mr. Ellis?

21     A.  No.

22     Q.  And to your knowledge, no other law enforcement

23  agency was seeking a search warrant of Mr. Ellis's home

24  at that time?

25     A.  I had no knowledge of that.

Deposition of Jeffrey Yasenchack                 William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

```
 1      Q.  Okay.  And certainly it was your expectation that
 2  upon execution of the search warrant that you would find
 3  evidence of criminal activity and criminal charges would
 4  be brought against Mr. Ellis; is that fair?
 5      A.  Yes.
 6      Q.  And now in this case, after the search of
 7  Mr. Ellis's home, you did not lead the subsequent
 8  criminal case, correct?  You're not the one that brought
 9  it to the prosecutor's office?
10      A.  Correct.
11      Q.  And that was another -- is he a member of the
12  Cleveland Police Department, Kopchak?  Is a he a member
13  of Cleveland --
14      A.  Yes.
15      Q.  Oaky.  And is it your understanding that Kopchak
16  brought the case to a federal prosecutor; is that
17  correct?
18      A.  Yes.
19      Q.  Do you know why he went to a federal prosecutor
20  and not a state prosecutor?
21      A.  He is a -- what is his title?
22          He's a member of a task force.  I think he's with
23  the ATF.  And one of his roles is to examine cases that
24  kind of fit the federal requirement for prosecution.
25  And, you know, even if zone-car patrolman made arrests,
```

1    like gun arrests, he would evaluate the case and

2    prosecutor cases that he deemed -- that had all the

3    elements to charge him federally.

4        Q.  Okay.  Well, you had participated in federal

5    prosecutions before, correct?

6        A.  Prosecutions?

7        Q.  Yes, sir.

8        A.  No.  There's usually a detective that, other than

9    myself, that handled all that.  I never presented a case

10   federally.

11       Q.  Okay.  You may have been a witness in a case but

12   you never presented one to a prosecuting attorney; is

13   that fair?

14       A.  Yes.

15       Q.  But up to this point in time, you had certainly

16   been the lead investigator at this point in time being

17   when you prepared the Search Warrant Affidavit and

18   obtained the search warrant, you would been the lead

19   investigator, correct?

20       A.  Yes.

21       Q.  And maybe the only investigator, correct?

22       A.  No.  At that point, we had a number of assisting

23   detectives that helped during the search warrant.

24       Q.  Well, I understand that.

25       A.  But I was the only lead.

Deposition of Jeffrey Yasenchack         William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    **Q.  But up to May 14, 2020, when you obtained the**

2    **search warrant, up to that point in time, you were**

3    **really the only investigator actively involved in the**

4    **case, correct?**

5            MR. RUSSELL:  Objection.

6    A.  I may have had detectives assist with doing some

7    surveillance.

8    **Q.  You don't recall one way or another?**

9    A.  No.

10    **Q.  Okay.  So why was the investigation or the**

11    **responsibility for presenting the case to the prosecutor**

12    **handed off to Officer Kopchak?**

13            MR. RUSSELL:  Objection.

14            Go ahead.

15    A.  I assume that Detective Kopchak thought that the

16    case met the standards to present it federally.

17    **Q.  Okay.  Well, certainly, you had the ability to**

18    **present the case to a state prosecutor, correct?**

19    A.  Yes.

20    **Q.  Okay.  So how was this determination made that**

21    **you would not go to a state prosecution, but Officer**

22    **Kopchak go to a federal prosecutor?**

23    A.  I think Kopchak, because of his task force with

24    the ATF, and he emphasized gun cases, and there was a

25    gun recovered from Mr. Ellis's residence, that there was

 1   an emphasis for him to present weapon cases federally.

 2   So he thought that this case --

 3       Q.  Well, did Officer Kopchak outrank you?

 4       A.  No.

 5       Q.  Was there discussion between you and Officer

 6   Kopchak about how the case would proceed following the

 7   search of Mr. Ellis's residence?

 8       A.  You know, Detective Kopchak assisted on the

 9   search warrant.  And he was aware of the gun being

10   recovered and drugs being recovered, so he may have -- I

11   don't know if we had talked or he just deemed that,

12   "Hey, I'm going to take this case and charge it

13   federally."

14       Q.  Well, were you reluctant to go back to state

15   court, given what happened with the 2019 case?

16       A.  No.

17              MR. RUSSELL:  Do you have; is this a good

18   time to take a short break.

19                    -  -  -  -

20              (Off the record.)

21                    -  -  -  -

22   BY MR. SCOTT:

23       Q.  So when your affidavit in paragraph four refers

24   to during the past 72 hours the affiant set up

25   surveillance at 628 East 127th Street.  You told me

1   about the, I think you described it as the 15 or 20

2   minutes you were there on May 11, 2020, correct?

3       A.  Correct.

4       Q.  Okay.  And do you recall returning to that

5   location at any time after May 11, 2020, but prior to

6   May 14th of 2020?

7       A.  I don't remember distinctly doing that it, but I

8   probably did further surveillance after that.  At the

9   very least, checking to see if the car was still there,

10  like, especially the morning of or the night before the

11  search warrant was executed.

12                  -  -  -  -

13              (Thereupon, Plaintiff's Exhibit 5 was marked

14              for purposes of identification.)

15                  -  -  -  -

16      Q.  Let me hand you what we've marked as Plaintiff's

17  Exhibit 5.  And that's a one page document.

18                  -  -  -  -

19              (Thereupon, Plaintiff's Exhibit 6 was marked

20              for purposes of identification.)

21                  -  -  -  -

22      Q.  And here's Plaintiff's Exhibit 6, which is

23  another one page document.

24          Plaintiff's Exhibits 5 and 6 are Duty Reports.

25  And I believe Plaintiff's Exhibit 5 is the Duty Report

```
 1    for May 12, 2020; is that correct?

 2        A.  Yes.

 3        Q.  And Exhibit 6 is the Duty Report for

 4    May 13, 2020?

 5        A.  Yes.

 6        Q.  Is there anything on Plaintiff's Exhibit 5 that

 7    suggests additional surveillance of Mr. Ellis's

 8    residence?

 9        A.  Brackland is very close to this -- the house of

10    Mr. Ellis.  I may have stopped, drove by the house on

11    Tuesday, during that surveillance.  But I don't

12    remember.

13        Q.  Okay.  Do you recall, as you sit here today,

14    whether or not the case invest that's referenced next to

15    the Brackland entry on Plaintiff's Exhibit 5, was that a

16    separate investigation from --

17        A.  Yes.

18        Q.  Okay.  But you believe in the same general area;

19    is that correct?

20        A.  Yeah.  It's very close to Mr. Ellis's house.

21        Q.  Okay.  And then as regards to Plaintiff's Exhibit

22    6, the Duty Report for May 13, 2020, is there anything

23    on there that suggests additional surveillance on

24    Mr. Ellis's residence?

25        A.  Yes.  The second line, East 127 and Shaw.
```

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1      Q.  Okay.  Very good.  And now there's no times

2  indicated.  Do you have any recollection as to how long

3  you would have observed the residence on May 13th of

4  2020?

5      A.  No.

6      Q.  Okay.  Do you think it might have just been a

7  drive-by to see if the vehicle was still there?

8      A.  I don't remember.

9      Q.  Okay.  Would there be notes or something in the

10  investigation file that would tell us that?

11      A.  Possibly.

12      Q.  Okay.  Is that something, typically, you would

13  have made notes about?

14      A.  Sometimes.

15      Q.  Okay.  Mr. Yasenchack, do you recall being

16  involved in a criminal prosecution captioned, State of

17  Ohio, versus Clyde Woods, in 2012?

18      A.  Vaguely.

19      Q.  Okay.  Do you recall that there was a suppression

20  issue in that criminal proceeding, requesting the

21  suppression of evidence?

22      A.  Vaguely.

23      Q.  Okay.  And do you recall that you were directly

24  involved as one of the investigators in that particular

25  criminal prosecution?

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1      A.  I think at the time Donald Kopchak and I were

2   patrolmen.

3      Q.  Okay.  Is this the same Kopchak that was involved

4   in the federal prosecution of Mr. Ellis?

5      A.  Yes.

6      Q.  All right.  So you two had been on the force

7   together for some time?

8      A.  Yeah.  At that time, he probably only had a few

9   years, Donald.

10     Q.  Okay.  And do you recall evidence being

11  suppressed based upon the Trial Court's conclusion, that

12  the justification for the search was pretextual?

13     A.  I vaguely remember that that judge didn't think

14  we could pace a car for speed, as being the reason why

15  she suppressed the evidence.

16     Q.  Okay.  Well, do you recall if the justification

17  for searching the vehicle was an inventory search or

18  something like that?

19     A.  I don't remember.

20     Q.  Okay.  You do recall though that the judge

21  suppressed the evidence that was gathered during that

22  stop?

23     A.  Yes.

24     Q.  And do you recall that the suppression decision

25  in the Clyde Woods, Jr. case from 2012 was appealed to

1    the 8th District Court of Appeals?

2         A.  No.

3         Q.  Okay.  Are you aware -- do you have any

4    recollection of the Court of Appeals upholding that

5    decision?

6         A.  No.

7         Q.  Okay.  Do you remember what your duty assignment

8    was in 2012 relative to that criminal case?

9         A.  I don't know if we were on patrol or in the CSU

10   Unit.  I don't remember.

11                    -  -  -  -

12              (Thereupon, Plaintiff's Exhibit 7 was marked

13              for purposes of identification.)

14                    -  -  -  -

15        Q.  Mr. Yasenchack, I'm going to hand you what's been

16   marked as Plaintiff's Exhibit 7, which is an opinion

17   from the 8th District Court of Appeals, regarding the

18   Clyde Woods, Jr. criminal prosecution.  And I mean, you

19   can familiarize yourself with it.  But let me ask you

20   this:  Do you know or do you recall, as you sit here

21   today, whether or not you've seen this opinion before?

22        A.  I do not think so.

23        Q.  Okay.  All right.  That's fine.  If you turn to

24   the second to the last page, there is lines that have

25   been written on there.  And there's a sentence at the

```
 1   bottom of the first paragraph.

 2          "This is a classic example of a police officer's

 3   intentional use of an unlawful traffic stop.  Under a

 4   questionable codified ordinance for the sole purpose of

 5   conducting a fishing expedition for evidence of another

 6   crime and a tailored script at the motion to suppress

 7   hearing to justify the stop and subsequent searches."

 8          Do you see that?

 9               MR. RUSSELL:  Objection.

10               Go ahead.

11      A.  I see that.

12      Q.  Okay.  Does that refresh your recollection as to

13   why the evidence was suppressed in the Clyde Woods case?

14               MR. RUSSELL:  Objection.

15               Go ahead.

16      A.  No.

17      Q.  Okay.  To your knowledge, did the City of

18   Cleveland conduct any sort of review or impose any sort

19   of discipline for either you or Officer Kopchak as a

20   result of the suppression of evidence in the Clyde Woods

21   case?

22               MR. RUSSELL:  Objection.

23               Go ahead.

24      A.  Am I aware of any discipline resulting in

25   evidence being suppressed?
```

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

```
 1      Q.  Yes, sir.  Did anybody review this and call you

 2   and/or Officer Kopchak into the office and offer any

 3   sort of discipline or re-instruction, or anything like

 4   that?

 5      A.  This was 11 years ago.

 6      Q.  I appreciate that.

 7      A.  I don't remember.

 8      Q.  Okay.  To your knowledge, sir, was there any

 9   requirement for you to advise a court in any sort of

10   subsequent requests for warrants or in subsequent

11   affidavits of any history where your credibility had

12   been called into question?

13              MR. RUSSELL:  Objection.

14              Go ahead.

15      A.  Could you repeat that question again?

16      Q.  Sure.

17          To your knowledge, was there any requirement that

18   you advise any judicial officer, whether it be in a

19   search warrant application or otherwise, of a prior

20   situation where your ability would have been called into

21   question?

22      A.  No.

23      Q.  And certainly, we can agree that the fact that

24   you had previously been an investigating officer in a

25   criminal matter where evidence was suppressed because
```

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    your credibility was questioned, was not part of your

2    Search Warrant Affidavit on May 14, 2020, right?

3             MR. RUSSELL:  Objection.

4             Go ahead.

5        A.  You are saying that I didn't mention it in my

6    affidavit?

7        Q.  Yes, sir.

8        A.  I just mentioned that the case was open and

9    currently in appeals.

10       Q.  Correct.  There is no reference to the fact that

11   evidence was suppressed or that your credibility was in

12   any way questioned, correct?

13       A.  I did put in that is it was open and currently in

14   Appeals Court.

15       Q.  All right.  And you are aware, as you sit here

16   today, that the federal case against Mr. Ellis was

17   ultimately dismissed, correct?

18       A.  Yeah.  I am aware that the confidential

19   informants lied in federal court to get the charges

20   dismissed.

21       Q.  So you are aware that the confident informants

22   did not testify consistent with what was represented in

23   the Search Warrant Affidavit, correct?

24       A.  I am aware that the informants recanted their

25   testimony that they supplied in federal court.

 1    Q.  Again, if we had a recording of some kind of the
 2   information they gave you, there would be a way of
 3   demonstrating clearly that their testimony in court was
 4   different than what they told you?
 5    A.  Matthew Radovanic, I think is his name, admitted
 6   to Internal Affairs Sergeant Sheehan that the
 7   information he supplied during federal court was
 8   inaccurate, and that he lied.  And that they the
 9   information I put in the affidavit was correct.
10    Q.  Okay.  Is that a recorded statement somewhere?
11    A.  Yes.
12    Q.  Okay.  And it's not just the officer's summary,
13   it's what Mr. Radovanic stated?
14    A.  Yes.
15    Q.  Okay.  All right.  And you believe that's in his
16   OPS interview?
17    A.  Yes.
18    Q.  But at least as to what he testified under oath
19   in court was different than what was reflected in the
20   Search Warrant Affidavit?
21    A.  I am aware that he provided false information
22   during a federal court proceedings.
23    Q.  That was different than what was in your
24   affidavit?
25    A.  False information.

1    Q.  Okay.  Have you ever spoken to Mr. Radovanic

2  directly since the federal criminal charges against

3  Mr. Ellis were dismissed?

4    A.  No.

5    Q.  Did you make any effort to speak with either him

6  or Vanessa Smith after the Federal Court Franks hearing?

7    A.  No.

8    Q.  And I take it you did not participate in the

9  Franks hearing?

10    A.  No.

11    Q.  In fact, did you participate in the actual

12  federal criminal prosecution at all?

13    A.  No.

14    Q.  So you didn't meet with the prosecutor or didn't

15  testify for the Grand Jury and weren't a witness in the

16  case?

17    A.  I had a quick conversation over the phone with

18  the prosecutor.  That was it.

19    Q.  Okay.  They were just mainly coordinating with

20  Officer Kopchak, right?

21    A.  Correct.

22    Q.  Was there any discussion between you and Officer

23  Kopchak or anyone else involved in the federal

24  prosecution that the District Attorney's Office would be

25  moving to dismiss the charges against Mr. Ellis once the

Deposition of Jeffrey Yasenchack                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

1    evidence had been suppressed?

2        A.  No.

3        Q.  Is it your understanding that the criminal

4    charges though were ultimately dismissed based upon the

5    request of the District Attorney's Office to dismiss

6    those charges?

7        A.  Due to the informants providing false testimony,

8    yes.

9                MR. SCOTT:  Mr. Yasenchack, I believe those

10   are all of the questions I have for you today.  I want

11   to thank you for coming here today and giving me the

12   opportunity to speak with you.

13               And I believe your counsel will tell you

14   about your right --

15               MR. RUSSELL:  Yeah.  You have the right to

16   review the transcript in advance of it being kind of

17   formalized, or you can waive signature.  It's entirely

18   your choice.

19               But if you ask to review, it will be

20   prepared.  You will have a chance to sit down and review

21   the transcript and make sure it's accurate.

22               THE WITNESS:  Sure.  Sure.

23               MR. RUSSELL:  We'll review.

24               MR. SCOTT:  Thank you so much.

25                    -  -  -  -

```
 1              (Deposition concluded at 11:56 a.m.)

 2                      -   -   -   -

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Jeffrey Yasenchack   William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

```
 1
 2
 3                      C E R T I F I C A T E
 4
 5        I, Denise Cardona, a Notary Public within and for
 6   the State of Ohio, do hereby certify that I attended the
 7   foregoing hearing in its entirety, that I wrote the same
 8   in stenotypy, and that this is a true and correct
 9   transcript of my stenotype notes.
10        IN WITNESS WHEREOF, I have hereunto set my hand
11   and seal of office, at Cleveland, Ohio, this 8th day
12   of August A.D. 2023.
13
14
15
16
17   _____
18   Denise Cardona, Notary Public, State of Ohio
19   1020 Ohio Savings Plaza, 1801 East 9th Street,
20   Cleveland, Ohio 44114
21   My commission expires November 29, 2026.
22
23
24
25
```

## WORD INDEX

**< 0 >**
**0900** 29:10

**< 1 >**
**1** 3:9 7:13, 18, 23 19:3
20:2 25:12 26:25 35:12
**1:22-CV-00815** 1:9
**10:00** 1:21
**1020** 74:19
**106** 2:15
**11** 42:24 47:1, 5, 14
53:22 62:2, 5 68:5
**11:56** 73:1
**11th** 25:13, 18 42:21
48:13 54:4
**12** 63:1
**12/16** 3:11
**127** 35:3 63:25
**127th** 23:18 26:2 35:14
40:8 42:15 47:2 49:1
61:25
**13** 18:17 63:4, 22
**13th** 64:3
**14** 1:22 7:7 18:12 19:5,
22 22:16 27:1 29:19
32:9, 14 34:13 42:24
60:1 69:2
**14th** 7:25 19:9, 13, 15
28:24 30:17 31:3 41:14
42:9 62:6
**15** 47:19 62:1
**16th** 33:17
**17th** 33:17
**1801** 74:19
**1900** 1:21 2:6

**< 2 >**
**2** 3:11 12:16, 20 13:16
18:11 36:17
**20** 62:1
**200** 21:6
**2012** 64:17 65:25 66:8
**2019** 6:25 8:8, 10, 12, 14,
25 10:6, 12 12:23, 25
13:7, 11, 13 14:14, 18
15:24 17:12 20:6, 24
29:24 30:11, 17 41:8, 14,
15 42:2 61:15
**2020** 7:7, 25 14:19 17:9
18:12, 17 19:5, 13, 22
22:16 23:1 25:8, 21, 18
27:1 28:24 29:19 30:12,
17 31:3 32:3, 9, 14 34:13
35:13 36:18, 25 39:24
40:2 41:4, 19 42:9, 21, 24
43:13 47:1, 5, 14 53:22
60:1 62:2, 5, 6 63:1, 4, 22

**64:4** 69:2
**2023** 1:22 74:12
**2026** 74:21
**20th** 32:3 43:13
**216-644-276712** 2:17
**216-650-3318** 2:8
**22** 27:25
**22nd** 41:21
**23** 13:13
**23rd** 13:3 30:17
**29** 74:21
**29/4** 3:12

**< 3 >**
**3** 3:12 29:4, 9 41:7

**< 4 >**
**4** 3:13 8:14, 25 13:7
17:12 20:6 42:13 43:2, 6,
8, 9 46:25
**4/6** 3:4
**43/2** 3:13
**44113** 2:7
**44114** 2:16 74:20
**4th** 6:25 8:10

**< 5 >**
**5** 3:14 62:13, 17, 24, 25
63:6, 15
**5/14/2020** 29:9
**5/16/2019** 13:18
**50** 1:20 2:6

**< 6 >**
**6** 3:15 62:19, 22, 24 63:3,
22
**62/13** 3:14
**62/19** 3:15
**628** 40:8 61:25
**638** 35:3, 14 42:15 47:1
49:1
**66/12** 3:16

**< 7 >**
**7** 3:16 66:12, 16
**7/13** 3:9
**72** 42:14, 20, 23 61:24

**< 8 >**
**8/23/19** 13:16
**8894** 48:10
**8th** 31:13, 22 32:1 66:1,
17 74:11

**< 9 >**
**9601** 2:15
**9th** 74:19

**< A >**

**A.D** 74:12
**a.m** 1:21 73:1
**ability** 5:9 49:21 60:17
68:20
**absent** 11:10
**accident** 4:21, 23 49:1
**accommodate** 33:14
**accompanied** 43:18
**accurate** 72:21
**actions** 18:24
**active** 14:25 15:13 17:25
45:14 46:11
**actively** 15:21 60:3
**activities** 44:3, 7
**activity** 11:4, 6, 19 25:10,
17 35:24 36:5, 7, 14 40:5,
12 44:7 49:16 50:1, 14
51:6 53:8 58:3
**actual** 71:11
**ad** 44:11
**additional** 54:5 63:7, 23
**Administrative** 33:21
**admitted** 70:5
**advance** 72:16
**advise** 33:11 68:9, 18
**advised** 36:2 40:4
**Affairs** 70:6
**Affiant** 34:4, 6 35:12
36:17, 19 41:8 42:14, 15
61:24
**Affidavit** 3:9 7:6, 24
19:3, 12, 21 20:1 25:12,
17 26:21, 25 27:9, 16, 20,
22, 24 28:9 32:23, 25
33:9 34:1, 24 35:11 42:1,
20 59:17 61:23 69:2, 6,
23 70:9, 20, 24
**affidavits** 68:11
**age** 4:3
**agency** 57:20, 23
**ago** 4:21 68:5
**agree** 8:23 32:6 41:14,
25 50:12 56:17 68:23
**agreed** 53:17
**ahead** 8:16 9:6 46:21
55:16 60:14 67:10, 15, 23
68:14 69:4
**al** 1:12 4:10
**allegations** 4:16
**amount** 39:15
**and/or** 1:12 68:2
**answer** 5:8, 14
**anticipation** 27:3
**anybody** 32:12 48:18
54:17 56:11 68:1
**appeal** 14:10 31:13, 16,
18, 22 32:2 41:18
**appealed** 65:25
**appealing** 31:1, 4

**Appeals** 31:14, 23 32:1
41:11 42:4 66:1, 4, 17
69:9, 14
**APPEARANCES** 2:1
**application** 68:19
**appreciate** 4:25 5:12
11:14 68:6
**apprise** 21:21 45:13
**apprised** 14:6 44:3 46:2
**apprized** 44:6
**appropriate** 5:2
**approximately** 25:18
**April** 23:1 25:8 32:3
35:13 41:18, 20
**area** 21:2, 6, 19 63:18
**arose** 7:2
**arrest** 15:22 43:18
**arrested** 41:8
**arrests** 58:25 59:1
**asked** 4:14 34:18 36:8,
10 40:19, 24 48:14
**asking** 5:4 36:12, 13
40:15, 18
**asserted** 4:16
**assigned** 20:8, 11
**assignment** 6:4 66:7
**assist** 34:25 60:6
**assisted** 16:13, 25 17:5
34:15 61:8
**assisting** 59:22
**associated** 48:8 52:1, 6
**assume** 5:7 29:11 60:15
**ATF** 58:23 60:24
**attempted** 31:13
**attend** 12:12
**attended** 74:6
**attorney** 59:12
**Attorney's** 71:24 72:5
**August** 13:3, 13 30:11, 17
74:12
**availability** 22:6
**available** 33:19 49:25
**Avenue** 2:15
**avenues** 20:16
**avers** 36:18 42:14
**averse** 35:12
**aware** 14:12 31:4, 8
32:7, 8 40:25 55:19, 20
56:13 61:9 66:3 67:24
69:15, 18, 21, 24 70:21

**< B >**
**back** 19:2, 14 20:23 26:1
47:4 53:24 54:7 57:2
61:14
**backwards** 42:19
**bailiff** 33:11
**based** 22:6 65:11 72:4
**basis** 9:2 25:11, 16

Case: 1:22-cv-00815-SO  Doc #: 24-1  Filed:  08/31/23  77 of 121.  PageID #: 335

Deposition of Jeffrey Yasenchack

William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

**began** 19:4
**begun** 42:21
**behalf** 2:2, 10
**believe** 12:24 17:9 21:5
32:8 34:2 52:21 62:25
63:18 70:15 72:9, 13
**beneficial** 56:18
**benefit** 14:24
**best** 5:8 14:15 16:24
**binoculars** 51:6
**bit** 5:1 20:21 21:17
**black** 35:14 36:19 48:5,
21 52:1
**block** 36:12 51:8
**blue** 51:16 52:11
**body** 24:18 49:20
**borders** 16:21
**bottom** 34:3 67:1
**Brackland** 63:9, 15
**break** 5:12, 13, 14 61:18
**Brian** 28:22
**bring** 46:18
**brought** 17:6 21:7 58:4,
8, 16
**Bureau** 56:1, 5, 7
**burgundy** 48:22 52:9
**buyers** 50:17

**< C >**
**calculate** 28:1
**call** 9:25 21:17 37:14
68:1
**called** 12:2, 6 17:20
68:12, 20
**calling** 21:12, 13
**cam** 49:20
**camcorder** 49:22 50:2, 5,
7, 10
**camera** 24:18, 20 25:5
**Cane** 45:6
**Captain** 45:6
**captioned** 12:22 64:16
**capture** 24:23
**captured** 24:20 25:3
**capturing** 26:14
**car** 62:9 65:14
**Cardona** 1:18 74:5, 18
**carfentanil** 41:9
**CARLI** 2:12
**carrier** 37:25
**carriers** 38:2
**CASE** 1:9 3:11 4:10
8:8, 12, 18 9:11, 24 10:13,
14, 15, 17, 19 11:1, 15
12:23 13:4 15:10 16:14
17:2, 6, 25 20:19 29:13,
25 30:11, 15, 20 38:17, 21
39:6, 9 41:10, 15 42:2
45:9 46:18 57:4 58:6, 8,
16 59:1, 9, 11 60:4, 11, 16,

18 61:2, 6, 12, 15 63:14
65:25 66:8 67:13, 21
69:8, 16 71:16
**cases** 6:19 14:7 15:9, 13,
20, 21 16:4, 16, 25 20:17
30:7, 8 45:14, 23 46:2
50:9, 11 58:23 59:2
60:24 61:1
**catch** 46:7
**Caucasian** 24:8
**cause** 28:14, 19
**Center** 29:11
**certain** 50:14
**certainly** 5:2 50:24, 25
55:22 57:4 58:1 59:15
60:17 68:23
**certify** 74:6
**chambers** 32:19
**chance** 43:8 72:20
**Chances** 54:2
**changed** 38:2
**charge** 59:3 61:12
**charged** 53:16
**charges** 18:5 29:24
39:19 53:5, 9 58:3 69:19
71:2, 25 72:4, 6
**check** 15:5, 12 30:6
34:18
**checked** 30:18, 21, 24
**checking** 30:10 34:16
62:9
**choice** 72:18
**citation** 23:10 35:23
**citizen** 35:14, 19
**City** 2:13 5:21 6:3
19:12, 20 35:3 46:9
67:17
**city-issued** 37:20 38:3
**civil** 4:20
**classic** 67:2
**clear** 5:5
**clearly** 70:3
**Cleveland** 1:21 2:7, 13,
16 5:21 6:4 35:4 46:9
58:12, 13 67:18 74:11, 20
**close** 6:11 10:1 63:9, 20
**Clyde** 64:17 65:25 66:18
67:13, 20
**cocaine** 41:9
**codified** 67:4
**coincidence** 41:2
**coincidental** 30:2
**collect** 8:17
**collected** 8:14, 25 13:6
53:23
**come** 4:14 9:25 12:4
14:9 18:4, 8 31:17 37:12
52:2 54:13 57:2, 3
**coming** 15:10 21:14

24:25 54:9 72:11
**Commander's** 21:13
**commission** 74:21
**Common** 8:6 27:4 28:22
29:23 31:5 33:7
**complain** 21:18
**complaint** 4:15, 16 21:7,
9, 11, 20 22:7 40:25
**complaints** 15:18 21:5,
15 36:11
**complete** 43:20 44:1
**completed** 43:12 47:6
**concerned** 35:13, 19
**concerning** 8:13 18:12
30:20 31:5 34:13
**concluded** 73:1
**conclusion** 9:3 65:11
**conduct** 67:18
**conducted** 20:3 22:16, 23
23:15 25:16 47:13 53:25
57:11
**conducting** 21:3 67:5
**confident** 69:21
**confidential** 36:18 37:5
53:3, 17 55:13, 23 56:2,
15 69:18
**considered** 17:1
**consistent** 69:22
**constantly** 15:18
**contact** 10:13 20:23 40:6
**contacted** 40:11, 12, 14, 18
41:5
**contained** 32:22
**conversation** 24:21, 23
71:17
**convey** 21:23
**coordinating** 71:19
**copy** 7:24 12:20
**correct** 4:17 5:22 6:5, 6,
17, 25 7:1, 4 8:3, 6, 10, 12,
25 10:16 12:24 13:15
19:1, 4 20:2, 24 24:21, 22
25:2, 13, 19 27:1, 2, 5, 10,
14, 20 28:6, 14, 15, 25
29:15, 17, 25 31:7, 10
34:23 35:4, 8, 9, 20 36:5,
7 37:4, 24 38:12 39:10
41:16, 19, 23 42:2, 6, 7, 20,
22, 24, 25 43:11 44:4
47:2, 3 48:5 49:2, 7, 8
50:18 51:20 52:3, 6, 9, 10,
12, 18, 19, 21 53:18, 19
55:10, 24 56:16 57:9, 13
58:8, 10, 17 59:5, 19, 21
60:4, 18 62:2, 3 63:1, 19
69:10, 12, 17, 23 70:9
71:21 74:8
**Corrigan** 33:18
**counsel** 1:23 72:13

**County** 8:5 15:2, 4 16:8,
11, 12, 13, 22, 23, 25 17:5
27:4, 6 28:21 29:23
30:18 35:4
**couple** 4:24 10:8 19:18
33:23 50:9, 17 51:7
**course** 5:4 12:12 17:25
46:3
**COURT** 1:1 4:11 8:5,
23 11:8 12:21 13:5, 17
14:2 15:4, 20 16:3 17:10
18:6, 25 28:18 29:23
31:5, 10, 14, 22 32:1
41:11 42:4 50:13 57:5, 6
61:15 66:1, 4, 17 68:9
69:14, 19, 25 70:3, 7, 19,
22 71:6
**Court's** 9:2, 3 13:23
42:2 65:11
**credibility** 68:11 69:1, 11
**credible** 9:4
**crime** 67:6
**criminal** 6:19 8:4 9:11
10:6, 13 14:6, 25 15:5, 14,
25 16:10, 19 20:14 21:4,
18 29:24 30:6, 10, 14
35:24 36:5, 14 39:19
41:15 46:11 53:5, 8, 9
58:3, 8 64:16, 20, 25 66:8,
18 68:25 71:2, 12 72:3
**criminally** 53:16
**CSU** 66:9
**current** 38:8, 11
**currently** 5:24 41:11
42:3 69:9, 13
**Cuyahoga** 8:5 16:8 27:4
28:21 29:23 35:4
**Cyoung2@clevelandohio.go
v** 2:19

**< D >**
**date** 13:2 14:13, 20
15:11 17:16 19:5, 17
29:7 30:5, 16, 25 31:21
34:23 36:24 37:2 42:9,
19
**dated** 29:9
**day** 11:10 18:17 29:22
30:3 47:10 54:7, 8 74:11
**days** 19:18 31:21
**dealer** 57:2
**decision** 13:10 14:10
30:4 65:24 66:5
**deemed** 59:2 61:11
**Defendants** 1:14 2:10
**Defendant's** 13:17
**defense's** 11:17
**definitely** 39:6 46:1
47:18

Case: 1:22-cv-00815-SO  Doc #: 24-1  Filed: 08/31/23  78 of 121.  PageID #: 336

Deposition of Jeffrey Yasenchack

William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

demonstrating 70:3
Denise 1:18 74:5, 18
Department 2:14 5:21
21:9 46:10 58:12
Departmental 3:13 43:11
55:12
Deposition 1:17 4:8, 19
7:17 73:1
describe 48:22 51:16, 25
described 34:6, 7, 8 48:4
52:23 62:1
DESCRIPTION 3:8
36:21
DET 1:11
detail 47:8
detailed 27:12
details 44:17
Detective 4:9 6:5 17:2
28:5 56:1, 5, 7 59:8
60:15 61:8
detectives 6:21 9:12
11:10 14:7 22:7 55:25
56:14 59:23 60:6
determination 60:20
determine 28:13, 18
determined 13:5 24:11
35:7 48:7
developments 14:6
device 50:8
different 51:8 70:4, 19, 23
direct 44:25 45:4 49:3
directly 12:6 17:24 21:8
49:9 64:23 71:2
discipline 67:19, 24 68:3
discretely 24:6
discuss 9:24
discussion 61:5 71:22
dismiss 18:5, 12, 17
71:25 72:5
dismissed 29:23 32:2
41:16, 18 69:17, 20 71:3
72:4
distance 51:2, 5, 14
distinctly 62:7
DISTRICT 1:1, 2 4:11
6:8, 9 16:8, 9, 21 21:18
31:14, 22 32:1 53:25
56:1 66:1, 17 71:24 72:5
DIVISION 1:3
docket 12:21 13:16 15:4
18:11 30:10 41:17, 24
dockets 18:1 30:7
document 62:17, 23
Dodge 48:22 52:9
doing 26:5 34:15 41:1
49:10 60:6 62:7
Donald 65:1, 9
dozen 15:25
draft 19:11, 14

drafted 27:6
drafting 27:8
drive 48:15
drive-by 64:7
driveway 23:18 51:23
driving 7:3 23:15
drop 6:12 9:22
dropped 10:22
drove 26:7, 14, 18 63:10
drug 21:5 34:5 36:7, 10
40:5 45:20, 21 50:17
53:12 57:2
drugs 20:20 35:15 50:21
61:10
due 32:4 72:7
duly 4:4
Duty 3:12, 14, 15 6:4
29:9 47:5 56:23 62:24,
25 63:3, 22 66:7

< E >
earlier 8:4 12:5 19:5
39:12 44:1 48:9 50:6
early 36:18, 25
East 21:6 35:3, 14 40:8
42:15 47:2 49:1 61:25
63:25 74:19
EASTERN 1:3
effort 71:5
eight 6:11
either 17:22 18:20, 21, 24
37:8 49:25 53:9 54:16
55:13 67:19 71:5
elected 6:12
elements 59:3
eligible 6:12
ELLIS 1:5 4:9 6:20, 22
7:3 8:5 10:6 12:22 13:6
17:11 18:6 20:4, 23
24:12 29:24 30:11 35:8
40:2, 8 41:8 48:8 52:2
57:20 58:4 63:10 65:4
69:16 71:3, 25
Ellis's 24:24 26:2, 18
27:5 57:11, 23 58:7
60:25 61:7 63:7, 20, 24
e-mail 12:3
emphasis 61:1
emphasized 60:24
employed 5:24
encountered 39:21
ended 8:18
enforcement 34:21 48:12
57:15, 20, 22
enjoying 5:24 6:1
enter 48:25
enters 51:20
entirely 72:17
entirety 27:13 74:7
entries 18:20, 21

Entry 3:16 13:17 18:11
41:20 63:15
equipment 49:24
especially 62:10
ESQ 2:3, 11, 12
establish 50:14, 23
established 26:24 35:6, 18
estimate 47:18
Et 1:12 4:10
Euclid 16:22
evaluate 59:1
event 31:15
eventually 10:20 14:22
54:1
evidence 8:13, 24 11:18
13:6, 24 14:3 17:11, 13
31:6, 9 49:9 50:13, 22, 25
52:17 53:8 58:3 64:21
65:10, 15, 21 67:5, 13, 20,
25 68:25 69:11 72:1
evidentiary 50:18
exact 47:11
exactly 18:20
examination 1:18 3:3 4:5
examine 58:23
example 67:2
exchange 23:23 53:16
executed 7:7, 25 62:11
executing 8:2
execution 44:16 58:2
EXHIBIT 3:6, 8 7:13, 18,
23 12:16, 20 13:16 18:11
19:3 20:2 25:12 26:24
29:4, 9 43:2, 6, 9 46:25
62:13, 17, 19, 22, 25 63:3,
6, 15, 21 66:12, 16
Exhibits 62:24
existed 28:19
exit 48:25
exits 51:17
expectation 58:1
expedition 67:5
expires 74:21
explore 20:21
Explorer 48:5, 22 52:1
expression 8:20

< F >
face 39:19
fact 18:16 29:19 31:9,
17, 21 35:19 41:15 42:1,
5 51:1 68:23 69:10
71:11
fair 5:9 6:2, 22 11:14
18:2, 21, 22 20:6 22:12
24:10 25:1, 8 31:14 33:4
35:25 39:19 44:3 46:16
57:15 58:4 59:13
fairly 10:1

false 70:21, 25 72:7
familiar 40:20
familiarize 43:7 66:19
far 30:2 46:17 51:4
federal 16:5, 8 58:16, 19,
24 59:4 60:22 65:4
69:16, 19, 25 70:7, 22
71:2, 6, 12, 23
federally 59:3, 10 60:16
61:1, 13
female 51:17 52:11, 21
Fifth 6:8, 9 21:18 56:1
figure 9:18
file 22:2 31:18 38:17, 21,
23, 25 39:6, 9 46:18 55:3,
6 64:10
filed 4:16 13:18 18:16
fill 10:19 11:10 45:6
film 49:18 50:1
find 33:5 53:8 58:2
fine 35:2 47:4 66:23
first 4:3 6:24 7:22
10:13 20:23 24:20 28:8
29:10 34:2, 3 35:11 36:8
37:8 39:21 40:14, 18
48:4 67:1
fishing 67:5
fit 58:24
five 52:5
floor 33:17, 18
folks 10:2, 7 24:25
follow 10:25
followed 8:9
following 9:3 61:6
follows 4:4
force 16:18, 21 27:24
28:2 58:22 60:23 65:6
Ford 48:5, 21 52:1
foregoing 74:7
forget 48:11
form 21:24 43:12, 15, 17,
20 44:1 46:25
formal 9:20
formalized 72:17
formed 25:16
forms 25:11
four 51:25 61:23
Franks 71:6, 9
Friday 1:22 6:3
Friedman 1:20
full 5:17
further 54:2 62:8

< G >
Gapente|spelling 45:5
gather 49:9 54:4
gathered 26:17 27:19
65:21
gathering 44:15

Case: 1:22-cv-00815-SO  Doc #: 24-1  Filed: 08/31/23  79 of 121.  PageID #: 337

Deposition of Jeffrey Yasenchack

William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

general 9:13 46:15 63:18
generate 20:16
generated 45:24
Gerhardstein 1:20
getting 15:18 32:4
Gilbert 1:20
Gina 19:24
give 15:23 36:21 38:14
41:3 44:17 54:20 56:24
given 15:15 16:1 35:3
61:15
giving 21:14 24:4 39:15
72:11
Go 8:16 9:6, 17 15:4
19:2 20:22 21:10 22:11
32:16 33:7, 16 42:12
44:11, 18 45:25 46:21
55:16 60:14, 21, 22 61:14
67:10, 15, 23 68:14 69:4
goes 10:20 22:7
going 5:4, 7, 8 7:10, 16,
17, 20 11:15, 17 15:20
16:1 17:25 18:5 19:14
24:8 25:1 36:13 43:5, 21
50:17, 19 61:12 66:15
good 6:2 51:5 61:17
64:1
go-to 33:18
Grand 11:3, 5, 8, 12
43:18 71:15
granted 13:18 18:13
guess 9:18 13:21 21:16
33:5 40:22
guidance 45:16, 18
gun 59:1 60:24, 25 61:9

< H >
half 47:19
hand 7:16 43:5 62:16
66:15 74:10
handed 7:22 22:4 60:12
handful 16:4
handing 12:19 29:8
handled 59:9
happened 30:3 41:3
61:15
happening 36:9
harm 57:2
hearing 8:13, 19, 21 9:3
11:17, 22 12:13, 25 67:7
71:6, 9 74:7
held 12:25
help 16:12 56:23
helped 59:23
helping 28:17
helps 26:23
Henry 48:10
hereunto 74:10
heroin 41:9

Hey 40:19 61:12
high-powered 51:5
highway 21:6
history 68:11
hitting 39:13
hoc 44:11
home 27:5 57:11, 23
58:7
Honorable 4:12
hot 39:13
hour 42:20 47:16, 17, 18,
19
hours 29:10 42:14, 23
61:24
house 24:7, 10 26:7, 15,
19 34:16, 19 35:15 40:20,
25 48:2, 15 50:17, 19
51:14, 20 52:3 63:9, 10,
20
houses 51:7, 9, 10, 11

< I >
idea 51:13
identification 7:14 12:17
29:5 43:3 62:14, 20
66:13
identified 57:5
identifying 24:24
imagine 47:7
importance 44:13
important 27:18 38:20
impose 67:18
inaccurate 70:8
include 27:22
included 26:21
INDEX 3:1, 6
indicate 47:1
indicated 13:17 22:17
64:2
Indicating 37:11
indictment 18:13, 17
individual 39:18 45:9
individuals 52:5, 20 53:1,
2, 6, 10, 17 54:16 57:5
inform 21:8
informal 46:4, 6
informant 36:18 37:5
40:24 55:13
informants 53:3, 17
55:23 56:2, 12, 15, 24, 25
69:19, 21, 24 72:7
information 3:11, 13
10:14 11:1 20:19 21:14,
23 22:18, 21, 23 23:21, 24
24:2, 4 26:4, 6, 18, 20
27:15, 17, 18, 21 28:12
32:22 35:13 36:3, 4 37:3
38:20, 22, 25 39:1, 16, 18
40:2, 5, 15, 18 41:3, 6
43:12 44:15, 20 53:20, 24

54:2, 5, 25 56:22, 24 57:1,
2 70:2, 7, 9, 21, 25
informed 14:1 17:23
18:24
initial 10:14 11:1
initiated 7:3 8:9 10:17
inner 10:21
instance 16:11
intentional 67:3
intentionally 25:3
interacted 53:21
interaction 25:7 49:3
52:8, 14
Internal 70:6
interview 13:25 70:16
interviews 54:16 56:12
inventory 65:17
invest 63:14
investigate 21:10 22:8
26:1
investigating 15:21 34:9,
12 57:20 68:24
investigation 6:19, 24 7:5
8:4 11:5 20:3, 9, 15 21:3
22:12, 15 25:10, 15, 17
26:3 27:13, 18 29:13
34:5, 14, 23 38:24 44:1, 7
45:17 48:12 50:15 60:10
63:16 64:10
investigations 6:21 16:23
45:9, 20, 21 46:12, 18
49:24 50:7
investigative 55:2, 6
investigator 59:16, 19, 21
60:3
investigators 64:24
involved 6:21 8:3, 13
9:12 10:5 14:7 15:6, 14
16:10, 18, 20 18:1 23:2
30:7 48:18 60:3 64:16,
24 65:3 71:23
involving 6:20 11:5
25:25
issue 28:14 31:13 64:20
issued 30:22 57:9
its 74:7

< J >
JC 29:10
JEFFREY 1:11, 17 3:3
4:3, 5, 8 59:9
JOSEPH 2:3 4:13
Journal 3:16
JR 1:8 2:11 4:12 65:25
66:18
Jrussell2@clevelandohio.go
v 2:18
Jscott@ohiowagelawyers.c
om 2:9

JUDGE 1:8 4:12 13:5
27:6 28:22 29:16, 19
31:10 32:13, 17, 21 33:2,
8, 14, 17, 20, 21 52:23
57:18 65:13, 20
judges 27:4 33:7
judicial 28:11 68:18
July 1:22
jurisdiction 17:1, 5 32:2
jurisdictional 16:18
Jury 11:3, 5, 8, 12 43:18
71:15
Justice 29:11
justification 65:12, 16
justify 67:7

< K >
keep 14:6 39:2 44:2
45:13
keeping 14:24 44:6
keeps 22:4
kept 46:1
Kincaid 45:1, 18
kind 21:24 30:14 33:7,
10 36:8 58:24 70:1
72:16
knew 15:5 31:15 44:15
46:17
know 9:20, 23 11:9, 11
13:12 14:13 15:10 16:22
19:19 21:12 25:24 26:20
30:3 31:20 32:10 33:3,
10, 21 34:18 36:8, 19
37:2, 5 38:5 39:2, 3, 11
40:1, 3, 4, 10, 13, 21 41:5,
20 42:5, 10 44:13 45:6,
18, 21, 22 46:1, 15, 22, 23
47:6 48:14 50:20 54:8
56:4, 23 57:7, 8 58:19, 25
61:8, 11 66:9, 20
knowledge 30:4 31:1
46:9, 14 55:11, 25 57:17,
19, 22, 25 67:17 68:8, 17
Kopchak 58:12, 15 60:12,
15, 22, 23 61:3, 6, 8 65:1,
3 67:19 68:2 71:20, 23

< L >
lack 32:2
Lake 16:11, 13, 22, 25
17:5
Lakeside 2:15
large 24:7
Law 2:14 34:21 48:11
57:15, 19, 22
lawful 4:3
Lays 36:20
lead 17:2 58:7 59:16, 18,
25

Case: 1:22-cv-00815-SO  Doc #: 24-1  Filed:  08/31/23  80 of 121.  PageID #: 338
Deposition of Jeffrey Yasenchack
William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

learn  14:9  17:17  18:4, 7, 8  31:17  32:3
learned  14:22  17:10, 13  45:25
learning  45:23
leave  49:13  52:3
leaving  24:9  50:20
left  45:3
license  26:8, 14  34:19
lied  69:19  70:8
lieutenant  22:10  44:2  45:3, 5
line  29:10  63:25
lines  34:3  66:24
little  5:1, 12  20:21  21:17
lobby  21:14, 22
local  17:7
located  1:20
location  24:25  35:3  47:14  48:19  50:24  51:1  62:5
long  6:9  30:14  33:21  37:16, 18  47:13, 15  64:2
look  7:20  27:23
looked  17:20
looking  36:4  44:16, 22  46:24
looks  51:22
Lorain  16:12
lot  24:25  50:3  56:24

< M >
Magnum  48:22  52:9
mail  10:21
maintain  38:21
maintained  22:2
making  39:3
male  35:14  36:19  52:21
males  48:25  49:4  52:8
March  6:25  8:9, 14, 25  13:7  17:12  20:6, 24
marijuana  41:10
mark  7:10, 17
marked  7:13, 23  12:16, 19  29:4, 8  43:2, 6  62:13, 16, 19  66:12, 16
material  27:17
matter  4:9, 20  68:25
Matthew  52:24  54:1, 4  70:5
McCormick  28:22  29:16, 19  32:14  33:2  57:18
mean  10:15  15:3  20:5, 12  57:4  66:18
meant  36:14
meet  9:12, 14, 24  32:16, 19  37:12  44:19, 21  71:14
meeting  9:21  12:10  27:3  32:13  46:5  54:3

meetings  46:4, 6
member  58:11, 12, 22
members  34:4
memory  5:1
mention  42:1, 3  69:5
mentioned  23:20  69:8
message  37:13, 19  38:16, 25
messages  37:15
met  28:21, 24  29:19  60:16
mid  25:8  35:12
minute  43:7
minutes  7:19  47:19  62:2
monitoring  15:9
morning  62:10
motion  11:17  13:17  15:12  18:12, 16  67:6
motorcycle  23:16
move  5:3  18:5  26:22
moving  71:25
multiple  16:18  44:23

< N >
name  4:13  5:17  37:8  70:5
Narcotics  16:13, 23  39:14
Nathan  37:9, 10  39:11
Nathaniel  37:9
near  21:6  47:24
necessarily  22:10  55:5
need  21:9
needed  15:11  44:13
neighborhood  23:21, 24  35:24  36:9, 14
never  49:6  59:9, 12
night  62:10
nine-month  30:24
Normally  21:25  32:24  33:16
NORTHERN  1:2  4:11  16:9
Notary  1:18  74:5, 18
note  38:23, 24  39:5
notepad  39:7
notes  39:3  54:25  55:2, 6  64:9, 13  74:9
notice  1:22
noticed  24:7
notification  14:4
notified  11:4, 16  13:22
November  74:21
number  4:14  28:5  38:5, 8, 11, 14  42:13  57:15  59:22
numbered  35:11
numbers  26:8, 14  34:19
Numerous  15:16

< O >
Oaky  58:15
oath  4:4  70:18
Objection  8:15  9:5  25:20  32:11  36:1  42:8  46:13, 20  55:15  56:3  60:5, 13  67:9, 14, 22  68:13  69:3
observe  34:8
observed  34:7  64:3
observing  47:20  51:10
obtain  27:5
obtained  59:18  60:1
obviously  6:18
occasions  26:9
occupants  50:21
occur  25:12
occurred  12:7  21:2  25:8  30:5  45:20  50:14
offer  68:2
office  9:10, 24  10:3, 14, 20, 21  11:16  12:2  13:22  14:5, 10  17:24  18:25  21:12, 13, 22  31:12  43:22  44:18, 21  46:7  54:1, 7, 10, 16, 17  58:9  68:2  71:24  72:5  74:11
officer  17:6  22:11  28:12, 18  45:8  46:19  60:12, 21  61:3, 5  67:19  68:2, 18, 24  71:20, 22
officers  34:9, 12  44:2, 6  46:11  57:15
officer's  67:2  70:12
offices  1:19  9:22
Oh  26:5  52:14
OHIO  1:2, 19, 21  2:7, 16  4:12  12:22  16:9  35:4  64:17  74:6, 11, 18, 19, 20
Okay  4:22  5:11, 15  6:12, 18  7:5, 10, 22  8:2, 8, 12, 20, 23  9:9, 16  10:12, 21, 24  11:4, 7  12:7, 9  13:4  14:5, 9, 14, 21  15:3, 17, 19  16:7, 15, 24  17:4, 17, 22  18:4, 10, 23  19:2, 11, 16  20:1, 8, 18  21:7, 16  22:6, 14, 25  23:2, 9, 17, 19, 23  24:2, 14, 17, 20  25:3, 7, 10  26:5, 9, 13, 17, 22  27:8, 17, 23  28:11, 21  29:22  30:2, 6  31:2, 17  32:1  33:1, 4, 13, 15, 20, 25  34:20  35:2  36:17  37:2, 16, 19  38:3, 5, 10, 15  39:11, 17  40:7  41:2, 7, 18, 25  42:5, 12, 19  43:20, 25  44:18, 22  45:7, 15  46:3, 16, 24  47:8, 13, 16, 20, 24  48:7, 11, 17, 21  49:17  50:12  51:13, 25

52:17, 23  53:2, 15  54:3, 12, 15, 20  55:5, 8, 11, 21  56:13  57:8  58:1  59:4, 11  60:10, 17, 20  62:4  63:13, 18, 21  64:1, 6, 9, 12, 15, 19, 23  65:3, 10, 16, 20  66:3, 7, 23  67:12, 17  68:8  70:10, 12, 15  71:1, 19
OLIVER  1:8  4:12
once  22:4  27:6  71:25
ongoing  34:5  46:11
open  41:10  69:8, 13
operated  33:6
operations  34:6
Opinion  3:16  66:16, 21
opportunity  39:15  72:12
OPS  70:16
order  31:4  52:24
ordered  17:10
orders  46:15
ordinance  67:4
outrank  61:3
outside  16:10

< P >
pace  65:14
packet  10:19  11:1  43:18, 19, 22
pad  39:2, 4
page  13:16  34:2, 3  35:2, 10  62:17, 23  66:24
PAGE/LINE  3:3, 8
paper  21:25  39:2, 4, 8
paragraph  35:11, 12  36:17  41:7  42:13  46:25  51:25  61:23  67:1
parens  42:16
parentheses  42:16
Parked  47:24  48:1, 6, 23
parks  51:16
part  9:2  16:17  24:21, 23  69:1
participate  6:16  32:13  34:13  48:12  71:8, 11
participated  34:4, 22  57:14  59:4
participating  54:15
particular  20:9, 14  21:19  34:22  64:24
parties  36:12
parts  34:1
patrol  66:9
patrolling  21:2
patrolman  58:25
patrolmen  65:2
Payne  23:6, 7, 9  24:24  25:7  26:1, 4, 6  35:22  36:2
P-A-Y-N-E  23:8
Pearson's  52:23

Case: 1:22-cv-00815-SO   Doc #: 24-1   Filed:  08/31/23   81 of 121.   PageID #: 339

Deposition of Jeffrey Yasenchack                                    William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

**pending** 4:*10* 5:*14* 9:*11* 30:*8*
**people** 10:*9* 24:*8* 34:*25* 50:*19, 23* 54:*18*
**perform** 20:*9* 22:*12*
**period** 16:*5* 24:*9* 25:*25* 30:*14, 24* 42:*16, 21* 44:*24* 45:*4, 23*
**person** 22:*1, 23* 56:*22*
**personal** 37:*23* 50:*4*
**personally** 34:*7, 8*
**personnel** 34:*22* 48:*12*
**pertinent** 27:*15*
**phone** 37:*14, 20, 23* 38:*3, 5, 13* 71:*17*
**phones** 50:*4*
**photo** 51:*2*
**photograph** 49:*25* 50:*4, 25*
**physical** 36:*21*
**picks** 22:*7*
**pin** 36:*24*
**place** 15:*9* 25:*18* 48:*9*
**Plaintiff** 1:*7* 2:*2*
**PLAINTIFF'S** 3:*8* 7:*13, 18, 23* 12:*16, 20* 13:*16* 18:*10* 19:*2* 20:*2* 25:*11* 26:*24* 29:*4, 9* 43:*2, 6, 9* 46:*24* 62:*13, 16, 19, 22, 24, 25* 63:*6, 15, 21* 66:*12, 16*
**planning** 31:*16*
**plate** 26:*8, 14* 34:*19*
**plates** 34:*16*
**Plaza** 74:*19*
**Pleas** 8:*6* 27:*4* 28:*22* 29:*23* 31:*5* 33:*7*
**Please** 4:*7* 5:*6, 17* 7:*19* 42:*13*
**point** 11:*2, 15* 27:*13* 59:*15, 16, 22* 60:*2*
**pointed** 24:*6, 11*
**Police** 5:*21* 46:*10, 15* 58:*12* 67:*12*
**policies** 46:*10*
**policy** 55:*12, 18, 20*
**positions** 45:*2*
**possession** 39:*14* 41:*9* 53:*12*
**possibility** 23:*20* 40:*17* 48:*15*
**possibly** 36:*5* 50:*16* 55:*4* 64:*11*
**post** 49:*13*
**potential** 21:*3*
**potentially** 50:*13*
**practice** 15:*8* 33:*6* 55:*21, 22*
**premises** 42:*16*
**prep** 11:*20*
**prepare** 11:*21* 43:*16*

**prepared** 27:*3* 28:*8* 59:*17* 72:*20*
**preparing** 19:*4* 27:*12*
**present** 60:*16, 18* 61:*1*
**presented** 59:*9, 12*
**presenting** 19:*11* 60:*11*
**pressed** 53:*5*
**pretextual** 65:*12*
**pretty** 11:*9*
**previously** 33:*2* 68:*24*
**prior** 8:*2* 19:*13, 21* 43:*21* 62:*5* 68:*19*
**probable** 28:*13, 18*
**Probably** 6:*11* 18:*9* 21:*22* 30:*21, 24* 31:*25* 54:*25* 62:*8* 65:*8*
**proceed** 61:*6*
**proceeding** 11:*5, 8* 12:*21* 18:*6* 64:*20*
**proceedings** 57:*6* 70:*22*
**P-R-O-C-E-E-D-I-N-G-S** 4:*1*
**process** 45:*25* 49:*14*
**product** 20:*2*
**program** 6:*13*
**promoted** 45:*2*
**prosecuted** 16:*5*
**prosecuting** 59:*12*
**prosecution** 8:*5* 10:*6* 16:*19* 56:*19* 58:*24* 60:*21* 64:*16, 25* 65:*4* 66:*18* 71:*12, 24*
**prosecutions** 14:*25* 15:*5, 14, 25* 16:*10* 59:*5, 6*
**prosecutor** 9:*15* 10:*8* 17:*7, 19* 32:*4* 42:*10* 58:*16, 19, 20* 59:*2* 60:*11, 18, 22* 71:*14, 18*
**prosecutors** 10:*4, 5* 11:*21* 19:*12, 20*
**prosecutor's** 9:*10* 10:*2, 14, 20* 11:*16* 12:*2* 13:*22* 14:*5, 10* 17:*24* 18:*25* 31:*12* 43:*21, 22* 58:*9*
**protect** 56:*23*
**proved** 27:*21*
**provide** 32:*21, 24* 45:*16, 18*
**provided** 36:*19* 53:*20, 21* 70:*21*
**providing** 39:*18* 72:*7*
**Public** 1:*18, 20* 2:*6* 74:*5, 18*
**pulled** 23:*18*
**pulls** 51:*23*
**purpose** 27:*8* 43:*15* 67:*4*
**purposes** 7:*14, 17* 12:*17* 29:*5* 43:*3* 62:*14, 20* 66:*13*
**pursuant** 1:*22*

**put** 21:*24* 27:*15* 28:*16* 38:*13, 17* 39:*5* 47:*11* 55:*5* 69:*13* 70:*9*

**< Q >**

**question** 5:*7, 14* 17:*13* 19:*14* 25:*14, 23* 30:*18* 68:*12, 15, 21*
**questionable** 67:*4*
**questioned** 49:*6* 69:*1, 12*
**questions** 4:*15, 25* 5:*4, 8* 72:*10*
**quick** 71:*17*
**quite** 20:*16* 21:*15* 28:*2* 38:*2*
**quote/unquote** 36:*19*

**< R >**

**Radovanovic** 52:*24* 54:*4* 70:*5, 13* 71:*1*
**rate** 49:*15*
**reach** 9:*20* 40:*1*
**reached** 10:*25* 40:*8, 23*
**really** 60:*3*
**reason** 33:*12* 45:*3* 54:*12, 23* 65:*14*
**recall** 5:*1, 3* 8:*17* 10:*12* 11:*7, 13, 24* 12:*9* 13:*1, 2, 4, 9* 14:*1* 16:*9* 18:*19* 19:*11, 16, 20* 20:*8* 21:*1* 22:*25* 23:*2, 14* 24:*4* 25:*21* 26:*5, 9, 13, 17* 29:*1, 2* 30:*10* 34:*15, 19, 20* 37:*13* 39:*21* 40:*7* 47:*21* 48:*17* 50:*6* 54:*3, 9, 15, 17* 60:*8* 62:*4* 63:*13* 64:*15, 19, 23* 65:*10, 16, 20, 24* 66:*20*
**recanted** 69:*24*
**receive** 21:*15* 23:*9*
**received** 20:*19* 22:*17, 20, 22* 35:*13* 37:*3, 14, 19* 40:*5, 25* 54:*2*
**recognize** 7:*23* 10:*9*
**recollection** 9:*7* 14:*15* 16:*24* 29:*18* 64:*2* 66:*4* 67:*12*
**record** 4:*7* 5:*18* 26:*11* 38:*14* 49:*17* 50:*1, 8* 55:*22* 56:*1, 12, 14, 21* 61:*20*
**recorded** 54:*20, 23* 55:*14* 56:*18* 70:*10*
**recording** 50:*8* 56:*20* 70:*1*
**recovered** 60:*25* 61:*10*
**recovery** 50:*20*
**reference** 69:*10*
**referenced** 63:*14*

**refers** 61:*23*
**reflect** 4:*7*
**reflected** 70:*19*
**refresh** 29:*18* 67:*12*
**regarding** 24:*24* 66:*17*
**regards** 10:*12* 22:*15* 63:*21*
**regular** 46:*4*
**regularly** 9:*13*
**re-instruction** 68:*3*
**related** 7:*6*
**relationship** 10:*2*
**relative** 4:*15* 20:*3* 22:*16* 29:*24* 45:*8* 66:*8*
**reluctant** 61:*14*
**relying** 28:*12*
**remember** 11:*11* 13:*8* 14:*4, 20* 17:*16, 17, 19, 21* 19:*19, 25* 21:*11* 22:*20* 23:*12* 26:*16* 34:*25* 37:*18* 38:*1, 2, 8, 9* 39:*5, 25* 40:*10, 16* 45:*1* 47:*12, 13, 15* 48:*16, 20* 49:*22* 50:*2* 53:*24* 54:*11, 14, 19* 62:*7* 63:*12* 64:*8* 65:*13, 19* 66:*7, 10* 68:*7*
**remembered** 15:*10*
**repeat** 68:*15*
**rephrase** 5:*6*
**Report** 3:*12, 14, 15* 24:*14* 29:*9* 43:*17* 47:*5* 50:*3* 62:*25* 63:*3, 22*
**Reports** 62:*24*
**represent** 12:*20*
**represented** 69:*22*
**request** 9:*25* 72:*5*
**requesting** 12:*3* 64:*20*
**requests** 68:*10*
**require** 46:*10*
**required** 54:*13* 55:*12*
**requirement** 58:*24* 68:*9, 17*
**residence** 24:*12, 24* 26:*2* 35:*7* 49:*1* 60:*25* 61:*7* 63:*8, 24* 64:*3*
**residents** 47:*21*
**residing** 35:*14*
**responsibilities** 45:*10*
**responsibility** 60:*11*
**responsible** 20:*14*
**result** 20:*24* 44:*16* 67:*20*
**resulting** 67:*24*
**retired** 5:*20* 6:*3, 15*
**retirement** 5:*25* 6:*1*
**returning** 62:*4*
**review** 10:*24* 19:*21* 43:*8, 23* 46:*11, 19* 67:*18* 68:*1* 72:*16, 19, 20, 23*
**reviewing** 28:*12* 44:*6*

Case: 1:22-cv-00815-SO  Doc #: 24-1  Filed: 08/31/23  82 of 121.  PageID #: 340

Deposition of Jeffrey Yasenchack

William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

**right** 6:12, 18  7:8, 9
10:1  12:1  14:1  17:22
18:10, 18  22:18  26:2, 5,
22  27:9  28:3, 16, 19, 22
29:16  32:12  33:4, 20, 22,
25  36:13, 15  39:8  40:1,
13, 17  42:12  46:24  47:4
48:8, 21  49:1, 12  51:23
52:25  53:3, 5  57:6, 12
65:6  66:23  69:2, 15
70:15  71:20  72:14, 15
**road** 39:2
**role** 45:8
**roles** 58:23
**Room** 2:15
**rotating** 44:23
**routine** 33:6
**ruling** 13:23  14:2  31:19,
22  42:2
**RUSSELL** 2:11  8:15  9:5
25:20  32:11  36:1  38:15
42:8  46:13, 20  55:15
56:3  60:5, 13  61:17  67:9,
14, 22  68:13  69:3  72:15,
23

**< S >**
**safety** 56:25
**Saturn** 51:16  52:11
**save** 38:16
**Savings** 74:19
**saw** 10:10  18:19, 20
**saying** 22:11  30:23  56:8
69:5
**says** 18:18  41:17
**scene** 53:21
**schedule** 9:21
**scheduled** 11:2  46:4
**SCOTT** 2:3, 4  3:4  4:6,
13  38:13  61:22  72:9, 24
**script** 67:6
**seal** 74:11
**search** 3:9  7:6, 24  8:2
19:3, 12, 21  20:1, 10
22:16  25:12, 16  26:25
27:5, 9, 10, 19  28:9, 14
29:14, 20  30:22  31:3
32:22  33:1  34:1  35:10
41:25  44:16  49:7  57:8,
11, 18, 23  58:2, 6  59:17,
18, 23  60:2  61:7, 9  62:11
65:12, 17  68:19  69:2, 23
70:20
**searches** 67:7
**searching** 65:17
**second** 7:5  46:25  63:25
66:24
**see** 10:9  13:19  15:11
18:10, 14  33:14  34:10
35:16  36:22  41:1, 12

42:17  48:25  49:15  51:6,
18  62:9  64:7  67:8, 11
**seeing** 18:9  48:5  50:19
**seeking** 57:23
**seen** 17:25  47:5  66:21
**seized** 17:11
**selling** 20:20  35:15
**sent** 9:23  12:3, 5  13:14
**sentence** 66:25
**sentencing** 15:11
**separate** 63:16
**September** 13:11
**Sergeant** 45:1, 18, 22  70:6
**session** 11:21  12:4
**set** 42:15  47:1, 8, 21
61:24  74:10
**seven** 6:11  31:21
**Shaw** 63:25
**Sheehan** 33:17, 20  70:6
**sheet** 21:25
**short** 24:9  61:18
**shortly** 19:17  39:24
**show** 13:2
**showing** 50:16
**shows** 41:24
**signaled** 24:6
**signature** 72:17
**signed** 26:25  29:7, 13, 16,
20  30:25  31:3
**significant** 26:18
**simply** 9:21
**sir** 10:18  17:15  19:4, 7
30:20  38:7, 18  41:22
43:11  44:9  45:12  59:7
68:1, 8  69:7
**sit** 34:20  40:14  48:17
63:13  66:20  69:15  72:20
**site** 30:18
**situation** 16:17  68:20
**situations** 17:4
**small** 39:15
**Smith** 52:24  54:9  71:6
**sole** 67:4
**SOLOMON** 1:8  4:12
**somebody** 12:1  21:8, 17,
20  34:18  35:19  48:14
**sorry** 13:13
**sort** 11:20  12:9  14:24
15:8  23:9  24:14  33:6
44:11  49:7  54:20  55:11
67:18  68:3, 9
**sought** 33:1
**sound** 7:7
**Sounds** 7:9
**speak** 71:5  72:12
**specific** 30:20  34:1  37:2
50:23
**specifically** 36:7  40:7
**speed** 65:14

**spoken** 71:1
**spots** 39:13
**Square** 1:21  2:6
**standards** 60:16
**stands** 29:11
**start** 19:6
**started** 10:15  26:3
**State** 1:19  5:17  11:8
12:21, 22  13:5  14:2  16:3
18:4, 6, 16  31:1, 4, 9, 16,
18  35:12  36:17  41:8
58:20  60:18, 21  61:14
64:16  74:6, 18
**stated** 56:7  70:13
**statement** 54:21  55:12
70:10
**statements** 55:22  56:1, 15,
18
**STATES** 1:1  4:11
**State's** 18:12
**status** 45:14
**staying** 24:8
**stenotype** 74:9
**stenotypy** 74:8
**stipulations** 1:23
**stop** 5:11  7:2  8:9, 14
13:7  17:12  20:6, 24  21:2
22:22, 23  23:3, 12, 15
24:15  25:25  35:20  39:13
41:10  52:11, 20  53:23
54:6  65:22  67:3, 7
**stopped** 35:20  47:9  49:6
53:1  63:10
**street** 20:20  24:6, 7  26:2
35:3, 15  40:9  42:15  47:2,
24  48:1, 6, 23  49:1  51:7,
17  61:25  74:19
**strong** 50:12, 21, 25
**stuff** 45:24
**stuffy** 5:12
**subpoena** 9:23  12:6
**subsequent** 6:19  8:4
20:3, 5  56:19  58:7  67:7
68:10
**subsequently** 25:15  52:3
**successful** 26:13
**suggestions** 46:1
**suggests** 63:7, 23
**Suite** 1:21  2:6
**summary** 70:12
**Summit** 16:11
**superior** 44:17, 20
**supervising** 22:11  44:2, 6
45:8, 11  46:11, 19
**supervisor** 44:12  45:1, 5,
19
**supervisors** 44:23, 24
**supplied** 36:2  55:1
69:25  70:7

**supply** 39:16
**supplying** 56:22, 25
**support** 20:10
**supported** 53:9
**supposed** 45:13
**suppress** 11:8  13:18, 23
14:2  15:12  67:6
**suppressed** 8:24  13:7
17:14  31:9, 15  65:11, 15,
21  67:13, 25  68:25  69:11
72:1
**suppression** 8:13, 19  9:2
11:22  12:12, 24  13:14
17:10  30:4  31:5, 19  42:2
64:19, 21  65:8  67:20
**sure** 11:9  12:7  18:23
33:3  49:23  50:4  68:16
72:21, 22
**surveillance** 34:16  42:15
47:1, 9, 14, 22  48:18  50:1,
8  60:7  61:25  62:8  63:7,
11, 23
**SW** 29:13
**sworn** 4:4
**system** 14:23  15:8, 21
16:6  24:18  44:5, 8

**< T >**
**tailored** 67:6
**take** 5:11, 13  7:19  10:22
21:20, 22  25:17  31:13
43:7, 25  55:8, 21  61:12,
18  71:8
**taken** 1:17  4:9, 19
**takes** 21:20
**talk** 6:18  15:24
**talked** 61:11
**talking** 42:23
**task** 16:18, 20  58:22
60:23
**tasked** 20:14
**tell** 5:2, 6, 13  64:10
72:13
**telling** 53:15
**Terminal** 2:5
**test** 4:25
**testified** 4:4  11:7  70:18
**testify** 8:20  69:22  71:15
**testifying** 11:11
**testimony** 69:25  70:3
72:7
**text** 37:13, 14, 19  38:16,
25
**thank** 72:11, 24
**things** 4:24  17:23  30:3
**think** 4:21  13:3  15:23
16:13, 20  26:7  33:16, 20
35:6, 18  36:8  39:12  40:4,
11, 19, 23  41:2  45:13, 20
47:11, 16  49:15  50:10, 21

Case: 1:22-cv-00815-SO  Doc #: 24-1  Filed:  08/31/23  83 of 121.  PageID #: 341

Deposition of Jeffrey Yasenchack

William Ellis, vs. Detective Jeffrey Yasenchack, et al.,

51:*4* 58:22 60:23 62:*1*
64:6 65:*1, 13* 66:22 70:5
**third** 13:*15* 35:*10*
**thorough** 53:*25*
**thought** 27:*21* 28:*17*
44:*12* 49:*14* 60:*15* 61:2
**three** 52:2, *6*
**ticket** 23:*22, 25* 36:*3*
**time** 5:*11* 12:25 13:22
14:2, *9*, *14, 19* 15:*4, 5, 15,
23, 24* 16:*1, 4* 17:9 24:9
25:25 27:*14* 28:8 30:*1, 5,
11, 14, 19* 32:5 33:*21*
34:*13* 38:*1, 6* 42:*11*
44:24, *25* 45:*4* 47:8 49:*3*
50:*3* 51:22 54:*4, 6* 57:24
59:*15, 16* 60:2 61:*18*
62:5 65:*1, 7, 8*
**timely** 31:*18*
**times** 10:8 26:7 38:2
47:*11* 50:*3* 64:*1*
**title** 58:*21*
**today** 4:8, *14, 25* 7:*21*
31:25 34:*20* 40:*14* 48:*17*
63:*13* 66:*21* 69:*16* 72:*10,
11*
**told** 23:*23* 35:*22, 23*
61:25 70:*4*
**total** 51:*13* 52:2, *5*
**Tower** 2:5
**track** 14:*24*
**traffic** 4:*23* 7:2 8:9, *14*
17:*12* 20:6, *24* 21:2
22:22, *23* 23:*3, 9, 15, 22*
24:15 25:25 35:20, *23*
36:*3* 39:*13* 41:10 67:*3*
**trafficking** 34:6
**transcript** 72:*16, 21* 74:9
**Trial** 65:*11*
**tried** 45:6
**true** 74:8
**try** 5:6
**trying** 9:*18* 14:*10* 21:*16*
25:*24* 26:7 33:5 40:22
50:*14*
**Tuesday** 63:*11*
**turn** 13:*15* 35:*10* 66:*23*
**turned** 25:5
**turns** 52:*21*
**two** 6:*21* 16:*10* 30:3
31:*12* 48:25 49:*4* 52:8,
*20* 53:*1, 2, 6* 65:6
**type** 44:*1* 50:*1, 7, 8*
**typical** 32:*16*
**typically** 9:9, *10* 14:6
15:*14* 43:20, *25* 64:*12*

< U >
**ultimate** 13:*10*

**ultimately** 8:*24* 13:5
24:*11* 27:9 28:*21* 35:7
48:7 51:*20* 57:5 69:*17*
72:4
**unaware** 30:*1* 56:*11*
**understand** 4:*17* 15:3
21:*16* 25:*23* 30:*23* 31:2,
*24* 59:*24*
**understanding** 5:*20*
24:*17* 58:*15* 72:3
**understood** 27:*23* 28:*11*
45:7, *16, 19*
**unit** 6:7, 8, *10* 21:*23*
34:5 39:*12* 44:25 45:22
49:22 50:5, *10* 56:5, 6, 9,
*10, 14* 66:*10*
**UNITED** 1:*1* 4:*10*
**unlawful** 67:*3*
**unsure** 37:8
**upholding** 66:*4*
**Use** 49:*20* 67:*3*
**usually** 33:*18, 19* 39:2
59:8

< V >
**Vaguely** 64:*18, 22* 65:*13*
**valuable** 27:22
**value** 28:*17* 50:*18* 56:*20*
**Vanessa** 52:*24* 54:9 71:6
**varied** 30:9
**vehicle** 7:*3* 47:*21, 23*
48:8 49:*4, 7* 51:*23* 52:20
64:7 65:*17*
**vehicles** 52:2, 6
**venues** 16:*11*
**versus** 4:9 12:22 64:*17*
**Vice** 6:8, 9 21:*23* 45:22
56:9, *10, 14*
**Victor** 23:6, 7 35:22
**video** 50:*16, 19, 24*
**view** 48:2
**Villa|spelling** 19:*24*
**violation** 23:22
**volume** 24:7 50:*16*
**vs** 1:9

< W >
**waiting** 49:*15*
**waive** 72:*17*
**walk** 21:*17*
**want** 5:*11* 22:*11* 28:*16*
33:25 38:*13* 42:*12* 49:*13*
72:*10*
**wanted** 50:*23*
**warrant** 3:*10* 7:6, *24* 8:3
19:*3, 12, 21* 20:*1, 10*
22:*17* 25:*12, 16* 26:25
27:5, *9, 10, 19* 28:9, *14*
29:*14, 20* 30:22 31:*3*
32:*23* 33:8 34:*1* 35:*11*

41:25 44:*16* 57:8, *18, 23*
58:2 59:*17, 18, 23* 60:2
61:*9* 62:*11* 68:*19* 69:2,
*23* 70:*20*
**warrants** 33:*1* 68:*10*
**way** 12:7 20:*13* 40:*13*
49:*17* 60:8 69:*12* 70:2
**ways** 21:*15* 22:*14*
**weapon** 61:*1*
**wearable** 24:*18*
**wearing** 24:*18*
**website** 15:2 17:20 18:9
**Well** 13:*15* 14:5 20:*21*
26:22 27:*21* 30:23 31:*17*
36:*4, 12* 40:7 45:*15*
50:*23* 51:*4* 57:*4* 59:*4, 24*
60:*17* 61:*3, 14* 65:*16*
**went** 24:*15* 26:*1* 57:*17*
58:*19*
**We're** 6:*18* 7:*16* 15:2*1*
33:8
**we've** 4:*14* 26:24 35:*18*
62:*16*
**WHEREOF** 74:*10*
**white** 24:8 48:25 51:*17,
22* 52:8, *11, 20*
**WILLIAM** 1:*5* 4:9 6:*20*
12:22 24:*12* 35:7 52:*1*
**Winters** 2:*4*
**witness** 15:*1* 59:*11*
71:*15* 72:22 74:*10*
**Woods** 64:*17* 65:*25*
66:*18* 67:*13, 20*
**work** 9:9, *10, 13, 22*
21:*21* 44:*14*
**worked** 9:*19* 10:7, *8*
37:*16*
**workers** 21:*22*
**working** 10:2 42:*19*
**worried** 56:*25* 57:*1*
**worthwhile** 26:*20*
**Wright** 37:*10, 11, 12, 15,
17* 39:*11, 14, 17, 22* 40:*1*
**W-R-I-G-H-T** 37:*10, 11*
**write** 23:*24* 34:*4* 36:*3*
37:*9*
**writes** 22:*1*
**writing** 19:6 54:*24*
**written** 39:*4* 54:*21*
55:*14* 66:25
**wrong** 56:8
**wrote** 27:*24* 38:22 39:6
74:7

< Y >
**YASENCHACK** 1:*11, 17*
3:*3* 4:*3, 5, 8, 10, 13* 5:*19*
7:*16* 12:*19* 29:8 43:5, *8*
64:*15* 66:*15* 72:9

**Yeah** 8:*18* 9:*14* 10:4
13:*10* 16:*4, 16* 18:*18*
19:*19* 20:*21* 22:5 25:*15*
33:*11* 41:*24* 44:*21* 48:6
53:*23* 63:*20* 65:8 69:*18*
72:*15*
**years** 4:*21* 6:*11* 27:25
28:*3, 5* 33:*24* 45:*19* 65:9
68:5
**Yep** 13:*20* 52:*4, 7* 57:*10*
**yesterday** 48:*10*
**YOUNG** 2:*12*

< Z >
**zone-car** 58:*25*

| STATE OF OHIO | ) | COURT OF COMMON PLEAS |
|---|---|---|
|  | ) | CRIMINAL DIVISION |
| COUNTY OF CUYAHOGA | ) | AFFIDAVIT FOR SEARCH WARRANT |

Before me a Judge of the Court of Common Pleas, personally appeared the undersigned, Detective Jeffrey Yasenchack, Badge #2362, who being first duly sworn deposes and says that he is a member of the Cleveland Police Department. Affiant states that he has been a member of the Cleveland Police Department for nearly twenty-two years, had been a member of the Cleveland Police Department Narcotics Unit for two years, and has been a detective in the 5th District Vice unit for the past six years. Affiant states that he has received training in the identification and testing of illegal narcotics, recognition of controlled substances, the methods of packaging controlled substances on the street and the manner in which sellers of controlled substances operate and the detection of narcotics trafficking as his basic course at the Cleveland Police Academy. Affiant states that he has made thousands of arrests for violations of state drug laws. Affiant has interviewed hundreds of drug traffickers as well as drug abusers. Affiant has participated in the execution of hundreds of search warrants. Affiant has participated in hundreds of purchases of narcotics using confidential informants. Based on the above training and experience, affiant is familiar with the modus operandi of persons involved in the illegal distribution of controlled substance as well as the terminology used by persons involved in the illegal distribution of controlled substances. Affiant has participated with other members of his unit in an ongoing investigation into the drug trafficking operations described below; affiant has not always personally observed everything described below, but that which he did not personally observe was described to him by the other investigating officers who did.

3

**Def. Exh. D  Page 3**



2913, 2923, and 2925 or other fruits and instrumentalities of crimes at the present time unknown.

The facts upon which Affiant bases such belief are as follows:

1.  Affiant avers that in mid April 2020 he received information from a concerned citizen about a black male residing at 638 East 127 St. selling drugs out of his house. The citizen further stated that a lot of white people were arriving at this house, staying a short time and then leaving and the male has been driving a black SUV.

2.  Affiant avers that in early May 2020 a confidential informant (CI) provided affiant with information on a black male known as "Lays," described as tall, over six feet, 240 lbs., bald or shaved head, approximately 35-40 years old, drives a black Ford Explorer with Ohio plate HYH8894, and lives at 638 East 127 St. Affiant using google maps brought up this area and CI pointed out the house. CI stated he sells heroin and crack cocaine and instructed affiant to watch the house and observe the volume of white people arriving to buy drugs.

3.  Affiant avers that he ran the plate HYH8894 through the OHLEG database and learned the owner was a known male, William Ellis, dob 9-18-1978, SS#***-**-6706. The CI when shown a BMV photo of Ellis positively identified him as the male CI knew as "Lays." Affiant arrested Ellis in 2019 having in his possession heroin, carfentanil, cocaine, and marijuana during a traffic stop. This case is open and currently in appeals court.

4.  Affiant avers that during the past seventy-two hours affiant set up surveillance on 638 East 127 St. (the Premises). The black Ford Explorer was parked on the street in front of the premises. After a few minutes a burgundy Dodge Magnum parked on the street. Two white males exited and knocked on the front door. Ellis opened the door and held the security door open while the two white males entered the premises. A blue Saturn parked on the street, a white female exited, and walked to the premises' front door. She was also let in by Ellis who stepped onto the porch, looked down the street just as a white vehicle pulled into the driveway of the premises. Two people from that vehicle entered the premises. The first two males exited and drove off. The female exited, re-entered the Saturn, and drove off. The listed owner of the Saturn who matched the female affiant observed had convictions for drug possession. A couple minutes later the last two people exited the premises and drove off. Affiant stopped this last vehicle and recovered fentanyl from the occupants.

5.  Affiant avers that the occupants became confidential informants (CIs) and supplied information about their dealer known as "Blaze." He was described as a black male, 6'4", 250 lbs., bald with a beard, about 40 years old. CIs positively identified their dealer when shown a BMV photo of Ellis. They had purchased heroin from Blaze over a dozen times, contacting him via phone#216-407-1016.

5

**Def. Exh. D  Page 5**

6.    Affiant avers that he field tested, using a NIK field test kit, a sample of the suspected heroin, which did test positive for the presence of fentanyl. Affiant avers that the NIK field test kit has been utilized by affiant and members of the Cleveland Police Department in the past on numerous occasions, and when said field tested substances were re-tested by the Cuyahoga county lab, the results of the NIK test have always proven to be true and accurate; said field test has never proven to be inaccurate in the experience of affiant. Affiant avers that the fentanyl was sealed into drug bag#589960 and has been submitted to the county lab for testing, results still pending.

7.    Affiant avers that a check of the Cuyahoga county felony docket revealed the following convictions for Ellis: 1996 case# CR-96-346236 pleading guilty to attempted drug possession M1 receiving nine months of community control, 1997 case# CR-97-349373 drug trafficking F4, drug possession F5 receiving one year of community control, 2000 case# CR-00-397031 receiving stolen property (MV) receiving one year of community control, 2001 case# CR-01-415901 fleeing and eluding M1 receiving a six month jail term, 2006 case# CR-07-495646 kidnapping with sexual motivation spec F1, gross sexual imposition F4, assault M1, receiving a five year prison term, 2007 case# CR-07-498821 felonious assault F3, criminal damaging M1 receiving a three year prison term, and open 2020 case# CR-20-648922 failure to comply with a police order.

8.    Affiant avers that a check of the OHLEG database revealed an eSORN entry for Ellis due to his gross sexual imposition conviction in 2007 and has to register his address with the Cuyahoga County Sheriff's office. The last supplied address was 638 East 127 St. and listed his vehicle as a black Ford Explorer with temp tag H237873, which is the same Explorer with Ohio plate HYH8894.

9.    Based on these facts, affiant avers that he has probable cause to believe, and does believe that the above described items will be found within the Premises, attached garage, curtilage, and all persons, vehicles, and safes located therein.

10.    In the experience of affiant, persons who traffic in illegal drugs frequently keep records of illegal transactions, including computers and computer files and discs, and evidence of communications used in the furtherance of drug trafficking activity, including, but not limited to, pagers, cellular telephones, answering machines, and answering machine tapes.

11.    In the experience of affiant, persons who traffic in illegal drugs frequently keep weapons, such as firearms, on or about their person, or within their possession, for use against law enforcement officials, as well as other citizens.

12.    In the experience of affiant, narcotic drugs are frequently carried or concealed by people who are present at locations where drugs are used, possessed, kept, or being sold and the size of usable quantities of drugs are small, making them easy to conceal on one's person. It is also affiant's experience that drug houses will be occupied by numerous individuals. Some persons will be involved with the direct sales, some

6

with the job of protecting the premises, some with preparing and packaging drugs, and some with the collection of the monies generated from the illegal activity. It is also affiant's experience and training that those who are traffic in illegal drugs will usually not permit those who are unaware or uninvolved in drug trafficking activity or use within the premise where the trafficking is conducted. It is therefore necessary to search all persons located in the premises.

13.    Affiant avers that in his experience, persons who traffic in illegal drugs frequently keep illegal narcotics, records of illegal transaction, money, firearms, weapons and other contraband in safes.

14.    Affiant avers that it may urgently be necessary that the Premises be searched in the night season forthwith to prevent the above-described property from being concealed or removed, and for the safety of the executing officers.

FURTHER AFFIANT SAYETH NAUGHT.

Affiant
Jeffrey Yasenchack, Detective
Cleveland Police Department
5th District Vice Unit

Sworn to before me and subscribed in my presence this \_\_\_\_\_ day of May 2020

JUDGE, COURT OF COMMON PLEAS
Cuyahoga County, Ohio

7

**Def. Exh. D   Page 7**

## CASE INFORMATION

**CR-19-637876-A   THE STATE OF OHIO vs. WILLIAM ELLIS**

View Printer Friendly Version

Docket Information

| From Filing Date | Docket Type 1 | Docket Type 2 | Docket Type 3 | Docket Type 4 | Filter Results |
|---|---|---|---|---|---|
| __ / __ / __ | [SELECT] ⌄ | [SELECT] ⌄ | [SELECT] ⌄ | [SELECT] ⌄ | Start Search |

| Proceeding Date | Filing Date | Docket Party | Docket Type | Docket Description | View Image |
|---|---|---|---|---|---|
| 05/14/2020 | 05/14/2020 | N/A | JE | STATE'S MOTION TO DISMISS INDICTMENT FILED ON 05/13/2020 IS GRANTED. CASE IS DISMISSED WITHOUT PREJUDICE. 05/14/2020 CPRMD 05/14/2020 09:43:29 | 📄 |
| 05/13/2020 | 05/13/2020 | P1 | NT | STATE'S SUPPLEMENTAL RESPONSE TO REQUEST FOR DISCOVERY UNDER RULE 16, FILED. | |
| 05/13/2020 | 05/13/2020 | P1 | MO | MOTION FILED BY P1 THE STATE OF OHIO STATE'S MOTION TO DISMISS INDICTMENT 05/26/2020 - UNKNOWN | 📄 |

**PLAINTIFF'S EXHIBIT**

2

| | | | | |
|---|---|---|---|---|
| 04/22/2020 | 04/22/2020 N/A | JE | Sua sponte, this appeal is dismissed for lack of lack of jurisdiction. Having considered the parties' briefs filed in response to this court's show cause order of March 30, 2020, we conclude that appellant's untimely appeal outside the relevant period specified in Crim.R. 12(K) and App.R. 4(B)(4) deprived the court of jurisdiction over this appeal. See State v. Bassham, 94 Ohio St.3d 269, 2002-Ohio-797, 762 N.E.2d 963. Appeal is dismissed. Notice issued. |
| 09/30/2019 | 09/30/2019 D1 | CL | RECORD ON APPEAL, PAGINATION SHEET AND CRIMINAL FILE SENT TO THE COURT OF APPEALS. |
| 09/05/2019 | 09/05/2019 D1 | SR | APPEAL, PRCPE, & DCKTNG STMNT(39687158) SENT BY REGULAR MAIL SERVICE. TO: CHRISTINE A. RUSSO 11005 PEARL ROAD SUITE 4 STRONGSVILLE, OH 44136-0000 |

| | | | | |
|---|---|---|---|---|
| 09/05/2019 | 09/05/2019 | D1 | NT | NOTICE OF APPEAL FILED BY PLAINTIFF'S COUNSEL AND THE COURT OF APPEALS CASE NUMBER IS CA-108970 |
| 09/05/2019 | 09/05/2019 | P1 | NT | NOTICE OF APPEAL FILED |
| 08/26/2019 | 08/26/2019 | N/A | CS | COURT REPORTER FEE |
| 08/23/2019 | 08/23/2019 | N/A | JE | PRETRIAL SET FOR 09/05/2019 AT 10:00 AM. AT THE REQUEST OF DEFENDANT. 08/23/2019 CPRMD 08/23/2019 14:31:46 |
| 08/23/2019 | 08/23/2019 | N/A | JE | DEFENDANT IN COURT. COUNSEL CHRISTINE A. RUSSO PRESENT. PROSECUTOR(S) CAROLINE NELSON PRESENT. COURT REPORTER KERRI NESTOR PRESENT. THIS MATTER IS SET FOR RULING ON MOTION TO SUPRESS FILED BY THE DEFENDANT ON 05/16/2019. DEFENDANT'S MOTION TO SUPRESS FILED ON 05/16/2019 IS GRANTED. MATTER IS SET FOR PRETRIAL ON |

| | | | | |
|---|---|---|---|---|
| | | | | 09/05/2019 AT 10:00 AM. 08/23/2019 CPRMD 08/23/2019 14:30:29 |
| 08/09/2019 | 08/09/2019 | N/A | SB | SHERIFF SERVICE FEES FOR SUBPOENA NUMBER 1294740, IN THE AMOUNT OF $8.50. |
| 08/09/2019 | 08/09/2019 | N/A | SB | SHERIFF SERVICE FEES FOR SUBPOENA NUMBER 1294739, IN THE AMOUNT OF $8.50. |
| 08/07/2019 | 08/07/2019 | N/A | CS | COURT REPORTER FEE |
| 08/06/2019 | 08/06/2019 | N/A | JE | DEFENDANT IN COURT. COUNSEL CHRISTINE A. RUSSO PRESENT. PROSECUTOR(S) CAROLINE NELSON PRESENT. COURT REPORTER LORRAINE J KLODNICK PRESENT. PROSECUTOR CARL MAZZONE, PRESENT. CITY OF CLEVELAND POLICE DETECTIVE JEFFREY YESENCHACK, PRESENT ON BEHALF OF THE STATE. THIS MATTER IS SET ON THE DEFENDANT'S |

| | | | | |
|---|---|---|---|---|
| | | | | MOTION TO SUPRESS FILED ON 05/16/2019. THE COURT HEARD OPENING STATEMENTS. THE COURT HEARD TESTIMONY THE STATE RESTS. DEFENSE ENTERED EXHIBITS A, B, C, AND D. THE COURT HEARD CLOSING ARGUEMENTS. THE COURT RULED THIS MATTER HEARD AND SUBMITTED. DEFENSE COUNSEL TO SUBMIT TO THE COURT A FORMATTED VERSION OF EXHIBITS C AND D. BY 08/19/2019. HEARING CONTINUED TO 08/23/2019 AT 01:30 PM 08/06/2019 CPRMD 08/06/2019 15:38:16 |
| 08/06/2019 | 08/06/2019 | N/A | CS | CALLING WITNESS |
| 08/06/2019 | 08/06/2019 | N/A | SB | WITNESS VOUCHER PRINTED FOR SUBPOENA 1294739 |
| 07/24/2019 | 07/24/2019 | N/A | SB | STATE SUBPOENA ISSUED (1294740) |
| 07/24/2019 | 07/24/2019 | N/A | SB | STATE SUBPOENA ISSUED (1294739) |
| 07/18/2019 | 07/18/2019 | N/A | SB | SHERIFF SERVICE FEES FOR |

| Date | Date | | Code | Description |
|---|---|---|---|---|
| | | | | SUBPOENA NUMBER 1291269, IN THE AMOUNT OF $8.50. |
| 07/18/2019 | 07/18/2019 | N/A | SB | SHERIFF SERVICE FEES FOR SUBPOENA NUMBER 1291268, IN THE AMOUNT OF $8.50. |
| 07/16/2019 | 07/19/2019 | N/A | JE | MATTER CONVERTED TO AN ATTORNEY CONFERENCE. MOTION TO SUPPRESS HEARING SET FOR 08/06/2019 AT 09:00 AM. 07/16/2019 CRMD 07/19/2019 10:33:07 |
| 07/16/2019 | 07/16/2019 | N/A | CS | CALLING WITNESS |
| 07/16/2019 | 07/16/2019 | N/A | SB | WITNESS VOUCHER PRINTED FOR SUBPOENA 1291269 |
| 07/16/2019 | 07/16/2019 | N/A | CS | CALLING WITNESS |
| 07/16/2019 | 07/16/2019 | N/A | SB | WITNESS VOUCHER PRINTED FOR SUBPOENA 1291268 |
| 07/02/2019 | 07/02/2019 | N/A | SB | STATE SUBPOENA ISSUED (1291269) |
| 07/02/2019 | 07/02/2019 | N/A | SB | STATE SUBPOENA ISSUED (1291268) |
| 07/02/2019 | 07/02/2019 | N/A | SB | SHERIFF SERVICE FEES FOR SUBPOENA NUMBER 1288469, IN THE AMOUNT OF $8.50. |

| | | | | |
|---|---|---|---|---|
| 06/19/2019 | 06/19/2019 P1 | NT | | STATE'S SUPPLEMENTAL RESPONSE TO REQUEST FOR DISCOVERY UNDER RULE 16, FILED. |
| 06/19/2019 | 06/25/2019 N/A | JE | | THE STATE'S MOTION FOR CONTINUANCE OF HEARING FILED ON 06/19/2019 IS GRANTED WITHOUT OBJECTION. HEARING PREVIOUSLY SET FOR 06/19/2019 AT 12:30PM IS RESET FOR 07/16/2019 AT 12:30PM. 06/19/2019 CPRMD 06/24/2019 16:03:51 |
| 06/20/2019 | 06/20/2019 N/A | SB | | SHERIFF SERVICE FEES FOR SUBPOENA NUMBER 1286563, IN THE AMOUNT OF $8.50. |
| 06/20/2019 | 06/20/2019 N/A | SB | | SHERIFF SERVICE FEES FOR SUBPOENA NUMBER 1286564, IN THE AMOUNT OF $8.50. |
| 06/20/2019 | 06/20/2019 N/A | SB | | SHERIFF SERVICE FEES FOR SUBPOENA NUMBER 1286566, IN THE AMOUNT OF $8.50. |

| Date | Date | Party | Type | Description |
|---|---|---|---|---|
| 06/19/2019 | 06/19/2019 | P1 | MO | MOTION FOR CONTINUANCE, FILED, 05/26/2020 - UNKNOWN |
| 06/18/2019 | 06/18/2019 | N/A | SB | SHERIFF SERVICE FEES FOR SUBPOENA NUMBER 1288309, IN THE AMOUNT OF $15.50. |
| 06/17/2019 | 06/17/2019 | N/A | SB | STATE SUBPOENA ISSUED (1288469) |
| 06/14/2019 | 06/14/2019 | N/A | SB | DEFENSE SUBPOENA ISSUED (1288309) |
| 06/11/2019 | 06/12/2019 | N/A | JE | PRETRIAL HELD 06/11/2019. MOTION TO SUPPRESS HEARING SET FOR 06/19/2019 AT 12:30 PM, AT THE REQUEST OF DEFENDANT. CPRMD 06/11/2019 06/11/2019 15:38:41 |
| 06/11/2019 | 06/11/2019 | N/A | SB | STATE SUBPOENA ISSUED (1287438) |
| 06/11/2019 | 06/11/2019 | N/A | SB | SHERIFF SERVICE FEES FOR SUBPOENA NUMBER 1287438, IN THE AMOUNT OF $8.50. |
| 06/11/2019 | 06/11/2019 | N/A | CS | CALLING WITNESS |
| 06/11/2019 | 06/11/2019 | N/A | SB | WITNESS VOUCHER PRINTED FOR SUBPOENA 1287438 |
| 06/07/2019 | 06/07/2019 | P1 | NT | STATE'S SUPPLEMENTAL |

| | | | |
|---|---|---|---|
| 05/21/2019 | 05/22/2019 N/A | JE | PRETRIAL HELD  |
| | | | PRETRIAL PREVIOUSLY SET FOR 05/21/2019 AT 09:00AM IS RESET FOR 06/04/2019 AT 09:00AM. AT THE REQUEST OF |
| 06/04/2019 | 06/07/2019 N/A | JE | PRETRIAL HELD  |
| | | | PRETRIAL PREVIOUSLY SET FOR 06/04/2019 AT 09:00AM IS RESET FOR 06/11/2019 AT 09:00AM. AT THE REQUEST OF DEFENDANT. 06/04/2019 CRMD 06/06/2019 16:12:00 |
| 06/05/2019 | 06/05/2019 N/A | SB | STATE SUBPOENA ISSUED (1286563) |
| 06/05/2019 | 06/05/2019 N/A | SB | STATE SUBPOENA ISSUED (1286564) |
| 06/05/2019 | 06/05/2019 N/A | SB | STATE SUBPOENA ISSUED (1286566) |
| 06/07/2019 | 06/07/2019 P1 | MO | MOTION FILED BY P1 THE STATE OF OHIO STATE'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS 05/26/2020 - UNKNOWN  |

RESPONSE TO REQUEST FOR DISCOVERY UNDER RULE 16, FILED.

| | | | | |
|---|---|---|---|---|
| | | | | DEFENDANT. 05/21/2019 CPRMD 05/22/2019 09:06:14 |
| 05/16/2019 | 05/16/2019 | D1 | MO | MOTION TO SUPPRESS, FILED. MOTION TO SUPPRESS 05/26/2020 - UNKNOWN |
| 05/08/2019 | 05/15/2019 | N/A | JE | PRETRIAL HELD 05/08/2019. PRETRIAL PREVIOUSLY SET FOR 05/08/2019 AT 09:00AM IS RESET FOR 05/21/2019 AT 09:00AM. AT THE REQUEST OF DEFENDANT. 05/08/2019 CPRXB 05/08/2019 11:57:03 |
| 05/01/2019 | 05/01/2019 | D1 | MO | MOTION FILED BY D1 WILLIAM W ELLIS MOTION FOR EXTENSION OF TIME 05/26/2020 - UNKNOWN |
| 04/25/2019 | 04/29/2019 | N/A | JE | PRETRIAL HELD 04/25/2019. PRETRIAL PREVIOUSLY SET FOR 04/25/2019 AT 09:00AM IS RESET FOR 05/08/2019 AT 09:00AM. AT THE REQUEST OF DEFENDANT. 04/25/2019 CPRMD 04/25/2019 14:44:21 |

| | | | | | |
|---|---|---|---|---|---|
| 04/09/2019 | 04/10/2019 N/A | JE | | | PRETRIAL HELD 04/09/2019. PREVIOUSLY SET PRETRIAL FOR 04/09/2019 AT 09:00AM IS RESET FOR 04/25/2019 AT 09:00AM. AT THE REQUEST OF DEFENDANT. 04/09/2019 CPRMD 04/10/2019 09:12:24 |
| 04/04/2019 | 04/05/2019 N/A | JE | | | PRETRIAL HELD 04/04/2019. PREVIOUSLY SET PRETRIAL FOR 04/04/2019 AT 09:00AM IS RESET FOR 04/09/2019 AT 09:00AM. AT THE REQUEST OF DEFENDANT. 04/04/2019 CPRMD 04/04/2019 14:57:32 |
| 04/03/2019 | 04/03/2019 P1 | NT | | | STATE'S DEMAND FOR DISCOVERY, FILED. |
| 04/03/2019 | 04/03/2019 P1 | NT | | | STATE'S RESPONSE TO DEFENDANT'S REQUEST FOR DISCOVERY AND BILL OF PARTICULARS UNDER RULE 16, FILED. |
| 03/28/2019 | 03/28/2019 D1 | MO | | | MOTION FILED BY D1 WILLIAM W ELLIS REQUEST FOR EVIDENCE NOTICE |

| | | | | |
|---|---|---|---|---|
| 03/28/2019 | 03/28/2019 | N/A | JE | DEFENDANT PRESENT WITH COUNSEL. DEFENDANT RETAINED RUSSO, CHRISTINE A. AS COUNSEL. READING OF INDICTMENT WAIVED. TWENTY-FOUR HOUR  |
| 03/28/2019 | 03/28/2019 | N/A | CS | PRISONER IN COURT |
| 03/28/2019 | 03/28/2019 | N/A | BN | $2,500.00 PERSONAL BOND POSTED ON 03/28/2019 BY DEFENDANT. BOND NO. 726665 |
| 03/28/2019 | 03/28/2019 | D1 | MO | MOTION FOR BILL OF PARTICULARS, FILED. MOTION FOR BILL OF PARTICULARS 05/26/2020 - UNKNOWN  |
| 03/28/2019 | 03/28/2019 | D1 | MO | MOTION FOR DISCOVERY, FILED MOTION FOR DISCOVERY 05/26/2020 - UNKNOWN  |
| 03/28/2019 | 03/28/2019 | D1 | MO | MOTION FILED BY D1 WILLIAM W ELLIS MOTION FOR PRODUCTION 05/26/2020 - UNKNOWN  |

SERVICE WAIVED.
DEFENDANT PLEAD
NOT GUILTY TO
INDICTMENT. BOND
SET AT 2,500.00
DOLLARS. BOND
TYPE: PERSONAL. .
JUDGE TURNER,
DEBORAH M (375)
ASSIGNED
(MANUALLY), FIRST
PRETRIAL SET FOR
04/04/2019 AT 09:00
AM IN COURT
ROOM JC20D
JUDGE DEBORAH
M. TURNER.

| Date | Date | | Code | Description |
|---|---|---|---|---|
| 03/27/2019 | 03/27/2019 | N/A | JE | CASE CONTINUED TO 03/28/2019 AT REQUEST OF DEFENDANT. |
| 03/20/2019 | 03/20/2019 | N/A | SR | FEDEX RECEIPT NO. 3806267S DELIVERED BY FEDEX 03/19/2019 ELLIS/WILLIAM/W PROCESSED BY COC 03/20/2019. |
| 03/13/2019 | 03/14/2019 | N/A | GP | ARRAIGNMENT SCHEDULED FOR 03/27/2019. |
| 03/13/2019 | 03/13/2019 | N/A | CS | WRIT FEE |
| 03/13/2019 | 03/13/2019 | N/A | SR | SUMMONS - CRIMINAL(3806267S) SENT BY FEDERAL EXPRESS. TO: ELLIS/WILLIAM/W 500 KARL DR. CLEVELAND, OH 4414300000 |

| INDICTED ORIGINAL ON 03/13/2019 | CR | N/A | 03/13/2019 | 03/13/2019 |
|---|---|---|---|---|
| LEGAL RESEARCH | SF | N/A | 03/14/2019 | 03/13/2019 |
| COURT SPECIAL PROJECTS FUND | SF | N/A | 03/14/2019 | 03/13/2019 |
| CRIME STOPPERS | SF | N/A | 03/14/2019 | 03/13/2019 |
| COMPUTER FEE | SF | N/A | 03/14/2019 | 03/13/2019 |
| CLERK FEE | SF | N/A | 03/14/2019 | 03/13/2019 |
| CASE INFORMATION ENTERED | CR | N/A | 03/06/2019 | 03/06/2019 |
| DATE OF OFFENSE 03/04/2019 | CR | N/A | 03/06/2019 | 03/04/2019 |
| ARRESTED 03/04/2019 | CR | N/A | 03/06/2019 | 03/04/2019 |

Only the official court records available from the Cuyahoga County Clerk of Courts, available in person, should be relied upon as accurate and current.
Website Questions or Comments.
Copyright © 2023 PROWARE. All Rights Reserved. 1.1.268

# CLEVELAND DIVISION OF POLICE
## DUTY REPORT

ZONE __5__  PLATOON __VICE__  RADIO CALL NO. __5V85__

| | DAY | DATE | TIME | MILEAGE |
|---|---|---|---|---|
| TOUR START | Thurs. | 5-14-2020 | 0900 HRS. | |
| TOUR FINISH | Thurs. | 5-14-2020 | 1700 HRS. | |
| | | | TOTAL | |

C OF C-71-ZC-1 rev. 12/98

| VEHICLE CODE# | CAR# | GAS CARD# | SHOTGUN# | AMMO. BOX# | PORTABLE TRANSCEIVER# | VEHICLE & EQUIPMENT CHECK BY: |
|---|---|---|---|---|---|---|
| 005L0629 | UC | 13841 | | | 1850482 | |

CIRCLE DAMAGED AREAS  2 3 4 / 1 5 / 9 TOP 10 UNDER CAR  8 7 6

DESCRIBE DAMAGE: 360 MINOR  WCS  JY-5189

OLD X  NEW ___  NEW DAMAGE REPORTED TO.

| Due for Service Mileage: | Due for Service Date: | Due for Service Sticker: Y / N |
|---|---|---|

SOURCE OF ASSIGNMENT:  B-BROADCAST  T-TELEPHONE  D-DISTRICT  O-ON VIEW OR OTHER

| SOURCE | REC'D. | TIME ARR. | COMP. | PRIORITY CODE | LOCATION AND NATURE OF ASSIGNMENT | | DISPOSITION | CAD NUMBER |
|---|---|---|---|---|---|---|---|---|
| O | | 0900 | / | | JC | CASE INVEST | SW SIGNED BY JUDGE MCCORMICK | |
| O | | 0940 | / | | 5D | RC /VEH. CHECK | COMP | |
| O | | / | / | | 5D | CASE INVEST | PREPPED FOR SW | |
| O | | 1050 | 1330 | | E127/SHAW AREA | CASE INVEST | SURVEILLANCE/ INFO REC'D TARGET NOT HOME | |
| O | | / | / | | !DAROSE AREA | CASE INVEST | CHECKED ADDRESS | |
| O | | / | / | | E146 STCLAIR | CASE INVEST | CHECKED ADDRESS | |
| O | | ·/ | / | | E148/LYTTON AREA | CASE INVEST | CHECKED ADDRESSES | |
| O | | ' / | / | | E152/WESTROPP | LUNCH | COMP | |
| O | | 1440 | / | | 5D | CASE INVEST | EMAILS/ CONF W/KANE/GG/SWAT | |
| O | | 1645 | 1700 | | 5D | RELIEF | COMP | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

MISC. STATS/EQUIPMENT

| ARRESTS | | CITATIONS ISSUED | | ISSUED | | | |
|---|---|---|---|---|---|---|---|
| FEL. | MISD. | TRF. | M. MISD. | PKG. INFRACTIONS | MISD. SUMMONS | RADIO ASSIGNMENTS | |

# ___  # 2362

PASSENGER

DRIVER ___

EXAMINED & APPROVED BY

Lt. Charles DePonti # 8499

PLAINTIFF'S EXHIBIT 3  tabbies

C OF C 71-1

# POLICE DEPARTMENT
### CLEVELAND, OHIO
## DEPARTMENTAL INFORMATION

DIST. 5 ZONE _____ May 20, 2020

EXAMINED BY_____ RANK_____                    _____2020

FROM  Det. Jeffrey A. Yasenchack #2362                    TO Lt. Charles DePenti 8499

SUBJECT Drug Trafficking Investigation into William Ellis 2020-139102

COPIES TO  Unit files, Personnel files

---

    In mid April 2020 I received information from a concerned citizen about a black male residing at 638 East 127 St. selling drugs out of his house. A lot of white people arriving at the house, staying a short time and then leaving. This male has been driving a black SUV. In early May 2020 a confidential informant (CI-1) provided me with information about a black male known as "Lays." described as tall, over six feet, 240 lbs., bald or shaved head, approximately 35-40 years old, drives a black Ford Explorer with Ohio plate HYH8894, and lives at 638 East 127 St. Using Google maps I brought up this area and CI pointed out the house. CI stated he sells heroin and crack cocaine and instructed me to watch the house and observe the volume of white people arriving to buy drugs. I ran the plate HYH8894 through the OHLEG database and learned the owner was a known male, William Ellis, dob 9-18-1978, SS#***-**-6706. The CI when shown a BMV photo of Ellis positively identified him as the male CI knew as "Lays." I arrested Ellis in 2019 having in his possession heroin, carfentanil, cocaine, and marijuana during a traffic stop. This case is open and currently in appeals court.

    On May 11, 2020 I set up surveillance on 638 East 127 St. The black Ford Explorer was parked on the street in front of the house. After a few minutes a burgundy Dodge Magnum parked on the street. Two white males exited and knocked on the front door. Ellis opened the door and held the security door open while the two white males entered the house. A blue Saturn parked on the street, a white female exited, and walked to the front door. She was let in just as a white vehicle pulled into the house's driveway. Two people from that vehicle entered the house. The first two males exited and drove off in the Magnum. The female exited, re-entered the Saturn, and drove off. The listed owner of the Saturn who matched the female I observed had convictions for drug possession. A couple minutes later the last two people exited the house and drove off. I stopped this last vehicle and recovered suspected fentanyl from the occupants.

    The occupants became confidential informants (CIs) and supplied information about their dealer known as "Blaze." He was described as a black male, 6'4", 250 lbs., bald with a beard, about 40 years old. CIs positively identified their dealer when shown a BMV photo of Ellis. They had purchased heroin from Blaze over a dozen times, contacting him via phone#216-407-1016. I field tested a sample of the suspected fentanyl, which did test positive for the presence of fentanyl. The fentanyl was sealed into drug bag#589960 and has been submitted to the county lab for testing. lab#2020-2394-0001 revealed the drugs weighed 0.76grams and tested positive for a mixture of heroin, carfentanil, fentanyl, cocaine, 4-ANPP, tramadol, and gabapentin.

    Ellis had numerous felony convictions including kidnapping, GSI, drug trafficking, felonious assault, failure to comply, and an open case for failure to comply. I drafted a search warrant and affidavit for the target house at 638 East 127 St. On May 12, 2020 Cleveland prosecutor Gina Villa reviewed it. On May 14, 2020 Honorable Judge Brian McCormack deemed probable cause existed and signed it.

    On May 18, 2020 at 0628 hours members of the 5th district Vice unit, Det. Yasenchack 2362, Smith 1712, Kopchak 2139, McCully 1167, Sabolik 1021, Sumlin 2153, Oliver 808, Ptl. Hornblower 2477, K9 Officer Nichols 2454 with partner Hugo, Capt. Kane 6571 along with the Cleveland SWAT unit executed

1



the search warrant making entry via the front door after making several announcements. The target, William Ellis, was located upstairs darting from the bedroom to the bathroom, and his girlfriend, Melissa Stalker, was located in the master bedroom. Both were advised of their constitutional rights. Swat advised us of a marijuana grow operation in the small upstairs room. Off. Nichols accessed the small operation including approximately 15 plants and variety of grow lights, fertilizers, soil, and grow containers. A search was conducted and the following drugs, guns, and property were seized:

1. Digital scale with residue bag#595034 located on kitchen table by 1167.
2. Bag with multiple bags of narcotics bag#595032 located in coat pocket in master bedroom by 2362.
3. Two grow lights located in grow room by 1712.
4. Drug press with residue bag#595030 located on top of kitchen cabinet by 2477.
5. Magazine loaded with 17 rounds located on living room table by 2139,2362.
6. Two cellphones located on top of kitchen cabinet by 2477.
7. Two scales with residue bag#595028 located on kitchen counter by 2477.
8. Seven and a half pills bag#595104 located on upstairs bathroom floor by 1712.
9. Mail and paperwork located in master bedroom and livingroom by 2362.
10. Three cellphones located in master bedroom by 2362.
11. Bottle of pills bag#589194 located in master bedroom by 2362.
12. Seven containers with residue bag#93671 located in kitchen cabinet by 808.
13. Mentos container with 2 packets/straw bag#595124 located in northwest bedroom by 1021.
14. Pill in paper bag#589192 located in master bedroom purse by 2362.
15. Pills bag#595026 located on living room floor by 2362.
16. Bag with residue bag#595118 located in living room by 2139.
17. Cell phone located in northwest bedroom by 1021.
18. Cell phone located in Chevy Avalanche by 2477.
19. Recording device located in Chevy Avalanche by 1021.
20. $775.00 cash located in master bedroom by 2362.
21. Gun swab of loaded magazine located from magazine in living room by 2139.
22. Gun swab of revolver located from Revolver in master bedroom by 2139.
23. Three cellphones located in living room by 2362.
24. Ring door camera located on front porch by 2362.
25. Cut agent bag#594968 located in living room by 1021.
26. Bag of baggies with residue bag#595024 located on stove by 2477.
27. Bag of 5.56 ammo located in living room closet by 2477.
28. Swan home security system located on house exterior by 2153, 2139.
29. 9mm ammo located in living room closet by 2477.
30. 7.62 ammo located in living room closet by 2477.
31. Smith &Wesson .38 special revolver S#1D65044  with 5 rounds located in master bedroom by 2362.
32. Marijuana plants (15) bag#595008 located in grow room by 1712.

During the search Ellis was interviewed and stated that when SWAT made entry he tried to flush pills down the toilet. Several pills and two bags with residue were found in route to and inside bathroom. Ellis began complaining about a variety of health issues despite just being released from the hospital yesterday. EMS conveyed Ellis to the Cleveland Clinic hospital.  He was treated and released, tested negative for covid, and conveyed to county jail. Stalker was interviewed and stated she had stayed the night there, doesn't live there, and was unaware that Ellis was selling drugs.  She did state she saw a silver revolver with wood handles upstairs in the master bedroom alongside the bed.  The electric meter was disconnected, but the wiring was re-connected providing the household free electricity. First Energy was notified. Above gun, drugs, and seized property entered into 5th district evidence.  Drug and gun to be conveyed to the county lab for analysis.



William Ellis  638 East 127 St. Cleveland, Oh 44108, ~~████████████~~ 6'5", 250, bald, Bro.
Charges to be indicted: drug trafficking, drug possession, drug manufacturing, cultivating marijuana,
HWWUD, theft of public utilities, PCT.


This incident occurred within 1000ft. of EBC Daycare & Preschool Center at 12205 St Clair Ave. and
Citizens Academy Elementary School at 12523 Woodside Ave.



Respectfully,


Det. Jeffrey Yasenchack 2362

3

# CLEVELAND DIVISION OF POLICE
## DUTY REPORT

| ZONE | 5th | PLATOON | VICE | RADIO CALL NO. | 5V85 |
|---|---|---|---|---|---|

| | DAY | DATE | TIME | MILEAGE |
|---|---|---|---|---|
| TOUR START | Tues. | 5-12-2020 | 0900 HRS. | 94,183 |
| TOUR FINISH | Tues. | 5-12-2020 | 1700 HRS. | 94,199 |
| | | | TOTAL | 16 |

C OF C 71-ZC-1 rev. 12/98

| VEHICLE CODE# | CAR# | GAS CARD# | SHOTGUN# | AMMO. BOX# | PORTABLE TRANSCEIVER# | VEHICLE & EQUIPMENT CHECK BY: |
|---|---|---|---|---|---|---|
| 210P01 | UC | 16005 | | | 1852362 | 2362 |

| CIRCLE DAMAGED AREAS | DESCRIBE DAMAGE: | OLD X NEW ___ |
|---|---|---|
| | 360 MINOR  WCS-JY-9306 | NEW DAMAGE REPORTED TO: |

| Due for Service Mileage: | 98,780 | Due for Service Date: | 8-5-2019 | Due for Service Sticker: | (Y)/ N |
|---|---|---|---|---|---|

SOURCE OF ASSIGNMENT: B-BROADCAST   T-TELEPHONE   D-DISTRICT   O-ON VIEW OR OTHER

| SOURCE | REC'D. | TIME ARR. | COMP. | PRIORITY CODE | LOCATION AND NATURE OF ASSIGNMENT | | DISPOSITION | CAD NUMBER |
|---|---|---|---|---|---|---|---|---|
| O | | 0900 | 0915 | | E147/WESTROPP AREA | CASE INVEST | SURVEILLANCE CHECKED SEVERAL ADDRESSES FOR MV | |
| O | | / | / | | 5D | RC / VEHICLE CHECK | COMP | |
| O | | / | / | | 5D | CASE INVEST | FORM I / SW / EVAL FORM I  CONF W/ CPTN SHE YELLED AT ME | |
| O | | | / | | 5D | LUNCH | COMP | |
| O | | 1410 | / | | CASTALIA | CASE INVEST | SURVEILLANCE K380104 FOLLOWED | |
| O | | / | / | | BRACKLAND AREA | CASE INVEST | SURVEILLANCE | |
| O | | / | / | | E140/STCLAIR | CASE INVEST | SURVEILLANCE | |
| O | | / | / | | STEVENSON AREA | CASE INVEST | TARGET MV UTL | |
| O | | 1615 | / | | 5D | PAPERWORK/DUTY | COMP | |
| D | | 1645 | 1700 | | 5D | RELIEF | COMP | |

MISC. STATS/EQUIPMENT

PLAINTIFF'S EXHIBIT
5

| ARRESTS | | CITATIONS ISSUED | | ISSUED | | |
|---|---|---|---|---|---|---|
| FEL. 0 | MISD. 0 | TRF. 0 | M. MISD. 0 | PKG. INFRACTIONS 0 | MISD. SUMMONS 0 | RADIO ASSIGNMENTS 0 |

| PASSENGER | # | # 2362 | | Sgt 7 | 9200 |
|---|---|---|---|---|---|
| | | DRIVER Det. Jeffrey Yasenchack #2362 | | EXAMINED & APPROVED BY Sgt. Terrance Smith #9200 | |

## CLEVELAND DIVISION OF POLICE
### DUTY REPORT

| ZONE | 5th | PLATOON | A | RADIO CALL NO. | 5V85 |
|---|---|---|---|---|---|

|  | DAY | DATE | TIME | MILEAGE |
|---|---|---|---|---|
| TOUR START | Wed. | 5-13-2020 | 0800 HRS. | 94,145 |
| TOUR FINISH | Wed. | 5-13-2020 | 1400 HRS. | 94,145 |
|  |  |  | TOTAL | 0 |

C OF C 71-ZC-1 rev. 12/98

| VEHICLE CODE# | CAR# | GAS CARD# | SHOTGUN# | AMMO. BOX# | PORTABLE TRANSCEIVER# | VEHICLE & EQUIPMENT CHECK BY: |
|---|---|---|---|---|---|---|
| 201P0104 | UC | 16005 |  |  | 1852362 | 2362 |

CIRCLE DAMAGED AREAS    2  3  4 / 1 / 5 / 8  7  6

9 TOP
10 UNDER CAR

DESCRIBE DAMAGE:

360 MINOR

OLD  X  NEW ____
NEW DAMAGE REPORTED TO ____

| Due for Service Mileage: | Due for Service Date: | Due for Service Sticker: | (Y) / N |
|---|---|---|---|

SOURCE OF ASSIGNMENT:  B-BROADCAST   T-TELEPHONE   D-DISTRICT   O-ON VIEW OR OTHER

| SOURCE | TIME REC'D. | TIME ARR. | COMP. | PRIORITY CODE | LOCATION AND NATURE OF ASSIGNMENT | | DISPOSITION | CAD NUMBER |
|---|---|---|---|---|---|---|---|---|
| O |  | 0800 | / |  | SPRING AREA | CASE INVEST | SURVEILLANCE |  |
| O |  | / | / |  | E127/SHAW AREA | CASE INVEST | SURVEILLANCE |  |
| O |  | / | / |  | 5D | RC /VEH. CHECK | COMP |  |
| O |  | / | / |  | 5D | CASE INVEST | PREPPED FOR SW / BUY |  |
| O |  | / | / |  | 5D | CASE INVEST | INTERVIEWED CI SIGNED UP |  |
| O |  | / | / |  | 5D | LUNCH | COMP |  |
| O |  | / | 1400 |  | 5D | RELIEF | COMP X-TIME TAKEN |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

PLAINTIFF'S EXHIBIT
6
tabbies

MISC. STATS/EQUIPMENT

| ARRESTS | | CITATIONS ISSUED | | ISSUED |
|---|---|---|---|---|
| FEL. 0 | MISD. 0 | TRF. 0 | M. MISD. 0 | PKG. INFRACTIONS 0   MISD. SUMMONS 0   RADIO ASSIGNMENTS 0 |

| PASSENGER | # | DRIVER
Det. Yasenchack #2362 | # 2362 | EXAMINED & APPROVED BY |



*Court of Appeals - Opinion*

[Cite as *State v. Woods*, 2012-Ohio-5509.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 98054

---

## STATE OF OHIO

PLAINTIFF-APPELLANT

vs.

## CLYDE WOODS JR.

DEFENDANT-APPELLEE

---

### JUDGMENT:
### AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Common Pleas Court
Case No. CR-556141

**BEFORE:**   S. Gallagher, J., Sweeney, P.J., and Rocco, J.

**RELEASED AND JOURNALIZED:**   November 29, 2012

*Exhibit 35*



PLAINTIFF'S
EXHIBIT
7

**ATTORNEYS FOR APPELLANT**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Maxwell M. Martin
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, OH   44113


**ATTORNEY FOR APPELLEE**

Aaron T. Baker
Aaron T. Baker Co., L.P.A.
38109 Euclid Avenue
Willoughby, OH   44094

P.S. 1

SEAN C. GALLAGHER, J.:

{¶1} Plaintiff-appellant, the state of Ohio, appeals from the trial court's decision to grant the motion to suppress of defendant-appellee, Clyde Woods, Jr.  For the reasons set forth below, we affirm the ruling.

{¶2} On October 31, 2011, Cleveland patrol officers Donald Kopchak and Jeffrey Yasenchak worked the second shift.  Because it was Halloween evening, the officers focused on children's safety in the area of East 105th Street.  As they headed west on Adams Avenue, the officers were behind a black Lincoln MKZ that just turned onto Adams from East 105th Street.  The speed limit on Adams is 25 m.p.h.  The officers' speed was 35 m.p.h.  They "paced" the Lincoln for a "little over two blocks" and concluded that the driver was exceeding the 25 m.p.h. speed limit.

{¶3} Yasenchak activated the overhead light and sirens and stopped the Lincoln by the address of 9601 Adams.  Yasenchak approached the driver's side, and Kopchak approached the passenger's side.  The driver, Woods, was the only person in the Lincoln.

{¶4} Woods stepped out of the car at Yasenchak's request.  While Yasenchak patted down Woods, "some sort of large object is moving down [Woods's] pant leg all the way down to his boots."  Yasenchak pulled up the bottom of Woods's pant leg and found one bag of suspected marijuana.  The officers handcuffed Woods and arrested him

for using a motor vehicle to solicit drug sales, a violation of Cleveland Codified Ordinances 619.23. The officers then walked Woods back to the patrol car, advised him of his *Miranda* rights, and placed him in the back seat.

{¶5} Yasenchak testified at the motion to suppress hearing about why he patted down Woods after he asked him to step out of the Lincoln:

A. As soon as he rolled down the window, I just detected the scent of marijuana.

Q. And are you familiar with the scent of marijuana?

A. Yes.

Q. Burned and unburned?

A. Yes.

Q. And can you describe for the Court why you're familiar with that scent?

A. I made a lot of arrests. I was in the narcotics unit for two and a half years [out of 14 with the department] * * *. Just numerous arrests, and personal experience with marijuana.

Q. Are you trained to identify that scent?

A. Yes.

Q. Are you qualified to identify that scent?

A. Yes. I've attended seminars from ATF, FBI, DEA all pertaining to drug investigations.

*Pg.3*

{¶6} After Woods's arrest, Kopchak proceeded to inventory the Lincoln's contents in preparation of towing the car.   He testified at the motion to suppress hearing about the inventory search:

A.   [I]n the trunk was an Ohio State bag, bookbag, backpack, I believe, and inside that backpack was [sic] two large bags of marijuana.

Q.   Okay.   Now, backing up, had you — obviously, by the time that you're doing an inventory search of the car, you have located some marijuana on the person of Mr. Woods, correct?

A.   Correct.

Q.   Any other marijuana found in the passenger compartment of the car?

A.   No, I don't believe so.

Q.   Okay.   Were you — did you detect the presence of any other marijuana?

A.   When I was in the back seat, making sure there was no valuables in the back seat, the smell of unburned or fresh marijuana was still very strong in the vehicle.

Q.   Okay.   All right.   So then you continue the inventory search and find the backpack, correct?

A.   Correct.

Q.   And did you have to open the backpack, it was already open, or what?

A.   It was already open.

{¶7} Kopchak next testified about his training relevant to the feel and smell of different drugs, including burnt and unburnt marijuana.   He followed up with testimony that he made "probably too many to count" marijuana arrests during his five years on the police force.   The marijuana found in the trunk of Woods's Lincoln was unburnt

*P.9.11*

marijuana with a "strong odor," even in the three plastic bags inside each other making up State's Exhibit No. 3.  The marijuana was in two individual large plastic freezer bags when found by Kopchak.

{¶8} Kopchak also testified about his training on the Cleveland Police Department's tow policy.  He stated that he read the tow policy a few years ago and he receives updates during roll call.  According to him, he was accurate, thorough, and acted in a manner consistent with the policy when he inventoried Woods's vehicle.  In the tow supplement, Kopchak did not list anything of value recovered from the trunk or the passenger compartment.  He also lifted the hood of the Lincoln as part of the inventory search, "[j]ust to make sure everything's there that's supposed to be there."

{¶9} During cross-examination, Kopchak admitted to issuing a citation for weaving to Woods ten days earlier, on or about October 21, 2011.  Woods was briefly in police custody that day.  When questioned as to why he was in custody, Kopchak responded, "[b]ecause he got out of his vehicle, exited his vehicle, and continued ignoring all my verbal commands to stop."

{¶10} On November 8, 2011, Woods was charged with drug trafficking in violation of R.C. 2925.03(A)(2), with forfeiture and schoolyard specifications; possessing criminal tools in violation of R.C. 2923.24(A), with forfeiture specifications; and drug possession in violation of R.C. 2925.11(A), with forfeiture specifications.

{¶11} On January 1, 2012, Woods filed a motion to suppress stop, arrest, and search.  He asserted that the traffic stop and pat down were improper because he was not

*Pg. 5*

driving in violation of the posted speed limit. His arrest was improper as well because the officers had no evidence or any indication that he was soliciting drug sales from his vehicle. Finally, the search of the vehicle was not a proper inventory search. Woods requested that the trial court, therefore, suppress all evidence obtained by the officers.

{¶12} The trial court held a motion to suppress hearing on January 26, 2012. The trial court granted the motion and suppressed as evidence all of the marijuana discovered on Woods's person and in the trunk of his vehicle. In its opinion dated March 1, 2012, the court stated:

> Since radar was not used by these officers to detect the speed of Defendant's vehicle, and because of the short distance traveled by Defendant's vehicle following his turn off East 105th Street, and because neither officer testified that they had specified training in detecting speed of another vehicle unaided by technology, it is unlikely that stopping Defendant's vehicle for traveling at 35 miles per hour in a 25-mile per hour zone is justified within the meanings articulated by *State v. Johnson* (1986) 34 Ohio App.3d 94 or *Brown v. Texas* (1979) 443 U.S. 47.
>
> Testimony of the officers that the search was an inventory search of the vehicle was tantamount to a tow is disingenuous and merely a pretext for the claimed inventory. First of all, the stop, handcuffing and pat down were illegal since probable cause was absent. Secondly, the search of the trunk and most [s]uspiciously, the hood, along with the officer's failure to list all of the vehicle's contents on the inventory list suggests that the search of the vehicle was neither incidental to a tow nor for the purposes of inventory.

{¶13} The state timely appealed and challenges in one assignment of error, the trial court's ruling on the motion to suppress. The state argues that the police officers properly stopped Woods based on pacing his vehicle under the authority of *Richmond Hts. v. Myles*, 8th Dist. No. 86171, 2006-Ohio-542. It also argues that a police officer

may properly order a motorist out of a vehicle when stopped for a traffic citation, even without suspicion of criminal activity, under the authority of *State v. Evans*, 67 Ohio St.3d 405, 1993-Ohio-186, 618 N.E.2d 162.   According to the state, the smell of marijuana justified the pat down, the discovery of marijuana on Woods's person justified his arrest, and his arrest and detention justified the inventory search.   For the following reasons, we reject the state's arguments.

{¶14} Appellate review of a suppression ruling involves mixed questions of law and fact.   *See State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71. When ruling on a motion to suppress, the trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight of the evidence.   *See State v. Mills*, 62 Ohio St.3d 357, 582 N.E.2d 972 (1992); *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982).   An appellate court must accept the trial court's findings of fact as true if they are supported by competent and credible evidence.   *Burnside* at ¶ 8. The appellate court must then determine, without any deference to the trial court, whether the facts satisfy the applicable legal standard.   *Id.*

{¶15} When determining whether an investigative stop is supported by a reasonable, articulable suspicion of criminal activity, the stop must be viewed in light of the totality of circumstances surrounding the stop.   *State v. Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489 (1988), paragraph one of the syllabus.   An officer's inchoate hunch or suspicion will not justify an investigatory stop.   For example, "[t]he reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately

*Pg. 7*

rely in determining whether an investigative stop is warranted." *Bobo* at 179. However, that fact alone is insufficient. The totality of the facts and circumstances before the officer must reasonably suggest that some specific criminal activity is afoot. *Id.* Courts must give "due weight to the officer's trained eye and experience" in reviewing the totality of the circumstances. *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶16}   Some appellate courts in Ohio, including ours, have held that an officer's visual estimation of a vehicle's speed alone is insufficient to support a conviction for speeding. *See, e.g., Middleburg Hts. v. Campbell*, 8th Dist. No. 87593, 2006-Ohio-6582, abrogated by *Barberton v. Jenney*, 126 Ohio St.3d 5, 9, 2010-Ohio-2420, 929 N.E.2d 1047. Prior to the Ohio Supreme Court's decision in *Jenney*, this court has recognized pacing as a legitimate means of determining speed. In *Middleburg Hts. v. Quinones*, 8th Dist. No. 88242, 2007-Ohio-3643, we stated:

> [A]n arresting officer's visual estimates of speed alone are insufficient to convict persons of speeding beyond a reasonable doubt. *See Cleveland v. Wilson*, 8th Dist. No. 87047, 2006-Ohio-1947, at ¶ 7. However, as Quinones himself points out, that was not the only evidence presented. Officer Bulka testified that he paced Quinones' vehicle to determine his speed. Many Ohio courts, including this district, have found that pacing a car is an acceptable manner for determining speed. *State v. Horn*, 7th Dist. No. 04BE31, 2005-Ohio-2930, at ¶ 18; *Middleburg Heights v. Campbell*, 8th Dist. No. 87593, 2006-Ohio-6582, at ¶ 17.

{¶17} The above recognition of pacing is based on a police officer's visual perception that a vehicle is speeding, in combination with years of experience. Visual perception and years of experience constitute "'specific and articulable facts which

*P.S.S.*

provide the police officer with reasonable grounds to make an investigatory stop[.]'"
*State v. Porter*, 11th Dist. No. 99-P-0061, 2000 Ohio App. LEXIS 4211, *10 (Sept. 15,
2000), quoting *State v. Lawless*, 11th Dist. No. 98-P-0048, 1999 Ohio App. LEXIS 2941
(June 25, 1999).  *See State v. Hammen*, 5th Dist. No. 2012CA00009, 2012-Ohio-3628.
The Seventh District relied on this language in recognizing pacing in *Horn*, and we, in
*Quinones*, relied on *Horn* in recognizing pacing as a legitimate way of determining speed.

{¶18} The Ohio Supreme Court, however, in *Jenney*, 126 Ohio St.3d 5,
2010-Ohio-2420, 929 N.E.2d 1047, found that visual perception and general experience
as a police officer is sufficient evidence to support an officer's unaided visual estimation
of speed under certain circumstances.  The court held:

> A police officer's unaided visual estimation of a vehicle's speed is
> sufficient evidence to support a conviction for speeding in violation of R.C.
> 4511.21(D) without independent verification of the vehicle's speed if the
> officer is trained, is certified by the Ohio Peace Officer Training Academy
> or a similar organization that develops and implements training programs to
> meet the needs of law-enforcement professionals and the communities they
> serve, and is experienced in visually estimating vehicle speed.

*Id.* at syllabus.

{¶19} In *Jenney*, the Supreme Court concluded that a police officer's visual
estimation of the defendant's speed was sufficient to support a conviction under R.C.
4511.21(D) because there was testimony offered at trial as to the officer's training,
certification, and experience in visually estimating vehicle speeds.  *Id.* at ¶ 2.
Specifically, the officer testified that he was trained to visually estimate vehicle speed,
was certified by a law enforcement training organization in visual estimations, and

*pg. 9*

performed hundreds of visual speed estimations as a police officer. *Id.* at ¶ 21. The officer further testified that based on his training and experience, he estimated that the defendant's vehicle was traveling 70 m.p.h. in a 60 m.p.h. zone at the time of the traffic stop. *Id.* at ¶ 21-22.

{¶20} Accordingly, visual estimation of a vehicle's speed is sufficient evidence depending on the *type of training* provided to the police officer *and* the officer's *certification and experience in visually estimating vehicle speed.* In other words, visual estimation and the officer's general years of experience, without the training, certification, and actual experience in visually estimating vehicle speed, is insufficient evidence of a vehicle's speed.

{¶21} In this case, the totality of the officers' testimony was that Woods was exceeding the posted speed limit of 25 m.p.h. Yasenchak and Kopchak both testified about drug detection training and their respective years of service with the police department. Kopchak also testified about tow policy training. Neither officer testified, however, as to his training, certification, and experience in visually estimating vehicle speed. As a result, we find Yasenchak's and Kopchak's testimony as to their visual observation of Woods's speed insufficient under *Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047. *See also State v. Starks*, 196 Ohio App.3d 589, 2011-Ohio-2344, 964 N.E.2d 1058 (12th Dist.); *State v. Riddle*, 6th Dist. No. OT-10-040, 2011-Ohio-1547.

{¶22} The state argues that even if the officers' testimony did not satisfy the *Jenney* standard, the testimony about pacing Woods's vehicle alone warranted a traffic stop for speeding. The trial court considered and rejected this argument, finding the officers did not have sufficient time or distance to reasonably use pacing as a means to determine the speed of Woods's vehicle.

{¶23} Woods turned onto Adams from East 105th. This necessitated time and distance for the officers' vehicle to first catch up to Woods's vehicle and then commence pacing. The officers only followed Woods for two residential city blocks, too short a distance to establish a speeding violation based on pacing. The court was in the best position to evaluate the credibility of the officers' testimony on this point, and we decline to substitute our judgment for that of the trial court. *See Mills*, 62 Ohio St.3d 357, 582 N.E.2d 972; *Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583. The trial court's findings are, therefore, supported by competent and credible evidence, and the totality of the facts and circumstances before the officers does not otherwise suggest criminal activity. *Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489.

{¶24} Under these circumstances, the trial court correctly concluded that the officers lacked probable cause to stop Woods for speeding. The ensuing searches of his person and vehicle were illegal, and thus the trial court properly suppressed the evidence discovered in those searches.

{¶25} Even if we found that the officers validly stopped Woods for speeding, the trial court serves as the trier of fact and is the primary judge of the credibility of the

witnesses. *Mills*, 62 Ohio St.3d 357, 582 N.E.2d 972; *Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583. We would defer to and agree with the trial court's findings and conclusions relating to the testimony of Yasenchak and Kopchak: the "[t]estimony of the officers that the search was an inventory search of the vehicle was tantamount to a tow is disingenuous and merely a pretext for the claimed inventory," and "the search of the trunk and most [s]uspiciously, the hood, along with the officer's failure to list all of the vehicle's contents on the inventory list suggests that the search of the vehicle was neither incidental to a tow nor for the purposes of inventory." This is a classic example of a police officer's intentional use of an unlawful traffic stop, under a questionable codified ordinance, for the sole purpose of conducting a fishing expedition for evidence of another crime, and a tailored script at the motion to suppress hearing to justify the stop and subsequent searches. *See State v. Bevan*, 80 Ohio App.3d 126, 608 N.E.2d 1099 (11th Dist.1992).

{¶26} The state's assignment of error is accordingly overruled.

{¶27} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Pg. 12

SEAN C. GALLAGHER, JUDGE

JAMES J. SWEENEY, P.J., and
KENNETH A. ROCCO, J., CONCUR