UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


UNITED STATES OF AMERICA,          Case No. 20CR302

            Plaintiff,
                                   May 28, 2020
        vs.                        10:10 a.m.

WILLIAM ELLIS,

            Defendant.



TRANSCRIPT OF PRELIMINARY/DETENTION HEARING PROCEEDINGS
BEFORE THE HONORABLE DAVID A. RUIZ
UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For the Government:        Kevin Pierce, AUSA
                           Office of the U.S. Attorney
                           Northern District of Ohio
                           801 West Superior Avenue
                           400 U.S. Court House
                           Cleveland, Ohio   44113
                           (216) 622-3600

For the Defendant:         Charles Fleming, AFPD
                           Office of the Federal Public
                               Defender
                           1660 West Second Street
                           Skylight Office Tower, # 750
                           Cleveland, Ohio   44114
                           (216) 522-4856


Official Court Reporter:   Susan Trischan,RMR,FCRR,CRR,CRC
                           7-189 U.S. Court House
                           801 West Superior Avenue
                           Cleveland, Ohio   44113
                           (216) 357-7087

Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.

2

Case 1:20-cr-00305-SO Doc #: 16 Filed: 08/31/20 2 of 70. PageID #: 552

1      <u>THURSDAY, MAY 28, 2020, 10:10 A.M.</u>

2              THE CLERK:  This United States District

3      Court for the Northern District of Ohio is now open for

4      the transaction of business, the Honorable David A. Ruiz

10:10:40  5      presiding.

6              The Court calls Case Number 1:20MJ9138,

7      United States of America versus William Ellis.

8              THE COURT:  Good morning.

9              Will counsel for the United States please

10:10:53 10      enter your appearance for the record?

11              MR. PIERCE:  Good morning, Your Honor.

12      Kevin Pierce on behalf of the United States.

13              THE COURT:  And will counsel for the

14      defense please enter an appearance for the record?

10:11:01 15              MR. FLEMING:  Yes, Your Honor.  Thank you.

16      Charles Fleming on behalf of Mr. Ellis.

17              THE COURT:  And, sir, you are William

18      Ellis, is that correct?

19              THE DEFENDANT:  Yes.

10:11:11 20              THE COURT:  Mr. Ellis, you appeared before

21      me on May 20th of this year for an initial appearance.

22      At that time the Office of the Federal Public Defender

23      was appointed to represent you.

24              Is it your intention, Mr. Ellis, to

10:11:20 25      continue with your appointed counsel?

Case 1:20-cr-00305-SRO Doc #: 16  Filed: 08/32/20  3 of 70.  PageID #: 583

1           THE DEFENDANT:  Yes.

2           THE COURT:  Counsel and Mr. Ellis, we are

3   here today for a preliminary hearing and detention

4   hearing.

5           We are conducting this hearing via a

6   videoconference.  Counsel for the United States and

7   counsel for the defense are appearing via

8   videoconference.

9           It's my understanding that Task Force

10  Officer Kopchak is also appearing via videoconference.

11          The defendant Mr. William Ellis is

12  appearing via videoconference.  He's present in the

13  Northeast Ohio Correctional Center conference room.

14          We also have a representative from Pretrial

15  Services participating, and we have a court reporter

16  making a record of today's proceedings.

17          To confirm, AUSA Pierce, can you see and

18  hear not only me, but the other participants I've

19  identified?

20          MR. PIERCE:  Yes, Your Honor.

21          THE COURT:  And, Attorney Fleming, can you

22  see and hear me and the other participants?

23          MR. FLEMING:  I can, Your Honor.  Thank

24  you.

25          THE COURT:  And, Mr. Ellis, can you also

4

1    see and hear not only me, but the other participants I've

2    identified?

3                    THE DEFENDANT:  Yes.

4                    THE COURT:  I'll indicate that under normal

10:12:36 5    circumstances, you all would be present with me here in

6    United States District Court.  We would be conducting

7    this hearing in open court in my courtroom, but due to

8    the impact of Covid-19, we are conducting this hearing

9    via videoconference pursuant to the authority provided by

10:12:53 10    the CARES Act as well as the standing and general orders

11    issued by the Chief Judge of the Northern District of

12    Ohio.

13                    Mr. Ellis, do you consent to proceeding

14    with this hearing via videoconference?

10:13:11 15                    THE DEFENDANT:  Yes.

16                    THE COURT:  And, Attorney Fleming, do you

17    consent to proceeding via videoconference?

18                    MR. FLEMING:  Yes, Your Honor.

19                    THE COURT:  And, AUSA Pierce, do you

10:13:18 20    consent to proceeding via videoconference?

21                    MR. PIERCE:  Yes, Your Honor.

22                    THE COURT:  And, Attorney Fleming, have you

23    had an opportunity to speak with Mr. Ellis since the

24    initial appearance in preparation of today's hearing?

10:13:32 25                    MR. FLEMING:  Yes, I have, Your Honor.  And

5

```
 1      I should note for the record that I am actually at this
 2      point standing in for Darin Thompson.  Mr. Thompson has
 3      ultimately been given this case, but he was unable
 4      to -- he had a conflict for purposes of today's hearing,
 5      and I am doing the hearing for him.
 6                      THE COURT:  Thank you for that
 7      clarification, counsel.
 8                      But is the defense prepared to proceed at
 9      this time with the hearing?
10                      MR. FLEMING:  Yes, Your Honor.
11                      THE COURT:  Mr. Ellis, before we proceed
12      any further, I'm going to ask you an initial question.
13                      Are you presently under the influence of
14      any medication, drugs, alcohol, any substance that at
15      present would interfere or affect your ability to think
16      or understand?
17                      THE DEFENDANT:  No.
18                      THE COURT:  Attorney Fleming, do you have
19      any reason to question either your client's ability to
20      understand what's going on here today or his competency
21      to proceed in this matter?
22                      MR. FLEMING:  No, I do not, Your Honor.
23                      THE COURT:  Mr. Ellis, I will remind you
24      that you have the right to remain silent.
25                      You are not required to make any statement
```

10:13:48  (line 5)
10:13:59  (line 10)
10:14:12  (line 15)
10:14:21  (line 20)
10:14:29  (line 25)

1    or to testify, and anything you say may be used against

2    you.  If you start to make a statement, you may stop at

3    any time.

4              And you may also consult with your attorney

10:14:38 5    at any time.

6              Do you understand your right to remain

7    silent?

8                   THE DEFENDANT:  Yes.

9                   THE COURT:  Counsel and Mr. Ellis, I'll

10:14:49 10   also advise that during today's proceedings, I'll do my

11   best to call on each one of you by name, but if I have

12   not done so, I ask that you just identify yourself by

13   name so that way the court reporter can make an accurate

14   transcript of today's hearing.

10:15:07 15             Also, because we're appearing via

16   videoconference for this hearing, sometimes there is some

17   noise or feedback from open mics, so I ask that you all

18   mute your mics when you're not speaking.  And at times I

19   may have to mute your mic as well if there is any noise

10:15:30 20   reverberation or issue with the feedback and the sound.

21             But if you're on mute, you should be able

22   to unmute yourself and speak.

23             If there's any issue, just raise your hand

24   and I will be able to see you and make sure that you have

10:15:43 25   full and ample opportunity to make any statement that

1    you'd like.

2              In addition, Mr. Fleming and Mr. Ellis, I

3    wanted to advise you that if at any point in time you'd

4    like to have a private attorney/client conference, just

10:15:57  5    make that request.

6              With the technology we have, we can place

7    the two of you into a separate breakout room where you

8    can have a private conference.  The rest of us would stay

9    in this main videoconference and take a recess on the

10:16:09 10    record while you have an opportunity to have your private

11    attorney/client conference.

12              MR. FLEMING:  Thank you, Your Honor.

13              THE COURT:  Counsel and Mr. Ellis, as I

14    indicated, we're here today for a preliminary hearing and

10:16:21 15    a detention hearing.

16              We'll first address the matter of probable

17    cause and address the matter of detention, if necessary,

18    after first addressing the matter of probable cause.

19              With respect to the hearing itself, I do

10:16:38 20    have a copy of the Pretrial Services report, so if you

21    have any changes, corrections or modifications you'd like

22    the Court to consider with respect to the Pretrial

23    Services report, please let me know.

24              Also, I have been provided with copies of

10:16:59 25    the Government's and defendant's exhibits in advance of

8

1    this hearing.  I have electronic versions of those, but

2    to the extent that you intend to use any of those

3    exhibits, if you would just identify them during the

4    hearing so that way I can make sure I have the correct

10:17:16   5    document in front of me.

6              And it's also my understanding that those

7    exhibits have been exchanged between counsel, but if

8    there's any issue there, AUSA Pierce or Attorney Fleming,

9    let me know and we can address that before we proceed any

10:17:30  10    further.

11              Okay?

12              MR. FLEMING:  Yes.  Thank you, Your Honor.

13              THE COURT:  All right.  And then with

14    respect to the hearing itself, counsel, if you would like

10:17:43  15    to -- or AUSA Pierce, do you intend to call any

16    witnesses, or proceed by way of proffer?

17              MR. PIERCE:  Your Honor, I intend to call

18    Task Force Officer Kopchak.

19              THE COURT:  Okay.  And, Attorney Fleming,

10:17:55  20    do you intend to call any witnesses, or proceed by way of

21    proffer?

22              MR. FLEMING:  Your Honor, we would be

23    proceeding by way of proffer and argument.

24              THE COURT:  All right.  At this time, since

10:18:03  25    we are doing the combined preliminary hearing and

1    detention hearing, counsel, you can include in the direct

2    and cross-examination of Officer Kopchak issues that

3    would address both preliminary hearing, probable cause,

4    and detention hearing issues so that way we don't need to

10:18:26  5    split the testimony.

6                But you can do it for the issues that you

7    would address during direct examination, AUSA Pierce, you

8    can address those issues, and same to you, Attorney

9    Fleming.

10:18:41 10                MR. FLEMING:  Thank you, Your Honor.

11                THE COURT:  As well, Attorney Fleming, any

12    proffer that you reserve can address both the preliminary

13    hearing issues and detention hearing issues at the time,

14    and then I'll make an initial determination with respect

10:18:56 15    to whether, in fact, there's probable cause to support

16    the charges alleged against Mr. Ellis.

17                And then, if necessary, I'll hear any

18    additional argument that you have with respect to the

19    matter of pretrial detention.

10:19:07 20                MR. FLEMING:  Okay.

21                THE COURT:  AUSA Pierce, unless there's any

22    further initial issues to address, you may call your

23    first witness.

24                MR. PIERCE:  Thank you, Your Honor.

10:19:20 25                The United States calls Task Force Officer

1    Don Kopchak.

2                    THE COURT:  Mr. Kopchak, please raise your

3    right hand.

4                    Ms. Gallagher, would you please swear in

10:19:30  5    Mr. Kopchak?

6                         DONALD KOPCHAK,

7        of lawful age, a witness called by the Government,

8              being first duly sworn, was examined

9                  and testified as follows:

10:19:41  10                    THE COURT:  Officer Kopchak, your line was

11    on mute for a moment.  Can you answer again?

12                    THE WITNESS:  I do.

13                    THE COURT:  You understand, Officer

14    Kopchak, that you're now under oath and your testimony is

10:19:53  15    subject to the pains and penalties of perjury?

16                    THE WITNESS:  I do.

17                    THE COURT:  AUSA Pierce, you may begin.

18                    MR. PIERCE:  Thank you, Your Honor.

19          DIRECT EXAMINATION OF DONALD KOPCHAK

10:19:59  20    BY MR. PIERCE:

21    Q.    Can you state your name and spell your last for the

22    record?

23    A.    Detective Donald Kopchak, K-O-P-C-H-A-K.

24    Q.    What's your current occupation?

10:20:10  25    A.    I am assigned to the City of Cleveland Division of

Kopchak - Direct                    11

1    Police as a detective for the last 13 years.

2              I'm also assigned to the ATF as a task

3    force officer for -- it will be two years next week.

4    Q.   As a task force officer with the ATF, what are your

10:20:26  5    current duties?

6    A.   With the -- as a task force officer with the ATF,

7    my duties are to investigate federal crimes including

8    drug trafficking, felons in possession of firearms,

9    pretty much anything that we can go forward federally

10:20:47 10    with.

11    Q.   Okay.  Do you have any training in the field of

12    narcotics?

13    A.   Yes.

14    Q.   Like what?

10:20:52 15    A.   Well, I graduated from the Cleveland Police

16    Academy.  Shortly after that, I attended several drug

17    trafficking classes, basic narcotics school through HIDTA

18    in Brooklyn.  I also went to an advanced narcotics school

19    in Dallas, Texas for a week.

10:21:13 20              I have attended undercover schools.  I have

21    participated in numerous undercover operations and

22    handled confidential informants, things like that.

23    Q.   What about firearms, do you have any training in

24    the field of firearms?

10:21:32 25    A.   Yes.  ATF sends me to -- or sent me to Washington,

Kopchak - Direct                                    12

 1    D.C. for seven days for an ATF course which includes

 2    firearms, the basics of firearms, how much they're worth,

 3    trafficking in firearms, characteristic of an armed gun

 4    man, things of that nature.

10:21:54  5    Q.    Okay.  Besides your 13 years with the Cleveland

 6    Division of Police, do you have any other law enforcement

 7    experience?

 8    A.    No.

 9    Q.    Okay.  During your time as a detective with

10:22:04 10    Cleveland or as an ATF Task Force Officer, have you ever

11    testified as an expert?

12    A.    No.

13    Q.    Okay.  I want to turn your attention now to May

14    18th of 2020.

10:22:15 15              Do you remember that?

16    A.    Yes.

17    Q.    Was the search warrant executed at 638 East 127th

18    Street?

19    A.    Yes, it was.

10:22:24 20    Q.    Is that the City of Cleveland, Ohio?

21    A.    It is.

22    Q.    Is that in the Northern District of Ohio?

23    A.    It is.

24    Q.    All right.  Can you tell me what happened on May

10:22:34 25    18th, 2020?

1    A.    We executed a Cuyahoga County search warrant with

2    the Cleveland SWAT unit.

3             I was notified two days prior from

4    Detective Yasenchack from the Cleveland Police

10:22:50 5    Department --

6    Q.    I'm going to stop you there.

7             Could you spell that last name for us for

8    the record?

9    A.    Sure.   It's Y-A-S-E-N-C-H-A-C-K, and his badge is

10:23:03 10    2362.

11    Q.    Okay.   So continue.

12    A.    He notified me that there was going to be a search

13    warrant and asked me to assist.

14    Q.    Okay.   So on the morning of May 18th, was the

10:23:17 15    search warrant actually executed?

16    A.    It was.

17    Q.    Was anyone home?

18    A.    Yes.   There was two occupants in the home.

19             There was Mr. William Ellis and a female.

10:23:29 20    Q.    When you say "Mr. William Ellis," do you mean the

21    fellow here on the Zoom call with us?

22    A.    Yes.

23             MR. PIERCE:   Your Honor, identification for

24    the record?

10:23:39 25             THE COURT:   The record would so note that

| | |
|---|---|
| 1 | the witness has identified Mr. William Ellis appearing |
| 2 | through Northeast Ohio Correctional Center |
| 3 | videoconference. |
| 4 | BY MR. PIERCE: |
| 10:23:49 5 | Q.    All right.  So you know, police enter, they find |
| 6 | Mr. Ellis and a female, as you mentioned. |
| 7 | Where was Mr. Ellis when you arrived at the |
| 8 | home? |
| 9 | When I say "you," I mean officers in |
| 10:24:01 10 | general. |
| 11 | A.    He was running upstairs in the hallway when SWAT |
| 12 | made contact with him. |
| 13 | Q.    Where was he running towards? |
| 14 | A.    The bathroom. |
| 10:24:11 15 | Q.    Was there anything going on in the bathroom? |
| 16 | A.    Numerous times SWAT had to get his attention to |
| 17 | almost gain control of him verbally. |
| 18 | Once they did that, they were able to |
| 19 | detain him, and they detained a female who was in the |
| 10:24:30 20 | bedroom. |
| 21 | And SWAT noticed that there were several |
| 22 | empty bags near the toilet as well as pills on the |
| 23 | bathroom floor and in a living room area -- or hall area. |
| 24 | Q.    Okay.  Was he eventually detained then? |
| 10:24:44 25 | A.    He was. |

10:24:53

10:25:06

10:25:19

10:25:33

10:25:50

1   Q.   Okay.  After his detention, was he provided his
2   Miranda warnings?
3   A.   He was.
4   Q.   Did he, during the time of the search warrant, did
5   he mention what was going on in the bathroom?
6   A.   Yes, I actually advised him of his Miranda rights.
7   I actually explained to him who I was, that I was with
8   the ATF as a task force officer.
9        I asked him about if he was flushing
10   anything down the toilet, and at that time he explained
11   that he was just getting rid of some Percocets.
12   Q.   Okay.  Now, I want to turn your attention to the
13   search of the house.
14        Let's start in the upstairs bedroom.
15        Was that searched?
16   A.   Yes, there was actually -- well, there was two
17   bedrooms, but one, one -- the third one was actually a
18   marijuana grow house.
19   Q.   Okay.  Let's talk about that.
20        What do you mean by "a marijuana grow
21   house"?
22   A.   Inside the -- which would be a normal bedroom, was
23   approximately 15 plants.  They had grow lights,
24   fertilizers, grow containers, heat lamps, humidity
25   thing -- humidity control, everything you need to

            1    successfully grow marijuana.

            2    Q.    Okay.  Anything else in that room?

            3    A.    No.

            4    Q.    You mentioned there were other bedrooms.

10:26:02    5                   Was there anything else found in the

            6    bedrooms upstairs?

            7    A.    Yes, the next bedroom was what we considered

            8    Mr. Ellis's bedroom.

            9                   We --

10:26:10   10    Q.    Before you get too far ahead, why, why did you

           11    consider it his bedroom?

           12    A.    His wallet was in there with his driver's license.

           13    Clothing was in there.  He's a large gentleman.  The

           14    clothing matched his posture.  All men's clothes in

10:26:30   15    there.

           16                   The other bedroom had all female clothes.

           17                   Basically with the driver's license and

           18    everything else, as well as the other female in the

           19    residence stated that that was his bedroom.

10:26:45   20    Q.    Okay.  Was anything found in that room?

           21    A.    Yes.

           22    Q.    What?

           23    A.    Inside that bedroom in the closet was a jacket.

           24    Inside the jacket was a large bag of suspected Fentanyl.

10:27:04   25                   Also, we located Mr. Ellis's wallet with

Kopchak - Direct                                    17

1   his driver's license, some paperwork with his name on it,

2   and next to that wallet with his driver's license was a

3   loaded Smith & Wesson revolver.

4   Q.    When you say "Next to the wallet," what do you

10:27:24   5   mean?

6   A.    So right -- if you're looking at the bed, to the

7   left of the bed was, like, a little makeshift nightstand

8   which is what the wallet was on with some paperwork.

9            And then the firearm was in between the

10:27:39 10   nightstand and the bed, as if you were laying there you

11   could just reach and grab the revolver.

12   Q.    So if you were laying in bed, about how far away

13   from the bed?  Was it within arm's reach?

14   A.    Yes, it was.

15   Q.    Would he have to get --

16   A.    Yes, it was actually almost touching the bed.

17   Q.    Anything else found in that room; any ammunition or

18   anything like that?

19   A.    No.  The -- there was ammunition located throughout

10:28:03 20   the home, but I don't believe there was any additional

21   ammunition in that bedroom.

22   Q.    Was the gun loaded?

23   A.    Yes, it was.

24   Q.    Let's turn to the living room.

10:28:14 25            Was anything found in the living room?

Kopchak - Direct                                    18

1    A.    Yes, in the living room where Mr. Ellis was

2    actually sitting, where I advised him of his Miranda

3    rights, I located a magazine with 17 rounds in it.

4                That's -- shortly after I located that,

10:28:28  5    that was within the first couple minutes of being in the

6    home, I asked Mr. Ellis if there was a firearm upstairs

7    or in his bedroom, and he stated he couldn't remember.

8                I asked him why he would have another

9    magazine just sitting out, and he did not answer that

10:28:46  10    question.

11                However, through -- through the search of

12    the living room, officers located numerous boxes of

13    different ammunition in the living room.  They located a

14    box of .556 ammunition, a box of .762 ammunition, a box

10:29:07  15    of .9 millimeter ammunition as well.  And then an

16    additional bag of .556 rounds also located in the living

17    room.

18    Q.    What about drug paraphernalia, was there any drug

19    paraphernalia found?

10:29:26  20    A.    Once you made your way into the kitchen, which was

21    located in the rear of the home, it was set up as to

22    manufacture drugs or to step on drugs.

23                And by that I mean that there was digital

24    scales with heavy residue throughout the kitchen.  There

10:29:42  25    was blender with residue.  There was -- next to the

Kopchak - Direct                                    19

1    blender there was a box of Benefiber which is being used

2    to color the Fentanyl.

3              The Fentanyl now is coming white or

4    Carfentanil is coming in white.  The users do not want it

10:30:01  5    white because they don't want the Carfentanil to Fentanyl

6    so it's a common practice to either cut the Fentanyl or

7    Carfentanil with some sort of colored powder, Rizzy or

8    now they are using Benefiber.  That was next to the

9    kitchen by the scales and the plastic bags and the

10:30:17 10    blenders.

11              Also there was a press.  It was a little

12    press, approximately, I don't know, eight inches long

13    that would be used to press heroin.

14              The reason you do that is to -- once you

10:30:31 15    blend up the cut and everything else, you're able to

16    repress it so it appears that it's -- has not been

17    stepped on.

18    Q.    Why would somebody not want stepped-on heroin?

19    A.    Because you're losing the potency of what you're

10:30:47 20    purchasing, so if you're getting almost pure Fentanyl or

21    Carfentanil, every time you step on it you're losing that

22    little bit, or if you're buying heroin it would be the

23    same thing.

24    Q.    All these items you mentioned, you mentioned there

10:31:02 25    was what appeared to be Fentanyl upstairs, this drug

1   paraphernalia with the residue, et cetera, were all these

2   items sent to the laboratory?

3   A.     They were.

4   Q.     Are the results back yet?

10:31:12  5   A.     They are not.  I just checked this morning right

6   before the conference, but they are not back yet.

7                    The only results that we have back are from

8   our prior investigation of Mr. Ellis of the drugs we

9   recovered.

10:31:23 10   Q.     What -- what do you mean by that?

11   A.     On May 11th of 2020, Detective Yasenchack conducted

12   surveillance on Mr. Ellis's home and was able to notice a

13   large volume of traffic coming and going from the home.

14                    The last vehicle that came into the

10:31:51 15   residence, Mr. Ellis was observed letting them in the

16   home.  They then left Mr. Ellis's home.  They were then

17   stopped, and they were able -- they were in possession of

18   suspected Fentanyl.

19                    Those occupants were interviewed and they

10:32:11 20   were able to describe Mr. Ellis.  They know him as Blaze.

21   They supplied a phone number that they contacted him on.

22   And they were shown a video -- not video -- a BMV photo

23   of Mr. Ellis, and they were able to positively identify

24   him as Mr. Ellis.

10:32:31 25                    Those drugs that were confiscated were sent

Kopchak - Direct

21

1    to the lab, and it should be noted that those drugs were

2    also -- the suspected heroin was a yellowish color

3    similar to the same exact color that was located in

4    Mr. Ellis's coat.

10:32:49  5              Those labs came back, and it was a mixture

6    of heroin, Carfentanil, Fentanyl, cocaine, Tramadol,

7    4-ANPP which is a Schedule II, and Gabapentin which is a

8    nonschedule which would be cut.

9    Q.    Okay.  So the May 11th Fentanyl was very similar in

10:33:17 10   color and look as to what was recovered on the 18th; fair

11   to say?

12   A.    It was, yes.

13   Q.    Okay.  Does Mr. Ellis have any prior convictions?

14   A.    He does.

10:33:26 15   Q.    Like what?

16   A.    Mr. Ellis has a prior conviction for gross sexual

17   imposition, kidnapping, felonious assault, and drug

18   trafficking.

19   Q.    Did that make him prohibited from possessing or

10:33:41 20   owning a firearm?

21   A.    It does.

22   Q.    You mentioned gross sexual imposition.

23              Does that mean he's a registered sex

24   offender?

10:33:50 25   A.    It is.

|   |   |
|---|---|
| 1 | Q.    During -- as a registered sex offender, does he |
| 2 | have to provide an address? |
| 3 | A.    He does. |
| 4 | Q.    Do you know what that address is? |
| 10:33:58 5 | A.    He supplied 638 East 127th. |
| 6 | Q.    Okay.  You mentioned, I think -- and if you didn't, |
| 7 | I apologize -- you mentioned a vehicle that was |
| 8 | registered or a vehicle of Mr. Ellis's. |
| 9 | Do you know of his vehicle? |
| 10:34:14 10 | A.    Yeah, the original complaint that we received |
| 11 | that -- not me -- that Detective Yasenchack received in |
| 12 | April stated that the person that's selling the drugs |
| 13 | drives Ford Explorer with Ohio plate of HYH 8894. |
| 14 | When Detective Yasenchack ran that plate, |
| 10:34:37 15 | it did come back to William Ellis. |
| 16 | And on May 12th, I assisted Detective |
| 17 | Yasenchack and I did see that vehicle there.  However, |
| 18 | during the search warrant, that vehicle was not present. |
| 19 | Q.    Do you know where that vehicle is registered to, |
| 10:34:57 20 | what address? |
| 21 | A.    I don't believe I have that information in front of |
| 22 | me. |
| 23 | Q.    That's fine. |
| 24 | Detective, I want to -- I have five |
| 10:35:15 25 | exhibits that I want to sort of go through, Exhibits A |

Kopchak - Direct                                    23

1    through E.

2                    I provided them to you earlier and you sent

3    them to me.  I know this is a little awkward, but Exhibit

4    A, that's Detective Yasenchack's report.

5                    Do you remember seeing that?

6    A.    Yes.

7    Q.    Have you reviewed it?

8    A.    I have.

9    Q.    Is it a fair and accurate copy of his report?

10   A.    It is.

11   Q.    Okay.  In that report, does he mention when his

12   search warrant was submitted to the Cuyahoga County

13   Prosecutor's Office?

14   A.    Yes.

15   Q.    When?

16   A.    He submitted it to -- he drafted the warrant and

17   submitted it on May 12th to the prosecutor for review.

18   Q.    Okay.  I want to turn your attention to Exhibit B.

19                    You provided me and I provided counsel with

20   four photographs.

21                    MR. PIERCE:  Your Honor, with permission,

22   could I share my screen?  It may make this process a

23   little easier if I could show the photo.

24                    THE COURT:  Yes, you may.

25

        1    BY MR. PIERCE:

        2    Q.    Detective, I'm going to draw your attention to the

        3    screen.

        4              Is that Exhibit B?  Detective, do you see

10:36:40  5    that?

        6    A.    Yes, I do.

        7    Q.    What do you see here?

        8    A.    Those, that is the -- I refer to as a bedroom, but

        9    it's the grow house.  Those are pictures of the plants,

10:36:51 10    the fertilizer.

       11              To the left you see the humidifier or the

       12    humidifier controller.

       13              And then right above there was all the heat

       14    lamps.

10:37:04 15    Q.    Is this photo a fair and accurate copy of the

       16    bedroom of Mr. Ellis's house on May 18th, 2020?

       17    A.    Yes.

       18    Q.    Did you see my screen change then, Detective?

       19    A.    It did not.

10:37:23 20    Q.    Okay.  One second.

       21              Detective, did my screen just change to

       22    Exhibit C?

       23    A.    Yes.

       24    Q.    Could you describe what you see here in Exhibit C?

10:37:41 25    A.    That is the bag of suspected Fentanyl that was

Kopchak - Direct                                    25

1    located in the coat.

2              It's removed from the coat to take a photo

3    to depict what it looks like.

4    Q.    Okay.  Is it a fair and accurate copy of what was

10:37:57 5    seized from the coat on May 18th, 2020?

6    A.    Yes.

7    Q.    Turning your attention back to the screen here to

8    Exhibit D, what do you see here?

9    A.    That is Captain Kane -- that's spelled K-A-N-E.

10:38:21 10   She is holding the coat which the Fentanyl, suspected

11   Fentanyl, bag of Fentanyl was located in.

12   Q.    You mentioned earlier that Mr. Ellis is a big

13   individual.

14              What stands out about the size in this

10:38:34 15   photograph?

16   A.    Captain Kane is very tall as well, above six foot,

17   and she's holding the coat up.  As you compare, it's a

18   very large coat that would -- that would match

19   Mr. Ellis's description or posture, I guess.

10:38:50 20   Q.    About how tall is Mr. Ellis?

21   A.    He's tall.  He's six-five.

22   Q.    Okay.

23   A.    Six-four, six-five.

24   Q.    All right.  Turning your attention to the screen

10:39:05 25   again, Exhibit E.

Kopchak - Direct                                     26

1              Do you see this?

2    A.    Yes.

3    Q.    What do you see here?

4    A.    That is the revolver that I stated earlier that was

10:39:15  5    next to the bed.

6              The bed is actually moved to get a better

7    photo of the gun.

8    Q.    So there's a brown object on the left.

9              What is that?

10:39:25 10    A.    That's the nightstand that I spoke of that -- I

11    don't think it's an actual nightstand.  It was more like

12    a make-shift nightstand.

13    Q.    There appears to be either a covering or a plastic

14    sheet on the right.

10:39:40 15              What is that?  Is that the bed?

16    A.    Yes.

17    Q.    So does it -- how did it get in that position?

18    A.    The bed?

19    Q.    Yes.

10:39:48 20    A.    It was moved when -- throughout the search.

21              I wasn't present for the search of that

22    bedroom, just Captain Kane was and Detective Yasenchack,

23    but the bed was moved to check under the bed, and that's

24    when the bed was moved and the firearm was located.

10:40:05 25    Q.    So the firearm was found in that spot when the bed

1  was moved, is that fair to say?

2  A.    Correct, to get a better photo of it.

3  Q.    All right.  So is this photo a fair and accurate

4  depiction of where the gun was found on May 18th of 2020?

10:40:20  5  A.    It is, yes.

6            MR. PIERCE:  All right.  Your Honor, I move

7  for the admissions of Exhibits A through E.

8            THE COURT:  Attorney Fleming, any

9  objections?

10:40:30  10            One moment.  Attorney Fleming, I believe

11  your mic is on mute.

12            Any objections, Attorney Fleming?

13            MR. FLEMING:  No objection, Your Honor.

14            I apologize.

10:40:40  15            THE COURT:  All right.  Government's

16  Exhibits A through E are admitted without objection.

17            AUSA Pierce, you may continue.

18            MR. PIERCE:  Your Honor, that's all I have.

19            THE COURT:  Attorney Fleming, any

10:40:57  20  cross-examination?

21            MR. FLEMING:  Yes, Your Honor, if I may.

22       CROSS-EXAMINATION OF DONALD KOPCHAK

23  BY MR. FLEMING:

24  Q.    Detective Kopchak, you did the affidavit in this

10:41:06  25  case, is that correct?

Kopchak - Cross

28

```
           1    A.    Yes, sir, I did.
           2    Q.    Okay.  And some of the stuff you talk about in the
           3    affidavit relates to surveillance that was conducted by
           4    Officer Kop -- I mean, I'm sorry, Officer Yasenchack on
10:41:20   5    May 11th, is that correct?
           6    A.    Yes, sir.
           7    Q.    Okay.  Now, were you present for that surveillance?
           8    A.    No, sir.
           9    Q.    Okay.  So all of the information you got with
10:41:30  10    regard to that surveillance came from Officer Yasenchack?
          11    A.    Correct.
          12    Q.    Okay.  Was he assisted by other officers?
          13    A.    I do not know.
          14    Q.    Okay.  Part of the information he had leading him
10:41:44  15    to the surveillance of that house came from a
          16    confidential informant.
          17                Do you recall that?
          18    A.    I do.
          19    Q.    Okay.  Was that a paid informant, or was that
10:41:52  20    someone who was looking to reduce a sentence?
          21    A.    I don't recall.
          22    Q.    Okay.
          23    A.    I can't remember if the CI has a case, or if his
          24    case is already completed.
10:42:13  25                I can't remember.
```

Kopchak - Cross                                                    29

1    Q.    Okay.  Did that person ever do any sort of

2    controlled buy that was allegedly from Mr. Ellis?

3    A.    I'm sorry, something happened with the audio.  I

4    couldn't hear.

10:42:27  5              THE COURT:  Could you repeat the question,

6    Mr. Fleming?  There was some static in your question.

7    BY MR. FLEMING:

8    Q.    Sorry.  I asked whether that person was -- ever did

9    a controlled buy, is alleged to have ever done a

10:42:38 10   controlled buy from Mr. Ellis.

11   A.    Not to my knowledge, no.

12   Q.    Okay.  So the person directed Officer Yasenchack to

13   Mr. Ellis, but to your knowledge never did any sort of

14   transaction for Officer Yasenchack with Mr. Ellis?

10:42:52 15   A.    Correct.

16              You're referring to the original CI --

17   Q.    Yes.

18   A.    -- who supplied information?

19   Q.    Yes, that led to the surveillance on May 11th.

10:43:01 20   A.    Correct.

21   Q.    Okay.  Now, you know that Officer Yasenchack was

22   involved in a previous case with Mr. Ellis, correct?

23   A.    Just recently, yes.

24   Q.    Okay.  And you actually mentioned it in your

10:43:14 25   affidavit, that that case is pending on appeal, correct?

|  |  |  |
|--|--|--|
| 1 | A. | Correct. |

A.    Correct.

Q.    Okay.  Now, are you -- are you aware that there was a suppression hearing in that case?

A.    I have no knowledge of the case.

10:43:28      AUSA Pierce updated me this morning, but before this morning I had no prior knowledge, no.

Q.    Okay.  So all you knew at the time you did this affidavit was that it was your understanding that that case was pending?

10:43:43      A.    Yes, sir.

Q.    Okay.  Where did you get that information from?

A.    I believe Detective Yasenchack as well as Cuyahoga County Clerk of Courts.

Q.    Okay.  And that, up until today, that was the only

10:44:03      information you knew about that case?

A.    Correct.

Q.    Okay.  When you -- what -- well, let me back up.

When you learned information today, did you learn that that appeal has actually been dismissed?

10:44:15      A.    I did.

Q.    Okay.  And did you learn what the basis of that appeal was?

A.    No.  I don't know anything about the case.  I wasn't present.

10:44:25      Q.    And did you learn that that appeal was actually

|     | |
| --- | --- |
| 1 | dismissed on April 22nd of this year? |
| 2 | A.   I wasn't told the exact date, but I was told it was |
| 3 | dismissed. |
| 4 | Q.   Okay.  Let's talk about the surveillance that |
| 10:44:39 5 | Officer Yasenchack did on the 11th. |
| 6 |            Did he take photographs of what he |
| 7 | surveilled? |
| 8 | A.   I do not know. |
| 9 | Q.   Do you know if he took video of what he surveilled? |
| 10:44:52 10 | A.   I don't believe so. |
| 11 |            We -- that's not a -- that wouldn't be |
| 12 | something that would be a common practice for the Fifth |
| 13 | District vice.  We don't have the capability to video |
| 14 | anything.  We don't have that type of equipment. |
| 10:45:09 15 | Q.   Did other officers assist with regard to that |
| 16 | surveillance? |
| 17 | A.   I don't know.  I wasn't present. |
| 18 | Q.   Okay.  He didn't give you that information? |
| 19 | A.   No.  I didn't -- I didn't ask. |
| 10:45:21 20 | Q.   Okay.  But you indicated at some point in your |
| 21 | affidavit you said that originally two white males |
| 22 | entered and at some point they left, correct? |
| 23 | A.   I'm pulling up that paragraph right now. |
| 24 | Q.   Okay.  Take your time. |
| 10:45:53 25 |            Specifically I refer your attention to |

Kopchak - Cross

32

1    Paragraph 13 of the affidavit.

2    A.    Yep.  I just got there.

3              Go ahead, what was the question?

4    Q.    I said eventually two white males entered the

5    residence and then at some point they left, correct?

6    A.    Correct.

7    Q.    Okay.  And they were not stopped by the Cleveland

8    Police Department at all, to your knowledge?

9    A.    Not to my knowledge, no.

10   Q.    Okay.  So we have no idea what -- what their

11   business was at that residence that day?

12   A.    No.  I don't -- no.

13   Q.    Okay.  And again, after them, after they entered, a

14   female entered and at some point left, correct?

15   A.    Yes.

16   Q.    Okay.  And she was not stopped by the Cleveland

17   Police Department for anything that day?

18   A.    Not to my knowledge.

19   Q.    So we have -- we do not know as we sit here what

20   her business was in that residence that day, correct?

21   A.    Correct.

22   Q.    All right.  And while we're on that topic, how many

23   people were living at the residence?

24   A.    What residence?

25   Q.    The residence that was being surveilled, the

1    residence that allegedly Mr. Ellis was staying at.

2    A.    Mr. Ellis.

3    Q.    He's the only person that was living there?

4    A.    To my knowledge.

10:47:06  5    Q.    Okay.  You said that when officers made entry, his

6    girlfriend was there.

7              Do you recall stating that?

8    A.    I stated a female, yes.

9    Q.    Okay.  Do you know if she was living there?

10:47:17 10    A.    During the interview of her, she stated that she

11    was not living there.  That she was keeping some stuff

12    there until she could go somewhere else.

13    Q.    Okay.  So she was -- if she's keeping stuff there,

14    then she stays there on and off apparently, correct?

10:47:37 15    A.    I didn't ask that.

16    Q.    She -- okay.  Well, she told you she's keeping some

17    stuff there?

18    A.    Yeah.  She had minor stuff there.  She said that

19    she was -- I didn't ask the exact date or time she got

10:47:52 20    there, but yes, she had some clothes there.

21    Q.    Okay.  Then let's go back to the people who are

22    going in and out of the residence on the 11th.

23    A.    Okay.

24    Q.    Finally, two people entered and came out.

10:48:04 25              Those were the last two people that went in

1   that day.

2                   Do you recall that?

3   A.    Yes.

4   Q.    Okay.  Were they two males, two females, male and

5   female?  What was that situation?

6   A.    Well, we don't supply that information and we keep

7   that vague to protect them.

8   Q.    Okay.  Because they cooperated?

9   A.    Correct.

10  Q.    Okay.  Ultimately drugs were found on them, right?

11  A.    Correct.

12  Q.    Okay.  Were they charged with a crime?

13  A.    I don't know if they were or not.  If they -- I can

14  tell you what past practice is, but I can't tell you what

15  Detective Yasenchack did.

16  Q.    You don't know what happened with those two people?

17  A.    No.  I wouldn't ask either.  That's not my -- what

18  he does with his cases are his prerogative.

19  Q.    At some point you know that Detective Yasenchack

20  went and got a search warrant, correct?

21  A.    Yes.

22  Q.    Okay.  Have you reviewed that warrant?

23  A.    Yes.

24  Q.    Okay.  Do you have that there with you?

25  A.    I don't believe so.  I did give it to AUSA Pierce,

1 though.

2 Q.    Okay.

3 A.    I can check if you -- if you want to wait.  I

4 don't -- I had to work from home today, I apologize.  Our

10:49:21 5 office is being disinfected.

6              MR. PIERCE:  If I can jump in real quick,

7 Charles, I can e-mail it to you real quick, if you don't

8 mind.

9              MR. FLEMING:  That's fine.  That's fine.

10:49:30 10 Take your time.

11              THE DEFENDANT:  Could I say something to my

12 attorney real quick in private?

13              THE COURT:  One -- one moment, Mr. Ellis.

14              Attorney Fleming, while AUSA Pierce e-mails

10:49:41 15 the document to Officer Kopchak, we'll take a brief

16 recess right now if you'd like, Attorney Fleming, or if

17 you'd like to proceed with your questioning, we can take

18 a recess after.

19              MR. FLEMING:  I can take -- Judge, I can

10:49:58 20 take a couple minutes and talk to him right now, if the

21 Court is amenable to that.

22              THE COURT:  Okay.  Let's go ahead and take

23 a brief recess right now.

24              Ms. Gallagher, if you could please place

10:50:08 25 Attorney Fleming and Mr. Ellis into a separate breakout

1    room right now, we will take a brief recess.

2                    THE CLERK:  Yes.

3                    (Recess taken).

4                    THE COURT:  All right.  Counsel and

10:52:46  5    Mr. Ellis, we're back on the record.

6                    Attorney Fleming, have you had sufficient

7    time to speak with Mr. Ellis?

8                    MR. FLEMING:  Yes, I did, Your Honor.

9                    THE COURT:  All right.  Are you ready to

10:52:53 10    proceed then?

11                    MR. FLEMING:  We are, Your Honor.

12                    THE COURT:  Okay.

13                    MR. FLEMING:  Thank you.

14    BY MR. FLEMING:

10:52:59 15    Q.    Officer Kopchak, do you have that warrant with you

16    now?

17    A.    I do.  Go ahead.

18                    MR. FLEMING:  Okay.  And, Judge, for the

19    record, I'm referring to Defendant's Exhibit D as in

10:53:07 20    David.

21                    THE COURT:  All right.  Give me one moment

22    to pull that up, counsel.

23                    MR. FLEMING:  Thank you.

24                    THE COURT:  Okay.  Attorney Fleming, I have

10:53:42 25    it.

```
       1            MR. FLEMING:  Okay.  Thank you.
       2    BY MR. FLEMING:
       3    Q.    Officer Kopchak, referring your attention
       4    to -- well, first off, this is the search warrant that
10:53:48 5  was executed on May 18th, correct?
       6    A.    Yes, sir.
       7    Q.    Okay.  And, sir, looking at the second page of the
       8    warrant itself, it shows the Judge having signed it, et
       9    cetera, correct?
10:54:03 10 A.    Yes, sir.
      11    Q.    Okay.  And the date of that signing appears to be
      12    May 14th of 2020, correct?
      13    A.    Yes, sir.
      14    Q.    Okay.  Now, just above that, do you see that last
10:54:14 15 paragraph of the warrant where it starts with
      16    "Therefore"?
      17    A.    Yes.
      18    Q.    Okay.  And do you see that it says, "You are hereby
      19    commanded in the name of the State of Ohio with the
10:54:29 20 necessary and proper assistance to serve this warrant in
      21    the day or night season and search forthwith within three
      22    days of the date hereof"?
      23            Do you see that?
      24    A.    I do.
10:54:41 25 Q.    Now, by my calculations, three days would take you
```

```
 1   to May 17th, correct?
 2   A.   For -- there's case law on this, and the
 3   weekends --
 4   Q.   I just asked you -- I'm just asking you --
 5   A.   No.
 6   Q.   -- three days doesn't take you to May 17th?
 7   A.   Not for us, no.
 8   Q.   Okay.  How far does three days take you?
 9   A.   The case law explains that when you're off or
10   unable to execute that warrant on your days off, that on
11   the weekends, if you're not employed, do not count.
12            So the warrant was signed on the 14th.
13   Saturday and Sunday would not count to execute the
14   warrant.  So then we executed it Monday morning.
15   Q.   Okay.  But in this, all this warrant says is "Three
16   days from the date hereof," correct?
17            It doesn't say "Three business days"?
18   A.   It's -- the language in there is within three days,
19   and there's numerous case laws that I don't have with me,
20   but I have discussed this before and shown, also.
21   Q.   Okay.  Now, you indicated that, among other things,
22   a gun was found in this residence, correct?
23   A.   I did.
24   Q.   All right.  Now, has that gun -- has a trace been
25   done on that gun?
```

1    A.    It has.

2    Q.    Okay.  And did it trace back to someone?

3    A.    It's not completed yet.

4    Q.    Oh, okay.  So the trace has not been done?

10:56:09  5    A.    I sent -- it has.  I sent it in the same day.

6    Q.    Okay.  So you've asked for it.  It has not been

7    completed?

8    A.    Yes, sir.

9    Q.    Okay.  And has fingerprint or DNA testing been done

10:56:21 10    on this gun?

11    A.    Yes, sir.

12    Q.    Okay.  And has that been completed?

13    A.    I swabbed it, yes, for DNA.

14    Q.    Okay.  And were fingerprints found?

10:56:31 15    A.    You don't do both.

16    Q.    Okay.  But -- okay.  You -- so you say you swabbed

17    it for DNA?

18    A.    Yes, sir.

19    Q.    Okay.  And did you locate DNA on the gun?

10:56:43 20    A.    Well, I would need a comparison.  I would type a

21    search warrant for Mr. Ellis's DNA, and then we would

22    collect that DNA.

23    Q.    Okay.

24    A.    And then we would take that DNA with the gun swab,

10:56:56 25    and then it would go to BCI in Richfield, and then it

        1    takes approximately three weeks or so and they would give

        2    me the results.

        3    Q.    So based on what you've just told us then that

        4    process has not been done and completed yet?

10:57:13 5    A.    No, the standard has not been collected.

        6    Q.    Okay.  And are your answers the same with regard to

        7    the ammunition, no fingerprint testing or DNA testing as

        8    yet?

        9    A.    We wouldn't swab the DNA or fingerprint or DNA.  A,

10:57:31 10   the DNA -- or the ammo was in boxes.

        11   Q.    Okay.

        12   A.    It was in a closet.  And our policy at ATF is we

        13   don't swab boxes of ammunition.

        14   Q.    Okay.  And what about the drug press?

10:57:44 15   A.    No.  We wouldn't --

        16   Q.    The drug press that was found?

        17   A.    Cuyahoga County Examiner's Office, when items are

        18   located inside someone's home, there has to be some sort

        19   of exigent circumstances to -- for them to test that DNA

10:57:59 20   such as a homicide or a drug overdose, because their

        21   explanation is that if it's their home, their DNA is

        22   going to be in the home and the item then would be --

        23   whatever scientific word they use -- it would be diluted

        24   or there would be DNA already on it.

10:58:19 25              So they don't -- where we get our DNA done

1    for drugs, they wouldn't do that.

2    Q.    Okay.  But you did indicate swabbing some items for

3    DNA, right?

4    A.    Yeah, a firearm is different.  We are able to -- we

10:58:33  5    have an agreement with BCI to do the standards for felons

6    in possession through ATF.

7    Q.    All right.  Do you know who the owner of the house

8    is?

9    A.    I -- not offhand, I do not.

10:58:49 10    Q.    Okay.  Is that information -- do you have that

11    information somewhere?

12                   I'm not asking you to get it, but do you

13    have that information somewhere?

14    A.    I believe we, when we do our -- when Detective

10:59:02 15    Yasenchack does his pre-entry forms for swab, it requires

16    the Cuyahoga County Auditor's page, so he would have that

17    then.

18    Q.    Okay.  And you don't know that information as you

19    sit here today?

10:59:11 20    A.    Not offhand, I do not.

21    Q.    Do you know -- so if you don't know that

22    information, I imagine you don't know what contact they

23    have with the house?

24    A.    Who?

10:59:21 25    Q.    The owner of the house.

1    A.    I don't understand your question.

2    Q.    You said -- you said that you don't know who the

3    owner of the house is, correct?

4    A.    Correct.

10:59:34  5    Q.    Okay.  And assuming, first of all, assuming that

6    it's someone other than Mr. Ellis, you don't know what

7    contact they have with the house, correct?

8    A.    Correct.

9    Q.    All right.  Now, you said that the female that was

10:59:50 10    there said to you or another officer that that's his

11    bedroom, is that correct?

12    A.    Yes.

13    Q.    Okay.  Did that tend to indicate to you that other

14    bedrooms in the house belonged to other individuals?

11:00:05 15    A.    No, not necessarily.

16    Q.    Okay.  Could mean that, though, correct?

17    A.    No, not necessarily.

18    Q.    Okay.  You said there was a bag of suspected

19    Fentanyl.

11:00:18 20              Do you recall that?

21    A.    Yes.

22    Q.    Okay.  Has that been tested?

23    A.    It was sent to the lab.  I should either get

24    results today or tomorrow.

11:00:26 25    Q.    Okay.  So the tests --

Kopchak - Cross

43

1    A.    The holiday -- no, the holiday set everything back

2    one day.

3    Q.    Okay.  Now, do you have any information to indicate

4    that Mr. Ellis is not a lifelong resident of the City of

5    Cleveland?

6    A.    That he's not a lifelong resident?

7    Q.    That's correct.

8    A.    He lived in --

9    Q.    Do you have any --

10   A.    I know his driver's license has him living in

11   Richmond Heights; not in Cleveland.

12   Q.    Okay.  So let me rephrase the question.

13             Do you have any information to indicate

14   that he's not a lifelong resident of the Northern

15   District of Ohio?

16   A.    Oh, no, not to my knowledge.

17             I don't have his full report here, but

18   nothing that stuck out to me, no.

19   Q.    Okay.  And you don't have any information to

20   contradict the fact that he was born and raised here in

21   Cleveland or in the Northern District of Ohio?

22   A.    I'll agree with you, if that's what you're saying.

23   Q.    Well, I'm just asking if you have any information

24   that contradicts that.

25   A.    Oh, no, I don't.

1    Q.    Okay.  And you, do you have any information that

2    contradicts that he has strong ties in terms of family to

3    the Northern District of Ohio?

4    A.    He spoke of his mom.  That's about it.

11:01:45  5    Q.    You don't have any information to contradict that?

6    A.    No.

7    Q.    Okay.

8                 MR. FLEMING:  Your Honor, I have no further

9    questions.

11:01:56 10                 THE COURT:  AUSA Pierce, any redirect?

11                 MR. PIERCE:  No, Your Honor.

12                 THE COURT:  All right.  Officer Kopchak,

13    you're now off the witness stand.

14                 (Witness excused).

11:02:18 15                 THE COURT:  AUSA Pierce, any additional

16    witnesses?

17                 MR. PIERCE:  No.

18                 THE COURT:  Any additional proffer for the

19    Court to consider before I turn to --

11:02:31 20                 MR. PIERCE:  I would just proffer the

21    Pretrial report, Your Honor, which I know you stated you

22    already have.

23                 THE COURT:  I do have it.  One moment.

24                 AUSA Pierce, before I turn to Attorney

11:03:26 25    Fleming, I'll note in the criminal complaint the

1    defendant was accused of violating 18, U.S.C., Section

2    922(g), possession of a firearm by a convicted felon.

3                    MR. PIERCE:  Correct.

4                    THE COURT:  Do you have any additional

11:03:42  5    information to proffer with respect to the firearm and/or

6    the ammunition that was referenced during the examination

7    of the witness?

8                    MR. PIERCE:  That being the interstate

9    commerce, is that your question, Judge?

11:03:59 10                    THE COURT:  My question was do you have any

11    additional information to proffer with respect to the

12    firearm and/or the ammunition?

13                    MR. PIERCE:  No.

14                    THE COURT:  Any information that would

11:04:09 15    indicate that it was -- has transferred or would in any

16    way affect interstate commerce?

17                    MR. PIERCE:  Not -- if I could recall

18    Detective Kopchak, he mentioned the make and model of it.

19                    I could simply ask him a question about

11:04:26 20    Smith & Wessons, if permitted to reopen the questioning.

21                    THE COURT:  Any objection, Attorney

22    Fleming?

23                    MR. FLEMING:  No objection, Your Honor.

24                    THE COURT:  Mr. Kopchak, you are back on

11:04:37 25    the witness stand.

```
 1              Do you understand that your testimony is

 2   still subject to the pains and penalties of perjury if

 3   you do not tell the truth?

 4              THE WITNESS:  I do.

 5              THE COURT:  AUSA Pierce, you may proceed.

 6         REDIRECT EXAMINATION OF DONALD KOPCHAK

 7   BY MR. PIERCE:

 8   Q.   Detective Kopchak, you heard some questioning and

 9   some testimony about the Smith & Wesson.

10              To your knowledge, does the

11   Smith & Wesson -- do you know where it's manufactured?

12   A.   The Smith & Wesson is not manufactured in the State

13   of Ohio, and I confirmed that with Special Agent Briggs

14   from the ATF who is our nexus expert.  He examined the

15   firearm.

16   Q.   So as it compares to interstate commerce, since

17   it's not manufactured in Ohio, what does that mean?

18   A.   That it crossed state lines in order to make it to

19   Ohio.

20              And as far as ammunition goes, there is no

21   ammunition made in Ohio.

22   Q.   In general, meaning there is no ammunition

23   manufactured here in the State of Ohio at all?

24   A.   Correct.

25   Q.   So all the ammunition that was found, you mentioned
```

       1    .556, I think, .9 millimeter and --

       2    A.    .762 rounds.

       3    Q.    There you go.

       4              None of those were manufactured in the

11:05:52 5  State of Ohio?

       6    A.    Correct.

       7              MR. PIERCE:  Your Honor, that's all I have.

       8              THE COURT:  Attorney Fleming, any

       9    cross-examination based upon that limited redirect?

11:06:01 10             MR. FLEMING:  No cross, Your Honor.

      11              THE COURT:  All right.  Mr. Kopchak, you

      12    are now free to step down from the witness stand.

      13              (Witness excused).

      14              THE COURT:  Anything further for the Court

11:06:10 15 to consider, AUSA Pierce?

      16              MR. PIERCE:  No.

      17              THE COURT:  Okay.  Attorney Fleming,

      18    any -- you indicated you don't intend to call any

      19    witnesses on direct examination, but any proffer that you

11:06:21 20 would have for the Court to consider?

      21              MR. FLEMING:  Yes, Your Honor.

      22              First of all, I would proffer my four

      23    exhibits, Exhibits A through D.

      24              Exhibit A is a State suppression hearing

11:06:31 25 transcript.  I didn't -- the transcript is relatively

1  ancillary to this matter, so I didn't submit the

2  transcript of both hearings.

3  One hearing was the hearing where they

4  actually took testimony.  The other hearing, it was just

11:06:44  5  the Judge's finding on the suppression hearing.

6  And I thought that was significant because

7  some of the information in this affidavit was provided by

8  Officer Kopchak through -- I mean by Officer Yasenchack

9  through Officer Kopchak.

11:06:59 10  And in that case, the Judge specifically

11  suppressed evidence with regard to a prior case involving

12  Officer Kopchak and Mr. Ellis.  That was the 2019 case

13  that Mr. -- Officer Kopchak referred to, and the Court

14  specifically found that Officer Yasenchack was not

11:07:18 15  credible.

16  The Court suppressed all of the evidence.

17  That is the matter that went up to the Court of Appeals.

18  The next exhibit is Exhibit B, which is the

19  Court of Appeals' dismissal of that matter, and

11:07:32 20  apparently it was dismissed because the Government didn't

21  timely file their appeal.

22  And then, finally, Exhibit C is the State's

23  ultimate dismissal of that matter on the Government's

24  motion.

11:07:46 25  Exhibit D, and I guess this is something

1    Mr. Thompson will have to look into, Exhibit D is a

2    search warrant in this case, and specifically the issue

3    with regard to the search warrant is, in fact, the fact

4    that it says it's to be executed within three days.  It

11:08:00  5    doesn't say three business days.  Doesn't give any sort

6    of qualification as to when it's to be executed.  And

7    it's actually executed four days after it's issued.

8              Now, again, whether or not that becomes a

9    suppression issue, I guess time will tell.  I know this

11:08:16 10    is not a suppression hearing, and I understand that.  But

11    I thought that that's something that the Court should at

12    least consider.

13              We would also proffer --

14              THE COURT:  Attorney Fleming, before you

11:08:26 15    move on.

16              MR. FLEMING:  Sure.

17              THE COURT:  You -- you referenced the

18    particular section of the search warrant in the direct

19    examination -- sorry -- the cross-examination of Officer

11:08:37 20    Kopchak, but for the record can you identify the

21    particular paragraph --

22              MR. FLEMING:  Sure.

23              THE COURT:  -- and page number you were

24    referring to?

11:08:43 25              MR. FLEMING:  Yes, Your Honor.  It's Page 2

1    of the actual warrant, and that -- again that's Exhibit

2    D, and on that page it says -- it has the Judge signing

3    it, which is the date is May 14th, and it indicates

4    without qualification that it should be served or

5    executed within three days thereof.

6                And it does not say "three business days."

7    It does not say "excluding days off" or what have you

8    because I don't even know what that would mean because

9    there are officers that can execute it, so I just simply

10   thought that that, that the Court should take that into

11   consideration.

12               Now, Mr. Thompson at some point can look at

13   the case law and see whether or not that gives rise to a

14   motion to suppress, but -- and I know this is not a

15   suppression hearing, Your Honor, but it says what it

16   says.

17               And so I just thought that should be

18   brought to the Court's attention.

19               With regard to the rest of my proffer, Your

20   Honor, first of all, I would proffer that Mr. Ellis is a

21   lifelong resident of northern Ohio except for when he

22   went to college at the University of Louisville.  After

23   that, he went to the University of Akron, but other than

24   that, he has lived in the Northern District of Ohio all

25   of his life.

            1              So having been born in 1978, that would put

            2     us about 42 years.

            3              I would also proffer that he suffers from

            4     significant health issues.  He has a bullet at the base

11:10:21    5     of his spine.  He has sciatic nerve problems, I think

            6     indicative of sciatica, which as the Court, I'm sure,

            7     knows, deals with nerve problems emitting from the hip to

            8     the legs, and also the ulnar nerve, which emits, I

            9     believe, from the shoulder down through the arms to the

11:10:44   10     fingertips.

           11              He indicated to the Pretrial Services

           12     officer that he had those ailments, and the different

           13     therapies and pain medications that he has been

           14     prescribed for purposes of those ailments.

11:10:57   15              So we would proffer that information.

           16              We would also proffer that if he is

           17     released, he is still -- he is not the owner of that

           18     residence, but he can still reside at that residence.

           19              And to the extent that that might give the

11:11:13   20     Court pause, and this is more argument, but the

           21     rigorousness of Pretrial Service supervision can take

           22     care of any concerns with him living at that residence.

           23              And that's what we have by way of proffer.

           24     Anything else would be by way of argument, Your Honor.

11:11:36   25              And, Your Honor, I would just say one

1    correction with regard to the Pretrial Services report.

2              THE COURT:  Yes, go ahead, counsel.

3              MR. FLEMING:  Thank you, Your Honor.

4              THE COURT:  Actually, before I -- before I

11:11:50  5    do that --

6              MR. FLEMING:  Sure.

7              THE COURT:  -- I'm going to turn to the

8    Pretrial Services representative to find out if there are

9    any changes, corrections or modifications to the Pretrial

11:11:57 10   Services report that has been provided to the Court and

11   to counsel.

12              THE PROBATION OFFICER:  No, Judge, not at

13   this time.

14              THE COURT:  All right.  Thank you.

11:12:04 15             Attorney Fleming, go ahead.

16              MR. FLEMING:  Just one correction with

17   regard to the Pretrial Services report.

18              On Page 4, it talks about Mr. Ellis's

19   substance abuse, and it makes the statement at the end of

11:12:22 20   that, before the -- before the part entitled substance

21   abuse history, it says, "He did not provide further

22   information regarding his substance abuse at the advice

23   of counsel," and I just want to clarify that.

24              What I did not allow and advised him not to

11:12:41 25   answer was a question that asked whether he was getting

1    drugs illegally.

2            That I said I would not allow him to

3    answer.  I did not say that he would not answer questions

4    about simple use of drugs.

11:12:56    5            So I just wanted to clarify that.  And to

6    the extent that the Pretrial Services officer -- Pretrial

7    Services officer misunderstood what I was saying, I

8    apologize if she did.  But it was not that he could not

9    talk about substance abuse.

11:13:09 10            THE COURT:  All right.  Thank you for that

11    clarification, counsel.

12            MR. FLEMING:  Thank you.

13            THE COURT:  AUSA Pierce, before I receive

14    argument with respect to the matter of probable cause or,

11:13:40 15    Attorney Fleming, before I receive argument with respect

16    to the matter of probable cause, would either one of you

17    like to take a recess, or are you prepared to proceed?

18            MR. FLEMING:  Your Honor, on behalf of

19    Mr. Ellis, I'm prepared to proceed.  No problem.

11:13:53 20            THE COURT:  Okay.  Then go ahead, AUSA

21    Pierce.

22            MR. PIERCE:  Your Honor, I think probable

23    cause in this case is pretty straightforward.

24            You know, a search warrant was executed at

11:14:03 25    638 127th Street.  Mr. Ellis was found in the home.  He's

1   flushing items, namely Percocets and some drugs that are

2   in the house.

3          More importantly, in his bedroom, which I

4   think we've established through Officer Kopchak's

11:14:18  5   testimony that it was his bedroom, his wallet is found,

6   the clothes are found.  He's an extremely tall

7   individual, six-four, six-five.  The clothes are there.

8          We saw the photograph of an extremely large

9   coat which had what appeared to be Fentanyl inside of it,

11:14:34 10  but more importantly the only charge we're here dealing

11  with right now is the felon in possession.  It was found

12  within arm's reach, as Detective Kopchak stated.  The

13  photograph shows that.  It's right next to a bed.  Right

14  next to the nightstand.  And, of course, he's a felon who

11:14:48 15  is not supposed to be possessing said items.

16          That said, all of that, that it being in

17  his room, we've established, and that it's a firearm

18  within arm's reach of where he would be sleeping, he is

19  in possession of it.  And as a felon, he's not allowed to

11:15:04 20  do that in violation of federal law.

21          So straightforward, that's probable cause.

22  That's the only charge we're dealing with.  Of course, as

23  Your Honor pointed out, interstate commerce, we've

24  established that as well.

11:15:16 25         You know, these other arguments I think

1    Mr. Fleming has brought up and sort of articulated, I get

2    it.  However, those are suppression issues, and they are

3    not relevant for purposes here today.

4              The other thing I would point out in that

5    Exhibit C, I -- Mr. Fleming states in Exhibit B that the

6    appeal was dismissed on April 22nd, 2020.

7              Well, that date's important and I get that.

8    However, the case was not dismissed until May 13th, 2020.

9              That's important because that case, the

10   Government, while I can't say what Cuyahoga County did,

11   however, they failed to do whatever they failed to do and

12   the Court dismissed their appeal.  That case was still

13   technically open.  They still had the ability to appeal

14   that decision, and the case wasn't ultimately dismissed

15   until May 13th.

16             The May 13th date is important because, as

17   Detective Kopchak pointed out, the probable cause was

18   submitted to the office on May 12th which is, of course,

19   before May 13th, but also the PC that was generated, the

20   surveillance, et cetera, the confidential informant, the

21   first one, provided information in April of 2020.

22   Secondly, there was surveillance on May 11th of 2020

23   which, of course, again is before May 13th.

24             So that case is still pending.  So it's

25   still out there.  It still could have been appealed and

1    it still was a possibility for Mr. Ellis.  That said,

2    that probable cause was still generated while Mr. Ellis

3    was still -- has a case pending.

4                Now, ultimately, the warrant is signed and

11:16:46  5    sealed on May 14th afterwards, but it was submitted on

6    May 12th, so everything was established before that.

7                So ultimately, this whether or not the case

8    was appealed or dismissed, et cetera, it's all a red

9    herring, ultimately, as the PC was generated while

11:17:01 10    Mr. Ellis still had an active case and nothing inherently

11    wrong about this.

12                More importantly, the suppression hearing,

13    the three-day thing, we will deal with later.  There is

14    Ohio case law on it and it's not important for today's

11:17:15 15    purposes.

16                As to detention, I would argue he should be

17    detained, Your Honor.

18                Most importantly, if you go through his

19    criminal history, you'll see that, one, in the present

11:17:24 20    case we are dealing with, he's being charged as a felon

21    in possession of a firearm and there's narcotics found in

22    the house, or what we expect to be narcotics found in the

23    house.  That said, that in itself is inherently

24    dangerous.

11:17:37 25                More importantly, if you go through his

1    criminal history, there's a long series of capiases,

2    there's a long series of violations, and he has a violent

3    criminal history.

4              If you go through it, there's a kidnapping,

11:17:47  5    gross sexual imposition, drug trafficking, a felonious

6    assault.  His criminal history dates all the way back to

7    1996 when he was 18 and continues all the way up

8    basically until today, Your Honor.

9              There was a -- a good break in there a

11:18:04 10    little bit in 2007, but most -- to 2015, but most of that

11    time was spent incarcerated.

12              And here we are back today as a felon in

13    possession.

14              All told, Your Honor, if you go through all

11:18:16 15    the factors and you read his history of substance abuse,

16    his lack of a job, the pending charges, his criminal

17    history, all told, Your Honor, I don't think he's a good

18    fit for, you know, going home, despite the fact that he

19    has been a lifelong resident of the area.

11:18:34 20              I don't think he is a risk of flight.

21    However, I do think there is a danger.  He's a felon in

22    possession of a firearm, possession of narcotics.  All

23    told with his criminal history, Your Honor, I don't think

24    he's a good fit.

11:18:53 25              THE COURT:  Attorney Fleming.

1          MR. FLEMING:  Your Honor, as to the issue

2     of probable cause as it pertains to the gun and

3     ammunition, we leave that to the Court's determination as

4     to whether the Government has satisfied the Court that

11:19:02  5     there is probable cause as to that.

6              With regard to detention, Your Honor, we do

7     believe that there are conditions or combinations of

8     conditions that could ensure that he's not a risk of

9     flight and that he's not a danger to the community, and a

11:19:19 10     few things I take issue with what the Government said.

11              First, that he has this long history of

12     capiases throughout his criminal history.  Now, I

13     will -- I will acknowledge that his criminal history is

14     not flattering.  And never is it flattering to even have

11:19:36 15     criminal history, so we will concede that.

16              But he had a 2015 case.  No indication that

17     he ever had a problem coming to Court in that case.  He

18     had a 2007 to 2008 case.  No indication that he ever had

19     a problem in that case.

11:19:58 20              In 2008, he had -- he was indicted,

21     apparently according to that case, Judge, he was arrested

22     in 2006 but wasn't indicted until 2008, and you'll note

23     that the capias occurred not long after he was indicted.

24              That indicates to me that there was a

11:20:21 25     failure of service.  It's not like he had appeared in

1   court and, you know, was given dates like pretrial,

2   trial, and then didn't show up.  So I think the Court

3   should take that into consideration.

4            This just does not comport with the

5   Government's statement that he's got this long line of

6   capiases, long line of violations.

7            When you look at his -- he had another 2006

8   case and that was the rape, gross sexual imposition.  He

9   was not -- that case was ultimately dismissed.

10           But in that case there was an allegation of

11  a violation, but whatever those allegations were, the

12  Court did not deem it sufficient to revoke his bond.  So

13  that tends to indicate at least, Judge -- and we can't

14  second guess what the Judge was doing or why they were

15  doing it -- but it was not serious enough in the Judge's

16  opinion to warrant revocation of the bond.

17           He has a 2006 case, and I don't know if

18  those cases were related because they both have arrest

19  dates of 2006, so that should be noted.  In July 11th of

20  2006, I should say.

21           But in that case, Your Honor, the one

22  problem that it indicated that he had was that the case

23  proceeds to trial.  It says, "The Court orders

24  defendant's bond revoked and he is remanded due to the

25  failure to appear for trial," but what actually happened,

1    Your Honor, according to the defendant -- and I proffer
2    this -- is that he got there late and the Judge was
3    upset.  He was several minutes late, the Judge was ready
4    to go, and the Judge revoked his bond.
5              THE COURT:  And, Attorney Fleming, which
6    case are you referring to?
7              MR. FLEMING:  It's the first case with an
8    arrest date of 7/11/2006.
9              There are two cases that indicate an arrest
10   date of 7/11/2006.
11             THE COURT:  All right.  And that's Page 8
12   of the Pretrial Services report?
13             MR. FLEMING:  That's absolutely correct,
14   Your Honor.
15             THE COURT:  Okay.
16             MR. FLEMING:  You see where it says, "Jury
17   impaneled and sworn"?
18             THE COURT:  Yes.
19             MR. FLEMING:  And then it starts to talk
20   about bond revocation.
21             And I'm simply pointing out, Your Honor,
22   that the defendant indicates that he was late, which, to
23   be very honest, Your Honor, that makes sense because if
24   you look further down in the disposition of that case, he
25   was found guilty on -- this entry was October 24th.  He

1  was found guilty on October 29th.  So soon after he was

2  arrested, the trial went forward.  So that indicates the

3  defendant may be telling the truth about that.

4  Again the entry the page before, Your

11:22:58  5  Honor, Page 7 in the entry 9/19/2001, again we have a

6  situation where the failure to appear -- note that the

7  arrest date was September 19th, 2001, but the failure to

8  appear is in 2002.

9  Now, at that point about four months has

11:23:19  10  transpired and it's at the beginning of the case, which

11  tends to indicate that there was a failure of service yet

12  again.

13  There are no capiases in the middle or at

14  the end of that case.  So again, I'm not seeing here any

11:23:35  15  real pattern of capiases or failures to appear.

16  He does have a PV hearing in the next case

17  up, starts on Page 6.  He does get a sentence of six

18  months in jail.  I do not know what the nature of the

19  violation was.

11:23:52  20  I think it was for new conduct because it

21  happened in 2002, and 2002 is when he picks up this other

22  fleeing and eluding case, so that does appear to be a

23  concern, but I would note, Your Honor, that was 18 years

24  ago.  So Mr. Ellis was somewhere in the vicinity of 20

11:24:15  25  years old.

1          Next case up, 1999, again bench warrant,

2     but it's at the beginning of the case -- three months

3     after he was originally arrested -- tends to indicate a

4     failure in service.

11:24:29  5          And before that, on Page 5 we do have a

6     capias, but that was recalled.  So, you know, he didn't

7     receive any sentence as a result of the capias or his

8     bond wasn't revoked, so apparently that must have been

9     explained away.

11:24:51 10          And in 1996, the next case above, when he

11    was 18, he had a capias which was recalled.  He was not

12    sanctioned for that, so it must have been explained away.

13          So, Your Honor, again, I don't see a

14    history of failing to go to Court.  I don't see a history

11:25:06 15    there.  To the extent there are capiases, they appear to

16    have been resolved.  And while he does have the one

17    violation of probation, that was 18 years ago.

18          In his most recent cases, the case in 2015

19    which is on Page 11, no indication that he had any

11:25:32 20    problem going to Court.  He was ultimately sentenced.  No

21    indication that he violated probation.  I think that's a

22    better litmus test of whether or not now he is more

23    mature and whether he is going to comport with the terms

24    of bond.

11:25:49 25          Now, the other thing, Your Honor, the Court

1  always has a middle ground because the Court may -- I

2  could understand -- it's a gun case, he's got a prior

3  history, it's not flattering.  The Court may have some

4  pause about him simply being at home.

5  11:26:07       So what I suggest to the Court is that in

6  lieu of releasing him directly on bond, we all know that

7  there are -- there is apparently a drug problem because

8  we know from the U.S. Marshals that when he was arrested,

9  when he was taken into their custody, he was apparently

10 11:26:24 going through withdrawal.  That is a clear indication of

11 a drug problem or at least some form of addiction.

12       This Court can put him in inpatient

13 treatment, to the extent that it's available, and do that

14 for a term of 30 or 60 days.  And this Court can use that

15 11:26:43 as the determiner in terms of whether or not he should be

16 continued on bond because obviously the Court would have

17 to do that on bond, but put him in inpatient treatment,

18 get him the treatment he needs.  He knows he needs

19 treatment.  And if he does well during that period of

20 11:27:01 time, that would inform the Court's judgment as to

21 whether he should be released or kept in jail.

22       If he has problems, if he tests positive

23 for drugs that he's not supposed to have, if he leaves

24 and he's not supposed to, then obviously that would

25 11:27:16 inform the Court's judgment, too.  And Mr. Ellis is

1    well-aware of what's going to happen if any of those

2    things happen:  He's going to jail.

3                    The only thing I would ask, Your Honor, is

4    the Court, in giving him inpatient treatment, if the

11:27:31  5    Court decides to do that, that the Court -- that he be

6    made available for his other medical treatments because

7    the nerve problems, sounds like they are serious.  He

8    gets nerve blocks every so often for the pain.  He was

9    being given pain medication.

11:27:46 10                    He had a car accident not too long ago that

11    just exacerbated the problems he already had, and I

12    believe created more problems with his back.  So he

13    appears to be in a lot of pain, quite a bit, and so I'd

14    ask the Court, to the extent that the Court does either

11:28:03 15    release him on bond with conditions or put him in some

16    form of inpatient treatment, that medical treatment be

17    made available to him so he can get the other treatment

18    that he needs.

19                    And that's what we have, Your Honor.

11:28:16 20                    THE COURT:  Thank you, counsel.

21                    Counsel and Mr. Ellis, the initial purpose

22    of today's proceeding was to conduct a preliminary

23    hearing and determine whether probable cause in fact

24    exists to support the charges alleged against Mr. Ellis.

11:30:23 25                    Having considered the testimony of Task

1    Force Officer Kopchak, the Court has considered not only

2    the direct but the cross-examination of the witness, and

3    makes the initial finding that the testimony is credible.

4                Having made the initial finding that the

11:30:59  5    testimony provided is credible, the Court's further

6    considered the information proffered by counsel for the

7    defense as well as counsel for the United States with

8    respect to the matter of probable cause.

9                The Court will also note that a number of

11:31:21 10    the issues that defense raised, as the defense pointed

11    out, would be issues that may be germane to a motion to

12    suppress, but are not determinative to whether, in fact,

13    probable cause exists to support the allegations alleged

14    against Mr. Ellis.

11:31:46 15                Based upon the -- all the information

16    before me, it's this Court's finding that there is

17    sufficient evidence to establish probable cause to

18    believe that a crime was as alleged in the criminal

19    complaint, that being a felon in possession of a firearm,

11:32:22 20    and the Court further finds that the evidence establishes

21    probable cause that the defendant committed the alleged

22    offense.

23                Having made that initial determination,

24    it's this Court's finding that the matter is bound over

11:32:45 25    to the grand jury for further proceedings.

1        At this time, the Court further finds that
2    pursuant to the amended general order 2020-05, 2020-05-2
3    and the most recent general order 2020-08 issued by the
4    Chief Judge for the Northern District of Ohio, the Court
11:33:10  5    finds that the speedy trial clock under 18, U.S.C.,
6    Section 3161(b) is extended to 30 days after the grand
7    jury is ordered to reconvene its normal operations.
8        And such time is excluded for Speedy Trial
9    Act purposes as provided by 18, U.S.C., Section 3161(b)
11:33:29 10    and 18, U.S.C., Section 3164 pursuant to the Court's ends
11    of justice determination under 18, U.S.C., Section
12    3161(h)(7)(A), (h)(7)(B)(i) and (h)(7)(B)(iii).
13        The Court further finds that the ends of
14    justice served by a continuance outweigh the best
11:33:49 15    interests of the public and defendant in the speedy
16    presentation of the case to the grand jury because
17    failure to grant such a continuance would deny counsel
18    for both sides the reasonable time necessary for
19    effective preparation taking into account the exercise of
11:34:02 20    due diligence.
21        Now, with respect to the Government's oral
22    motion for pretrial detention, there is no statutory
23    presumption in favor of detention in this case based upon
24    the charges alleged against Mr. Ellis.
11:34:29 25        Therefore, the Court considers the evidence

1    proffered as well as the testimony of Officer Kopchak and

2    the arguments of counsel.

3                    Based upon the Court's consideration of the

4    provisions of the Bail Reform Act and pertinent statutory

11:34:56    5    factors provided for the Court's consideration, the Court

6    notes that the Government has not moved for pretrial

7    detention based upon a theory that the defendant poses a

8    flight risk, but the Government has asserted that the

9    defendant poses a danger to the community.

11:35:15    10                    As noted, the Court has considered the

11    Pretrial Services report as well as its recommendation.

12                    I'll note for the record that the

13    Court -- the Pretrial Services recommendation to the

14    Court is that there are no conditions or combinations of

11:35:42    15    conditions that would reasonably assure the appearance of

16    the defendant as required and the safety of the

17    community.  Therefore, it's the Pretrial Services'

18    recommendation to the Court that the Court consider

19    further detaining the defendant.

11:36:32    20                    Counsel and Mr. Ellis, at this time the

21    Court's going to take the matter for pretrial detention

22    under advisement and, if necessary, counsel and

23    Mr. Ellis, the Court will schedule a further hearing on

24    the matter of pretrial detention should I deem it

11:36:51    25    necessary to have a further hearing, or the Court may

1    issue a written decision memorializing my determination

2    on the Government's motion for pretrial detention.

3              At this time, however, the Court is going

4    to take the matter under advisement, and to be clear, the

11:37:11  5    previous order of pretrial detention of Mr. Ellis shall

6    remain in effect until this Court renders further

7    determination with respect to the Government's motion for

8    pretrial detention.

9              AUSA Pierce, is there anything further for

11:37:29 10    the Court to consider at this time?

11             MR. PIERCE:  Your Honor, the only thing I

12   would note -- and I actually just forwarded this to

13   Mr. Fleming; it should be in his inbox -- is that Ohio

14   Rule of Criminal Procedure 45(a) talks about tolling and

11:37:44 15   timing of when a search warrant can be executed, and it

16   specifically states that "Weekends, when the time is

17   given that it's less than a week, i.e. three days, that

18   weekends are specifically not included, meaning the

19   weekend days do not count for that tolling."

11:38:04 20             I just wanted to point that out.

21             I just forwarded it to Mr. Fleming.

22             THE COURT:  Attorney Fleming, anything

23   further for the Court to consider at this time?

24             MR. FLEMING:  Nothing further on behalf of

11:38:14 25   the defense, Your Honor.

1          THE COURT:  All right.  Then at this time

2     the Court's going to adjourn this hearing and, as noted,

3     take the matter under advisement.

4          MR. FLEMING:  Thank you, Your Honor.

11:38:27  5          THE COURT:  Thank you, everyone.

6          MR. FLEMING:  Take care.

7          (Proceedings concluded at 11:38 a.m.)

8                    -  -  -  -

9                C E R T I F I C A T E

10          I certify that the foregoing is a correct

11     transcript from the record of proceedings in the

12     above-entitled matter.

13

14

15

16     **/s/Susan Trischan**

17     /S/ Susan Trischan, Official Court Reporter

18     Certified Realtime Reporter

19

20     7-189 U.S. Court House

21     801 West Superior Avenue

22     Cleveland, Ohio 44113

23     (216) 357-7087

24

25

1                         **I N D E X**

2

3     <u>**WITNESSES:**</u>                                    <u>**PAGE**</u>

4     DIRECT EXAMINATION OF DONALD KOPCHAK              10

5     BY MR. PIERCE

6     CROSS-EXAMINATION OF DONALD KOPCHAK               27

7     BY MR. FLEMING

8     REDIRECT EXAMINATION OF DONALD KOPCHAK            46

9     BY MR. PIERCE

10

11                         *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25